**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TEDOR DAVIDO,** | : | **CIVIL ACTION** |
| | : | |
| *Petitioner,* | : | |
| | : | |
| v. | : | **No. 06-cv-0917** |
| | : | |
| **JEFFERY BEARD, <u>ET</u> <u>AL.</u>,** | : | |
| | : | |
| *Respondents.* | : | |
| | : | |

## <u>MEMORANDUM OPINION</u>

Goldberg, J.                                                                      July 20, 2021

On December 12, 2001, Petitioner, Tedor Davido, was convicted of one count of first-degree murder and one count of rape for the killing of his girlfriend, Angelina Taylor. Petitioner was subsequently sentenced to death, and thereafter, the Pennsylvania Supreme Court affirmed his conviction and sentence.

Petitioner has filed a petition for the issuance of a writ of habeas corpus pursuant to 28 U.S.C. § 2254, seeking relief from his convictions and death sentence. He brings fifteen claims, challenging the constitutionality of both his trial and sentencing hearings. For the reasons set forth below, and after careful consideration of his petition, I conclude that Petitioner's claims are procedurally defaulted and/or without merit.

**Table of Contents**

I.  BACKGROUND AND PROCEDURAL HISTORY $\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots$ 4

II.  EXHAUSTION, DEFAULT AND STANDARD OF REVIEW $\cdots\cdots\cdots\cdots\cdots\cdots\cdots$ 7

    A.  Exhaustion of State Remedies; Procedural Default $\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots$ 7

    B.  Standard for the Issuance of the Writ $\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots$ 8

III.  DISCUSSION $\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots$ 9

    A.  Claim I.A.:  Petitioner's Challenge to Dr. Ross's Trial Testimony as "False, Unreliable and Misleading" and Counsel's Alleged Ineffectiveness Relating to Dr. Ross. $\cdots\cdots\cdots\cdots$ 9

    B.  Claim I.B.:  Petitioner's Challenge to Counsel's Ineffectiveness Relating to the Violation of Pennsylvania Discovery Rules $\cdots\cdots\cdots\cdots\cdots\cdots\cdots$ $\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots$ 20

    C.  Claim I.C.:  Petitioner's Challenge to Counsel's Stewardship Relating to the Rebuttal and Impeachment of Dr. Ross as to the Cause of Death $\cdots\cdots$ $\cdots$ $\cdots\cdots\cdots\cdots\cdots\cdots$ 23

    D.  Claim I.D.:  Petitioner's Challenge to Counsel's Stewardship Relating to the Rebuttal and Impeachment of Dr. Ross as to Rape $\cdots\cdots\cdots\cdots\cdots\cdots\cdots$ $\cdots\cdots\cdots\cdots\cdots\cdots$ 38

    E.  Claim II:  Petitioner's Challenge to Counsel's Ineffectiveness for Failing to Present a Heat of Passion Defense $\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots$ $\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots$ 42

    F.  Claim III:  Petitioner's Challenge to Ms. McGarrity's Trial Testimony as "False, Unreliable and Misleading" and Counsel's Ineffectiveness Relating Thereto $\cdots\cdots\cdots$ 56

    G.  Claim IV:  Petitioner's Challenge to Counsel's Ineffectiveness for Failing to Object to Unlawfully-Obtained Evidence $\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots$ $\cdots\cdots\cdots\cdots\cdots\cdots$ 63

    H.  Claim V:  Petitioner's Challenge to Counsel's Ineffectiveness Relating to the Inmate Witnesses $\cdots\cdots\cdots\cdots\cdots$ $\cdots\cdots\cdots$ $\cdots\cdots$ $\cdots\cdots\cdots\cdots$ $\cdots\cdots\cdots\cdots$ $\cdots\cdots\cdots$ $\cdots\cdots\cdots$ 70

    I.  Claim VI:  Petitioner's Challenge to the Trial Court's Denial of His Request to Proceed *Pro Se* During the Guilt Phase $\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots$ 75

    J.  Claim VII:  Petitioner's Challenge to the Trial Court's Grant of His Request to Proceed *Pro Se* During the Penalty Phase $\cdots\cdots\cdots$ $\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots$ 82

    K.  Claim VIII:  Petitioner's Challenge to Counsel's Ineffectiveness Relating to the Investigation and Presentation of Mitigating Evidence $\cdots\cdots$ $\cdots\cdots\cdots\cdots\cdots\cdots\cdots\cdots$ 104

L.   Claim IX:  Petitioner's Challenge Relating to the Trial Court's Failure to Instruct the Jury   105
     Pursuant to *Simmons v. South Carolina* · · · · · · · · · · · · ·   · · · · · · · · · · · · · · · · · · · · · ·

M.   Claim X:  Petitioner's Challenge Relating to Cumulative Error · · · · · · · · · · · · · · ·   · ·   118

N.   Claim XI:  Petitioner's Challenge Relating to Evidence of Decedent's Medication  · · · ·   120

IV.   CONCLUSION · · · · · · · · · · · · · · · · · · · · · · · ·   · · · · · · · · · · · · · · · · · · · · · · · · · · · ·   120

## I.    BACKGROUND AND PROCEDURAL HISTORY

On December 12, 2001, a Lancaster County jury sitting before the Honorable Joseph C.

Madenspacher convicted Petitioner of first-degree murder and rape.  (N.T. 12/12/01 at 993-94.)

These convictions arose out of Petitioner's physical altercation with his girlfriend, Angelina

Taylor, resulting in her death.  As summarized by the Pennsylvania Supreme Court:

> During the early morning hours of May 14, 2001, [Petitioner] and Angie Taylor
> were involved in a fight.  That fight became physical. Appellant's sister placed a 9-
> 1-1 call on the morning of the fight.  In that call, Appellant's sister requested that
> the police come to 26 Hager Street where "a guy was beating up a girl."  When the
> police arrived at 26 Hager Street, no one answered the door.  [Petitioner] testified
> that he got scared and exited the house via the roof when he heard the police.  He
> then went to Michele Gray's house.  Michele Gray testified that [Petitioner] told
> her he was arguing with Angie, that he beat Angie up, and that Angie was breathing
> funny and not moving at the time he left the house.
>
> The police testified that they entered the house through a window and found Taylor
> on the third floor.  Taylor was unconscious and almost nude when the police found
> her.  Medics transported Taylor to Lancaster General Hospital.  The treating
> physician testified that he treated her for brain swelling, which ultimately squeezed
> her brain stem, shutting off her vital functions.  Angie Taylor died in the afternoon
> of May 14, 2001.
>
> Testimony offered at trial established that [Petitioner] told others that he beat
> Taylor on the morning in question and then had sex with her when she wouldn't
> respond to him.  Expert testimony established that the cause of death was repeated
> blows to the head, which caused Taylor's brain to swell and occluded the brain
> stem, eventually causing her death.

Commonwealth v. Davido ("Davido I"), 868 A.2d 431, 435-36 (Pa. 2005).

When the penalty phase of trial commenced later that day, Petitioner stated that he intended

to proceed *pro se*, waiving both his right to counsel and his right to present evidence during the

penalty phase.  Following the penalty phase, the jury found one aggravating circumstance (killing

while in the perpetration of a felony) and no mitigating circumstances and determined that

Petitioner should be sentenced to death.  (Id. at 1051-54.)

On January 3, 2002, Judge Madenspacher formally imposed the sentence of death, and a consecutive sentence of 10 to 20 years of imprisonment for the rape conviction. Davido I, 868 A.2d at 435.

Petitioner filed a direct appeal to the Pennsylvania Supreme Court, challenging his convictions and sentence. On February 25, 2005, the Pennsylvania Supreme Court affirmed the judgment of sentence, Davido I, 868 A.2d 431, and on April 15, 2005, denied Petitioner's application for reargument. Commonwealth v. Davido, 872 A.2d 1125 (Pa. 2005). On November 14, 2005, the United States Supreme Court denied Petitioner's writ of certiorari. (Commonwealth's Exhibit K, ECF No. 131-12.)

On May 26, 2006, Petitioner filed a *pro se* petition pursuant to the Post-Conviction Relief Act, 42 Pa. C.S. §§ 9541, *et seq.* ("PCRA"). Current counsel of record was appointed to represent Petitioner and filed an amended PCRA petition. (Commonwealth's Exhibit M at 3, ECF No. 131-14.)[1] Between June 22 and 26 of 2009, the PCRA Court held an evidentiary hearing where prior counsel and several medical experts testified. On August 30, 2011, the PCRA Court denied Petitioner's petition. (Commonwealth's Exhibit M at 157, ECF No. 131-14.) On December 15, 2014, the Pennsylvania Supreme Court affirmed the denial of PCRA relief. Commonwealth v. Davido ("Davido II"), 106 A.3d 611 (Pa. 2014).

On May 20, 2015, Petitioner filed a Petition for Writ of Habeas Corpus. (Pet. for Writ of Habeas Corpus, ECF No. 33.) On May 5, 2016, Petitioner filed a second Motion for Discovery,

---

[1] Petitioner filed a motion for appointment of counsel and stay of execution in this Court on March 1, 2006. On March 10, 2006, the Honorable James T. Giles granted the motion and granted Petitioner 120 days to file a petition for writ of habeas corpus. On June 30, 2006, Petitioner filed a Motion for Discovery, which was granted. On November 21, 2008, the matter was reassigned to my docket. Because Petitioner's PCRA petition was pending in state court at that time, this matter was placed in civil suspense.

as well as follow up pleadings relating to discovery.  Each of these requests were granted.  On May 31, 2017, Petitioner filed a Motion for an Evidentiary Hearing.  (ECF No. 86).  Given the importance of the rights at issue here, I granted that request on January 9, 2018.  (ECF No. 104).

On May 7, 2018, I presided over an evidentiary hearing, which concerned brain flow studies and CT scans that had not been produced to Petitioner but were allegedly relied upon by forensic pathologist Dr. Wayne Ross in his postmortem report.  In the discovery motion, Petitioner argued that during the PCRA proceedings he was unable to prepare rebuttal testimony in advance because Dr. Ross's opinion had not been disclosed.  He, therefore, requested permission to present rebuttal testimony and reports from forensic pathologist Dr. Charles Wetli, and neuroradiologists Dr. Elias Melhem, and Dr. Sundeep Mangla.  I granted Petitioner's Motion as to Dr. Wetli and Dr. Mangla, finding that a hearing was permissible under § 2254(e)(2) because a hearing could enable Petitioner "to prove the petition's factual allegations, which, if true, would entitle [Petitioner] to habeas relief."  Schriro v. Landrigan, 550 U.S. 465, 474 (2007).  Further, I found that Petitioner was entitled, at a minimum, to present rebuttal testimony.  Hickman v. Taylor, 329 U.S. 495, 507 (1947).

On August 30, 2018, Petitioner filed a memorandum of law, reframing his claims, merging some and reorganizing others, but essentially setting forth the same arguments as had been set forth in his Habeas Petition.  The only substantial difference between the two pleadings was the withdrawal of Petitioner's stand-alone claim which asserted that the PCRA Court's decision not to allow an expanded evidentiary hearing was error, which was essentially resolved by my grant of an evidentiary hearing.  Since the memorandum of law provides a more complete legal analysis, I will address each claim as numbered in Petitioner's memorandum of law, and will note parenthetically where the claims are presented in the original habeas petition.

6

## II.        EXHAUSTION, DEFAULT AND STANDARD OF REVIEW

### A.  Exhaustion of State Remedies; Procedural Default

A prerequisite to the issuance of a writ of habeas corpus on behalf of a person in state custody pursuant to a state court judgment is that the petitioner must have "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A).  In order to satisfy this requirement, a petitioner must have fairly presented the merits of his federal claims during "one complete round of the established appellate review process." Lambert v. Blackwell, 387 F.3d 210, 233-34 (3d Cir. 2004).  A claim is not fairly presented if the state court "must read beyond a petition or brief." Baldwin v. Reese, 541 U.S. 27, 32 (2004).  The habeas Petitioner bears the burden of proving exhaustion of all state remedies. Boyd v. Waymart, 579 F.3d 330, 367 (3d Cir. 2009) (quoting Lambert, 134 F.3d at 513).

Where a claim was presented to the state court, but where the state court concluded that review was barred due to noncompliance with state procedural rules, the doctrine of procedural default generally bars federal habeas corpus review. Coleman v. Thompson, 501 U.S. 722, 729-32 (1991); Sistrunk v. Vaughn, 96 F.3d 666, 674-75 (3d Cir. 1996).  Relatedly, where a Petitioner has failed to present his claim in state court and he would now be barred from doing so under state procedural rules, the claim is procedurally defaulted. McCandless v. Vaughn, 172 F.3d 255, 261 (3d Cir. 1999).  A procedurally defaulted claim cannot provide a basis for federal habeas relief unless the petitioner (a) shows "cause for the default and actual prejudice as a result of the alleged violation of federal law," or (b) "demonstrates that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750.

**B. Standard for the Issuance of the Writ**

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), federal courts reviewing a state prisoner's application for a writ of habeas corpus may not grant relief "with respect to any claim that was adjudicated on the merits in State court proceedings" unless the claim (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). This is a "difficult to meet" and "highly deferential standard" for evaluating state-court rulings, which "demands that state-court decisions be given the benefit of the doubt." Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (internal quotation marks and citation omitted).

A decision is "contrary to" federal law if "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). A decision is an "unreasonable application" of federal law if the state court identified the correct governing legal rule but applied the rule to the facts of the case in an objectively unreasonable manner. Renico v. Lett, 559 U.S. 766, 773 (2010). A decision is based on an "unreasonable determination of the facts" if the state court's factual findings are objectively unreasonable in light of the evidence presented to the state court. Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

A court's review of a state prisoner's habeas corpus petition follows a "prescribed path." Eley v. Erickson, 712 F.2d 837, 846 (3d Cir. 2013). First, it must determine what arguments or

theories supported or could have supported the state court's decision.  Id.  Second, the court must ask "whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court."  Id. (internal quotation marks omitted).  Finally, habeas relief may be granted "only if the petitioner demonstrates that the state court decision 'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'"  Id. at 846-47 (alterations omitted) (quoting Harrington v. Richter, 562 U.S. 86 (2011)).

## III.   DISCUSSION

### A.   Claim I.A.:  Petitioner's Challenge to Dr. Ross's Trial Testimony as "False, Unreliable and Misleading" and Counsel's Alleged Ineffectiveness Relating to Dr. Ross[2]

In his memorandum of law, Petitioner argues that "[t]he Prosecution Presented False, Unreliable and Misleading Expert Testimony at Trial, in Violation of Due Process, and Trial Counsel Ineffectively Failed to Object to Dr. Ross's Testimony on the Ground it Was Misleading and Inadmissible."  (Petitioner's Mem. of Law at 5, ECF No. 123.)  Before addressing the merits of this claim, I must determine if Petitioner has demonstrated that he exhausted his state court remedies, or if there are any procedural restrictions upon my review of his claim.  Additionally, I must determine whether the standard of review set forth in 28 U.S.C. § 2254(d) applies.

### (1)   Exhaustion, Procedural Default, and the Standard of Review

Though captioned as one claim, Petitioner clarified in his memorandum of law that he is asserting two distinct legal theories regarding Dr. Ross: (a) an allegation of due process error, and (b) an allegation of ineffective assistance of counsel.  Petitioner argues that both of these legal

---

[2]  Included as Claims I and III.A. in the original habeas petition and merged into one claim as Claim I(A) in Petitioner's Memorandum of Law.

theories were fairly presented to the state court during his collateral appeal.  The Commonwealth disagrees, explaining that the claim is exhausted in part, but that the portion raising a stand-alone due process challenge is procedurally defaulted and unreviewable.  For the following reasons, I agree that the stand-alone due process claim is procedurally defaulted.

"[F]or purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts that entitle the petitioner to relief."  Gray v. Netherland, 518 U.S. 152, 162-63 (1996).  The claim presented to the Pennsylvania Supreme Court was captioned similarly to the claim presented here. But in state court, Petitioner specifically indicated that he was presenting *only* a substantive allegation of ineffectiveness and not a stand-alone claim of due process error.  This was the very opposite of the presentation here, where Petitioner has clarified that he intends to present two distinct legal theories.

On appeal to the Pennsylvania Supreme Court, Petitioner successfully argued that the PCRA Court had committed an error when it determined that his claim was previously litigated.[3] Petitioner stated that the claim was reviewable because he was "alleg[ing] ineffective assistance of counsel… and [relying] on evidence not previously presented."  (Commonwealth's Exhibit M at 35, ECF No. 131-14).[4]  In making this argument, Petitioner clearly advised the state court that

---

[3]   The PCRA requires that a prisoner demonstrate that his "allegation of error has not been previously litigated or waived."  42 Pa. Cons. Stat. § 9543(3).  A claim is previously litigated if "the highest appellate court in which the petitioner could have review as a matter of right has ruled on the merits of the issue."  42 Pa. Cons. Stat. § 9544(a)(2).  An issue is waived "if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state postconviction proceeding."  42 Pa. Cons. Stat. §9544(b).

[4]   This was not a statement of two separate reasons that his claim was not previously litigated. As is clear from the cases relied upon by petitioner, both of these things had to be true for a claim not to dismissed as previously litigated.  He provided the following string cite: "Commonwealth v. Miller, 746 A.2d 592, 602 n.9 (2000) (when PCRA 'claim does not rest

he was not presenting a stand-alone due process claim. That clear statement was relied upon by the state court when it determined that his claim was reviewable and not previously litigated. Therefore, the stand-alone due process claim that Petitioner is attempting to present is procedurally defaulted.

Petitioner tries to avoid this outcome by arguing that the Pennsylvania Supreme Court was required to indicate that it was not reviewing his stand-alone due process claim because it was barred by a state rule of procedure. (Petitioner's Mem. of Law at 19, ECF No. 123.) This misses the point. The plain statement rule in Harris v. Reed, 489 U.S. 255, 263 (1989) requires only that a state court clearly indicate that it is relying on a state rule of procedure to dismiss a claim that was presented to it. But Petitioner's claim is not procedurally defaulted because it was barred by an independent and adequate state procedural rule. Rather, it is barred because the stand-alone due process claim was not presented at all. See Nara v. Frank, 488 F.3d 188, 198-99 (3d Cir. 2007) (holding that a federal claim is fairly presented to the state courts where the petitioner has raised "the same factual and legal basis for the claim to the state courts").[5] Having presented this issue

---

solely upon the previously litigated evidence, we will reach the merits of appellant's claim'); [Commonwealth v. Collins, 888 A.2d 602 n. l0 (Pa. 2005)] (same); Commonwealth v. Williams, 828 A.2d 981, 984 n.6 (Pa. 2003) (claim that direct appeal counsel's litigation of issue was ineffective would not be deemed previously litigated, if proffered evidence contains facts that 'go beyond those which were presented on direct appeal')".

[5] Petitioner has not argued that he presented his due process claim on direct review. I observe that Petitioner's direct appeal brief did raise a challenge that discusses similar arguments as were presented here, but the presentation varied significantly from what I have before me today. Specifically, as the Pennsylvania Supreme Court observed, the factual basis for the underlying claim varied between direct appeal and the collateral appeal. Davido II, 106 A.3d at 627. Indeed, Petitioner himself agrees that the factual bases were significantly different when he argues that his claim was not previously litigated. As has already been discussed, the failure to present a sufficiently similar factual basis to the state court will result in a procedural default. Gray v. Netherland, 518 U.S. 152, 162–63 (1996).

as an ineffectiveness claim during the PCRA proceedings, Petitioner cannot now pursue a stand-alone due process claim before this court.[6]

Ultimately, however, the impact of this procedural ruling is limited.  Petitioner's challenge to counsel's ineffectiveness in relation to this claim was presented and is reviewed here.  Furthermore, the Pennsylvania Supreme Court concluded that counsel was not ineffective because the stand-alone due process claim was without merit.  The state court "identified the correct governing legal principle" and then applied it, "which constitutes an adjudication on the merits sufficient for purposes of the statute."  Albrecht v. Horn, 485 F.3d 103, 116 (3d Cir. 2007).  The fact that the state court's decision on the merits of this due process claim was reached in the context of the state court's adjudication of the "reasonable basis" prong of the Strickland v. Washington, 466 U.S. 668 (1984), analysis does not make it any less worthy of AEDPA deference.  Id.; see also Priester v. Vaughn, 382 F.3d 394, 398 (3d Cir. 2004).  The state court's adjudication of Petitioner's claim is entitled to deference under the AEDPA whether I am reviewing the claim as a due process challenge or as a claim of counsel ineffectiveness.

There is one final procedural issue that must be resolved before I can turn to the merits of Petitioner's claim.  AEDPA requires that I evaluate the reasonableness of the state court's decision in light of the record presented to it, as opposed to a record that was supplemented in federal court.  Cullen v. Pinholster, 563 U.S. 170, 181-82 (2011).  As I discussed supra, I granted a federal evidentiary hearing to allow Petitioner the opportunity to present additional rebuttal evidence,

---

[6] A procedurally defaulted claim may be reviewed in federal court if the petitioner can demonstrate cause and prejudice or a miscarriage of justice.  Petitioner has made no such showing, nor have I identified any basis to excuse the procedural default.

12

which he argued was necessary to support his claim.  Under <u>Pinholster</u>, my ability to use this additional evidence to evaluate the reasonableness of the state court's decision is limited.

However, on the record before me, I find that the restriction has no real impact.  To the extent there was new information in the testimony presented at the most recent hearing, that evidence does not change my assessment of Petitioner's factual averments.  Looking at all of the medical evidence, and for the reasons set forth in more detail below, I conclude that Petitioner has not demonstrated that Dr. Ross's testimony was "false, unreliable or misleading."  As a result, I decline to engage in a more finely tuned procedural analysis on Petitioner's exhaustion of the statement of facts that entitled him to relief since the claim fails either way.  <u>See</u> 28 U.S.C. § 2254(b)(2).

Exhaustion, default and the proper standard of review now clear, I turn to Petitioner's claim.

### (2)    Relevant Facts

To address Petitioner's claim that Dr. Ross's medical testimony was "false, unreliable and misleading," I start with a brief account of the medical testimony about cause of death.  The medical details surrounding Ms. Taylor's death were hotly contested at the trial, during PCRA hearings and during the federal evidentiary hearing.

Dr. Ross conducted Ms. Taylor's autopsy and opined that the cause of death was "multiple traumatic injuries" and that the manner of death was "homicide."  (N.T. 12/7/01 at 438.) Specifically, Dr. Ross observed forty "different trauma patterns to the body," including eleven "distinct areas of bruising to the front, to the side, to the top, and to the back of the scalp," as well as bruising to the lip, nose, chin, tongue, and eyes.  (<u>Id.</u> at 440-41.)  Dr. Ross also observed ligature marks from strangulation, abrasions, and fingernail marks on the victim's neck.  (<u>Id.</u> at 44-42.)  He

observed "bleeding and swelling, what I refer to as shearing injury, going directly to the center of the brain . . . from massive repeated impacts going to the center of the brain and actually implies a tremendous amount of force being used to the area, in excess of hundreds of G's of force." (Id. at 451-52.)

At trial, the defense presented pathologist Dr. John Shane to challenge Dr. Ross's conclusion that the victim suffered repeated trauma. (N.T. 12/11/01 at 818-35.) He opined that the bruising on Ms. Taylor's body varied in age, and that the strangulation injuries were not significant and did not cause unconsciousness. (Id. at 847-55.) Specifically, Dr. Shane opined that Ms. Taylor died from bleeding in the subarachnoid space of the brain, but that the injuries were not consistent with repeated striking to the skull, particularly because of the distribution of the subarachnoid blood and the nonexistence of contusion. (Id. at 841-47.)

On PCRA appeal and in this Court, Petitioner's attorneys have attempted a different strategy. Through the testimony of new medical experts, they argue that the victim died, not due to repeated trauma, but rather as the result of an aneurysm. They further argue that this should have been apparent to the Drs. Ross and Shane.

(3)     **Discussion of Merits**

Petitioner argues that: (a) counsel was ineffective for failing to obtain the exclusion of Dr. Ross's testimony on the ground that its admission violated the due process clause; (b) counsel was ineffective for failing to seek the exclusion of Dr. Ross's testimony on the ground that it was inadmissible under state or federal law; and (c) counsel's decision not to pursue these issues was

flawed because he had nothing to lose by pursuing them.  I agree with the state court's conclusion that these arguments are meritless.[7]

As the Pennsylvania Supreme Court explained on PCRA appeal:

> On this record, [Petitioner] has not demonstrated that counsel was ineffective for failing to further challenge Dr. Ross's testimony as false, misleading and unreliable. **[Petitioner] produced experts on collateral attack who disagreed with Dr. Ross's opinions, but that does not prove that Dr. Ross's different view was false or unreliable.**  Moreover, put to the challenge on collateral attack, Dr. Ross made clear that he did not haphazardly rule out a ruptured aneurysm as the cause of the subarachnoid hemorrhage he observed.  To the contrary, he testified that he considered the relevant medical factors in ruling out, to a reasonable degree of medical certainty, a ruptured aneurysm as the cause of death.  The determination was based on a number of observable factors, including bleeding and swelling throughout the brain, numerous contusions to the head, and an intact Circle of Willis.

Davido II, 106 A.3d at 628-29 (emphasis added).

On direct appeal, the Pennsylvania Supreme Court reviewed and rejected a similar argument that Dr. Ross's opinions were not based on a reasonable degree of scientific certainty and were not based on his first-hand observations.  Davido I, 868 A.2d at 441-42.  In explaining Dr. Ross's testimony relating to the "hundreds of G's of force," "shearing injury," and "twisters," the Supreme Court concluded that:

> The reference to the number of "g forces" was merely a descriptive term used to describe the fact that the victim was hit with force; it was not a linchpin as to the cause of death.  The substance of his testimony established the cause of death with a reasonable degree of medical certainty.  Accordingly, Dr. Ross's testimony was not speculative and the trial court did not abuse its discretion in admitting it at trial.

Id. at 442.  Further, the Supreme Court rejected Petitioner's argument that Dr. Ross's conclusions were in conflict with "the 'incontrovertible physical evidence' as established by Dr. Shane's

---

[7]  I further conclude that Petitioner's procedurally defaulted stand-alone due process claim is also meritless for the same reasons discussed herein.

testimony." Id. at 442 n.18.

### *(a)      Ineffectiveness for Failing to Pursue the Due Process Challenge*

Petitioner argues that counsel was deficient for failing to argue that Dr. Ross's "false, inaccurate, or misleading testimony" deprived him of a fair trial under Napue v. Illinois, 360 U.S. 264 (1959).  (Petitioner's Mem. of Law at 31, ECF No. 123.)  "The Supreme Court has long held that the state's knowing use of perjured testimony to obtain a conviction violates the Fourteenth Amendment."  Lambert, 387 F.3d at 242 (citing Napue, 360 U.S. at 269).  Petitioner's repetition of the phrase "false, inaccurate or misleading testimony" throughout his brief seems to imply that Napue required something less than a showing of perjury to establish a due process violation.  But Napue is far more particular with its requirements.  As the Third Circuit has explained, "in order to make out a constitutional violation [Petitioner] must show that (1) [the witness] committed perjury; (2) the government knew or should have known of his perjury; (3) the testimony went uncorrected; and (4) there is any reasonable likelihood that the false testimony could have affected the verdict."  Id.

Petitioner has failed to demonstrate that the Pennsylvania Supreme Court unreasonably applied Napue.  As the state court observed, Petitioner has done nothing more than produce experts who disagreed with Dr. Ross.  Davido II, 106 A.3d at 628-29 (emphasis added).  Disagreements among experts is not unusual.  There is nothing objectively unreasonable about the state court's determination that Petitioner failed to produce evidence that Dr. Ross's testimony was false.

Indeed, it is notable that Petitioner does not argue that Dr. Ross's testimony is perjured. Rather, he attempts to argue that something less is required.  (Petitioner's Mem. of Law at 11, ECF No. 123.)  But the Supreme Court has never held that a defendant can demonstrate a due process violation upon a mere showing that the testimony admitted might be "unreliable."  In reviewing

the state court's determination, I am guided by the holding of <u>Napue v. Illinois</u>, 360 U.S. 264 (1959), and not by dicta contained the dissenting opinion in <u>White v. Illinois</u>, 502 U.S. 346 (1992).

Similarly, Petitioner's citation to <u>Donnelly v. DeChristoforo</u>, does not suggest a different standard.  416 U.S. 637, 464 (1974).  In <u>Donnelly</u>, the Supreme Court reiterated that "the Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of *false* evidence." <u>Id.</u> (emphasis added).  Consistent with the standards set forth in <u>Napue</u>, <u>Donnelly</u> requires that Petitioner demonstrate that the evidence presented through Dr. Ross was false and that the prosecutor knew that it was false.  Petitioner has shown neither.  The absence of any argument at all on these two points is dispositive.

In a final attempt to avoid the relevant legal standards, Petitioner turns his focus away from the law and focuses instead on the state court's factual conclusions, arguing that the state court's determination was an unreasonable determination of facts in light of the record.  But mere factual error, even if shown, is not enough.  Aside from the deferential rigors of the AEDPA, at base, a federal habeas court may not grant relief unless the petitioner demonstrates that "he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a). Petitioner has failed to do so.  The <u>Napue</u> standard remains the relevant standard, and Petitioner has provided no evidence that Dr. Ross's testimony was false, or that the prosecution knew it was false.  Petitioner cannot, therefore, demonstrate a <u>Napue</u> violation even under a *de novo* standard.

Petitioner also cannot demonstrate that counsel was ineffective for failing to move to exclude Dr. Ross's testimony on due process grounds because he cannot show that the admission of Dr. Ross's testimony violated his due process rights.  As a result, I conclude that the state court's determination was not an unreasonable application of United States Supreme Court precedent.  I further note that I agree with the factual conclusions reached by the state court and therefore do

not find that they were unreasonable determinations of fact.  And, finally, I find that if I had reviewed this claim on a *de novo* basis, I would have reached the same conclusion as the state court.[8]  Since Petitioner cannot demonstrate that the admission of Dr. Ross's testimony violated his due process rights, he cannot demonstrate that counsel was ineffective for failing to raise that argument.  Therefore, this claim must be dismissed.

### (b)    *Ineffectiveness for Failing to Seek to Exclude the Evidence Under the State or Federal Rules of Evidence*

Petitioner next argues that counsel was ineffective for failing to attempt to exclude Dr. Ross's testimony because the testimony violated federal or state evidentiary rules.  Because federal rules of evidence are irrelevant in a state criminal prosecution and the state evidence rules did not bar the admission the testimony, I reject Petitioner's challenge.

Petitioner relies on Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993) for the proposition that "reliability is the cornerstone of inadmissibility."  But Daubert interprets the *federal* rules of evidence and Pennsylvania courts are not obligated to evaluate expert testimony under the Daubert standard.  Indeed, they have declined to do so.  See Commonwealth v. Treiber, 121 A.3d 435, n.13 (Pa. 2015) (explaining that Pennsylvania continues to evaluate expert testimony under the Frye standard, which requires a showing of "general acceptance" as opposed to "reliability").  Accordingly, the admissibility (or inadmissibility) of Dr. Ross's testimony under the federal rules of evidence is irrelevant in the context of a state criminal proceeding.

Petitioner also argues that Dr. Ross's testimony was inadmissible under state law.  The state court, however, disagreed.  The Pennsylvania Supreme Court concluded on direct appeal that

---

[8]   If Petitioner had fairly presented his due process challenge to the state court, I would have rejected that challenge for the same reasons set forth herein.  Dr. Ross's testimony should not have been barred by the due process clause.

Dr. Ross's opinions "were based on a reasonable degree of medical certainty."  Davido I, 868 A.2d at 441-42.  Since the "testimony was not speculative," the state court concluded that "the trial court did not abuse its discretion in admitting it at trial."  Id.  On PCRA appeal, after evaluating the new expert testimony produced in the collateral proceedings, the Pennsylvania Supreme Court reached the same conclusion anew.  Davido II, 106 A.3d at 627-29.

The state court's repeated conclusion that the evidence was admissible is binding on this Court.  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).  The fact that this conclusion of state law is a subsidiary point in an overall ineffectiveness analysis does not make the conclusion any less binding.  Priester v. Vaughn, 382 F.3d 394, 402 (3d Cir. 2004).  Accordingly, Counsel was not ineffective for failing to raise this meritless claim.  Ross v. District Attorney, 672 F.3d 198, 221 n.9 (3d Cir. 2012).

### (c)    *Ineffectiveness for Failing to Pursue the Meritless Claims*

Ultimately, Petitioner argues that Trial Counsel was obligated to present the foregoing challenges despite his (correct) belief that the challenges would fail.  His argument that counsel is obligated to pursue all challenges despite futility is an incorrect statement of law.

Petitioner argues that "[t]he only credible explanation for counsel's failure to object to Dr. Ross's testimony as misleading and unreliable was counsel's belief that such a challenge would be futile."  (Petitioner's Mem. of Law at 18, ECF No. 123.)  According to Petitioner, this is an unreasonable strategy "[p]articularly in a capital case."  (Id.)

The United States Supreme Court has never established "a 'nothing to lose' standard for ineffective-assistance-of-counsel claims."  Knowles v. Mirzayance, 556 U.S. 111, 122 (2009).  To the contrary, the Court has made clear that Counsel's decision to withdraw a claim that he believed was doomed to fail was a reasonable, strategic decision that could not give rise to a meritorious

claim under <u>Strickland</u>.  <u>Id.</u> at 124-25.  Here, Trial Counsel testified as to his strategy to impeach Dr. Ross through cross-examination and through the testimony of Dr. Shane, which I discuss in greater detail below.  Counsel further testified that he did not attempt to exclude Dr. Ross's testimony because "it had been permitted in Lancaster County courts before."  (N.T. 6/23/2009 at 220-22.)

For purposes of the current issue - Counsel's alleged failure to attempt to exclude the testimony - it is clear that Trial Counsel knew that the objection would have been fruitless at the time of trial and he was correct to conclude that such a challenge would not prevail on appeal. Counsel cannot be deemed ineffective for failing to raise a meritless claim.  <u>Ross</u>, 672 F.3d at 221 n.9; <u>see also</u> <u>Parrish v. Fulcomer</u>, 150 F.3d 326, 328 (3d Cir. 1998).  He also cannot be deemed ineffective for failing to make an objection that "would be overruled under prevailing law," particularly where that claim still fails under prevailing law more than a decade later.  <u>Sistrunk</u>, 96 F.3d at 671.  Since Counsel was not required to raise a challenge that he knew was "doomed to fail," this claim must be dismissed.

**B.**     **<u>Claim I.B.:  Petitioner's Challenge to Counsel's Ineffectiveness Relating to the Violation of Pennsylvania Discovery Rules</u>** [9]

Petitioner argues that "Trial Counsel unreasonably failed to object to the Prosecution's Violation of Discovery Rules with respect to Dr. Ross."  (Petitioner's Mem. of Law at 24, ECF No. 123.)  Specifically, Petitioner urges that the Commonwealth violated Pennsylvania Rule of Criminal Procedure 573 by failing to disclose Dr. Ross's testimony regarding "G-forces" and

---

[9]   Included as Claim III.B in the original habeas petition and as Claim I.B. in Petitioner's Memorandum of Law.

"shearing" that were allegedly "outside the scope" of his report, and that Trial Counsel should have objected to this violation.  (Id. at 24-25.)

For Petitioner to prevail on this claim, he must demonstrate that there was a discovery violation that could have merited objection.  The Pennsylvania Supreme Court concluded that there was no such violation.  Davido II, 106 A.3d at 626 ("[C]ounsel had received the report, was aware of the expected substance of Dr. Ross's testimony, and indeed, as a matter of trial strategy, had presented the testimony of Dr. Shane to rebut the damaging aspects of Dr. Ross's conclusions regarding G-forces and shearing injury.").  As discussed supra, the state court's conclusion that there was no discovery violation here is a ruling on a point of state law that is binding on this Court.  See Estelle, 502 U.S. at 67-68 (1991); Priester, 382 F.3d at 402.

Despite this clear legal restriction, Petitioner urges me to reexamine the law, pointing to different ways that Trial Counsel could have framed his objection.  But in the end, if the objection would have failed, then there can be no meritorious ineffectiveness challenge.

Petitioner also argues that I may ignore the state court's clear ruling on this point of state law because it was premised on a misunderstanding of his argument.  At the time of trial, Trial Counsel objected to Dr. Ross's testimony on the basis that his discussion of "G's of force" was beyond the scope of the report.  In both state and federal court, Petitioner argued that the objection was too narrow - Counsel should have also objected to any reference to a "shearing injury" as beyond the scope of the report as well.  Petitioner now argues that the state court misunderstood his allegation and the conclusion is not entitled to deference.  I disagree.

Selecting a portion of the state court opinion, Petitioner argues that the state court rejected his claim because it concluded that "counsel, in fact, objected to the testimony on that basis, and

that the objection was overruled." But that was only a small segment of the state court's conclusion. As the Pennsylvania Supreme Court fully explained:

> We find that counsel was not ineffective in failing to argue a discovery violation here, as counsel had received the report, was aware of the expected substance of Dr. Ross's testimony, and indeed, as a matter of trial strategy, had presented the testimony of Dr. Shane to rebut the damaging aspects of Dr. Ross's conclusions regarding G-forces and shearing injury. Notably, the discovery violation objection [Petitioner] identifies arose only when Dr. Ross's trial testimony allegedly exceeded the substance of his pre-trial report. However, [Petitioner] concedes that counsel, in fact, objected to the testimony on that basis, and that the objection was overruled. In these circumstances, appellant's ineffectiveness claim necessarily fails.

Davido II, 106 A.3d at 626-27.

The Pennsylvania Supreme Court (and the PCRA Court before it) ruled expressly that there was no discovery violation. That is binding here. The Pennsylvania Supreme Court's additional note that an objection was made does not change that result.

Ultimately, Petitioner is arguing that Trial Counsel was ineffective because he should have framed the objection differently. Such an argument can only amount to a violation of Strickland if Petitioner can demonstrate that the differently framed objection would have been meritorious. The state court has already concluded that the objection would not have been meritorious no matter how it was framed. That is a legal ruling on a point of state law that is binding here. In light of the Pennsylvania Supreme Court's ruling, I find that the court reasonably applied Strickland when addressing Petitioner's discovery violation claim. Accordingly, Petitioner is not entitled to relief.[10]

---

[10] Petitioner has also presented arguments about Trial Counsel's strategy (or alleged lack thereof) about the scope of his objection under the discovery rules. For our purposes, counsel's reasoning is irrelevant. The state court concluded that the objection proposed by Petitioner during the collateral appeal would not have been meritorious. The reasons that Counsel did what he did are therefore ultimately irrelevant. Even if the decision was strategically flawed, Petitioner was not prejudiced because the proposed objection was not meritorious under state law.

**C.     Claim I.C.:  Petitioner's Challenge to Counsel's Stewardship Relating to the Rebuttal and Impeachment of Dr. Ross as to the Cause of Death[11]**

In his final challenge to the medical testimony on cause of death, Petitioner argues that Trial Counsel was ineffective for failing to rebut or impeach Dr. Ross's testimony as to cause of death.  (Petitioner's Mem. of Law at 27, ECF No. 123.)  Within this claim, Petitioner presents two arguments: (1) Trial Counsel's reliance on Dr. Shane was deficient because counsel should not have relied on an expert who counsel deemed "incredible;" and (2) Trial Counsel's approach to the impeachment of Dr. Ross was deficient both due to an ineffective cross-examination and his failure to call other experts who could have presented a more effective rebuttal of Dr. Ross.

Having reviewed the medical expert testimony presented at trial and during both state and federal appellate proceedings, and for the reasons stated in more detail below, I agree with the state court's conclusion that Trial Counsel had a reasonable strategic basis for the decisions that he made.  I further conclude that Petitioner was not prejudiced by the approach that Trial Counsel took, because the alternate theories presented by Petitioner's new experts are not any more persuasive than the approach taken at trial.  The ineffectiveness claim, therefore, fails.

**(1)     Trial Counsel's Reliance on Dr. Shane**

Petitioner's claim is premised on the incorrect assumption that Trial Counsel deemed Dr. Shane "incredible."  (Petitioner's Mem. of Law at 27-29, ECF No. 123.)  The state court rejected this claim, crediting Trial Counsel's testimony about his confidence in Dr. Shane's ability to testify.  I do as well.

Petitioner's challenge is rooted in a memorandum written by Trial Counsel expressing his

---

[11]   Included as Claim IV in the original habeas petition and as Claim I.C. in Petitioner's Memorandum of Law.

initial intent to not call Dr. Shane as a witness, which stated:

> Dr. Shane has given us two main opinions that, at face value, appear to be of merit. First, he has said that Angie may have died of the medications in her systems, namely Benzodiazepines and Barbiturates, which he indicates were "on board[,"] and not administered by the hospital. These meds, in combination, may contribute to edema in the brain, the swelling which ultimately caused her death. The problem is that the Benzos were administered at the hospital, and Dr. Shane told us verbally, on 9/26, that the Barbits were likely administered with the Benzos, as there would routinely be a combination of two in the course of treatment. This information came out after two hours of discussion where the barbits had never been discussed before.
>
> Basically, Dr. Shane says that, if she had this stuff on board at the hospital, unless she can be proven to have had stuff on before the hospital, his opinion is out the window. We are awaiting the final lab report which will support or destroy this particular opinion, but it is most likely to destroy the opinion. Even if it supports it, Dr. Shane's demeanor and manner of presentation have left MM Spahn, Ray Solt, and I unconvinced that he is credible.
>
> [***]
>
> Additionally, Spahn, Solt and I all feel that Shane was reading the medical reports for the first time in front of us when we met with him on 9/26, which did nothing to bolster our confidence in the Dr.'s opinions.
>
> Lastly, there is a more overall concern in using Shane. Ted has been writing to him directly, and has provided a new and different version of events than has been provided to either the police or counsel. It appears to minimize even more the effect of the argument on subsequent assaults. It also appears to have been relied upon by Dr. Shane.
>
> Under all of the above circumstances, and for those additional matters outlined in the letter to Ted dated 9/27, we do not expect to call Dr. Shane to testify.

(Gratton Mem., Oct. 1, 2001, ECF No. 94-1.)

At the PCRA hearing, Trial Counsel further testified that he did not think he needed another expert because he was "satisfied with the opinion of Dr. Shane and ultimately was satisfied with the testimony of Dr. Shane on these issues." (Id. at 241.) While Trial Counsel acknowledged that he wrote a memo reflecting that he questioned Dr. Shane's credibility, he testified that he had

"obviously" changed his mind, otherwise Dr. Shane "would never have set foot in this courtroom." (Id. at 241-44.)

During the PCRA proceedings, the state courts were presented with the same argument that I have here. Davido II, 106 A.3d at 630. The PCRA Court credited Mr. Gratton's testimony during the hearing that he had a "change of heart" about calling Dr. Shane. Id. at 630 n.9. I do as well.

"Section 2254(d)(2) mandates the federal habeas court to assess whether the state court's determination was reasonable or unreasonable given th[e] evidence. If the state court's decision based on such a determination is unreasonable in light of the evidence presented in the state court proceeding, habeas relief is warranted." Lambert, 387 F.3d at 235-36. Where a petitioner attacks "specific factual determinations that were made by the state court," then "the state court's determination must be afforded a presumption of correctness that the petitioner can rebut only by clear and convincing evidence." Id. However, the United States Supreme Court has instructed that "§ 2254(d)(2) requires that we accord the state trial court substantial deference." Brumfield v. Cain, 576 U.S. 305, 314 (2015). "If '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'" Id. (quoting Wood v. Allen, 558 U.S. 290, 301 (2010) (alterations in original)).

Petitioner's arguments do not rebut the Pennsylvania Supreme Court's factual finding by clear and convincing evidence. The state court record reflects that Trial Counsel prepared his expert, understood the issues, considered bringing in an alternate expert, but ultimately chose to present Dr. Shane. The PCRA court observed Trial Counsel and found his testimony credible. Recognizing that Petitioner must do more than present a "plausible alternative to the factual findings of the state court," Washington v. Sobina, 509 F.3d 613, 621 (3d Cir. 2007), I cannot

conclude that Petitioner has demonstrated that the state court's factual determination was unreasonable.  Since I cannot say that the PCRA Court was unreasonable in its evaluation of Trial Counsel's testimony, Petitioner is not entitled to habeas relief pursuant to § 2254(d)(2).

(2)    **Trial Counsel's Ineffective Rebuttal and Impeachment of Dr. Ross**

I still need to address the ultimate question - whether Trial Counsel's efforts to impeach Dr. Ross - both through Dr. Shane and cross-examination - were deficient and if these decisions prejudiced Petitioner.[12]   The state court concluded that Petitioner had both failed to make a showing of deficient performance and to demonstrate that his alternate approach would have been more beneficial to his case.  I agree with both conclusions.

In many ways, Petitioner's current challenge to Dr. Ross is almost the same as Trial Counsel's approach:  Petitioner argues now, as Trial Counsel did during the trial, that Dr. Ross's conclusions were speculative.  The primary difference is that Petitioner now argues that the best way to demonstrate the speculative nature of the testimony was to argue that the victim died of an aneurysm.  Trial Counsel explained that he did not choose that approach because he was reluctant to rely on "an unprovable internal injury" to attempt to impeach.  (N.T. 6/23/2009 at 227.)

Trial Counsel explained during the PCRA that he thought that Dr. Ross's testimony was "junk science," but did not seek to exclude it because he (correctly) believed such request would be futile.  (Petitioner's Mem. of Law at 16-17, ECF No. 123.)  Instead, Trial Counsel explained that he attempted to impeach Dr. Ross, by pointing to his assumptions and attempting to make

---

[12] In arguing this claim, Petitioner has embedded other assumptions, which I rejected above.  There was no basis to completely exclude Dr. Ross's testimony on cause of death, and effort by Trial Counsel to do that would have proved futile.  Nothing asserted in this claim changes my opinion that there was no legal basis upon which counsel could have relied to exclude Dr. Ross's testimony as to cause of death.  He, therefore, cannot be found to be ineffective for failing to seek the complete exclusion of the testimony.

them seem like unreasonable leaps.  (N.T. 6/23/2009 at 221-22, 225.)  As Trial Counsel explained,

"[t] he best method of attack [was] to let Dr. Ross go out on a limb, take him as far as he wants to

go, let him talk about bricks falling off of buildings and compare forces and bring Dr. Shane in to

say, no, it's not possible to determine that.  And that was the strategy basically."  (N.T. 6/23/2009

at 222.)  Trial Counsel explained further that:

> Dr. Shane didn't find an independent causation for her brain injury.  I know Mr.
> Davido would have like us to find that and felt strongly that was the case.  We
> looked for it.  We looked at the medical records that were there.  We looked at the
> records the Commonwealth gave us and found nothing.  And Dr. Shane couldn't
> find anything to contradict the cause of death.
>
> At the end of the day we were stuck with the fact that she's in an argument at the
> top of the stairs and she ends up dead at the bottom of the stairs essentially.
>
> So I had limited goals for Dr. Shane, and they were targeted as much as anything
> towards my limited goals with Dr. Ross.

(N.T. 6/23/2009 at 22-22, 225.)

Petitioner argues that Trial Counsel's testimony was merely a *post hoc* explanation.  But

Trial Counsel's explanation was entirely consistent with the actions he took during the trial.  Trial

Counsel focused on the presence and absence of certain injuries to argue that the trauma to the

victim's body was not indicative of an intent to kill.  This strategy is apparent from the beginning

of his cross examination of Dr. Ross:

> Q:  There are no fractures to the skull. I think you told us that already.
>
> A:  I agree.
>
> Q:  There are no fractures to the nasal region?
>
> A:  I agree.
>
> Q:  There are no fractures around the eye sockets?
>
> A:  I agree.

Q:  There are no fractures to the cheek or the jaw?

A:  I agree.

Q:  There are no fractures in the neck?

A:  I agree.

Q:  There are no fractures to the hyoid bone in the throat?

A:  I agree.

Q:  And the thyroid cartilage in the throat is intact?

A:  I agree.

Q:  There are no fractures to the chest?

A:  I agree.

Q:  There are no fractures to either arm?

A:  I agree.

Q:  There are no fractures to either leg?

A:  I agree.

Q:  There are no fractures to the hips?

A:  I agree.

Q:  There are no fractures to the feet or to the hands?

A:  I agree.

Q:  Now, you told us a little bit about swelling in the area of the optic nerve, hemorrhaging, I think you said.

A:  I was talking about the bleeding and swelling above the brain, which compressed on the optic nerves.

Q:  There are no petechial hemorrhages on the eyes?

A:  No petechial hemorrhages to the eyes. There was plain hemorrhage to the left eye, but no petechial hemorrhages at this time.

Of course, she's been on the respirator for a number of hours, so you may not see petechial hemorrhages at this point.

Q:  There were no petechial hemorrhages which you saw on the body?

A:  No.

Q:  No blood coming from the mouth, nose and ears.  Page three of your report; no blood coming out of ears, inner, or oral cavity.

A:  That's correct.

(N.T. 12/7/01 at 471-73.)

The examination dovetailed with Mr. Gratton's closing arguments:

[The Commonwealth] want[s] to make it worse than it is.  It is what it is. You don't need to blow up a photo.  And I trust in you when you look at this stuff to consider it coolly and dispassionately and consider it for what it is.

The injuries are there. She died from the injuries. Our own expert says she died from the injuries.  We can't hide that, but I'm not hiding behind a mask of dried blood. The injuries are what they are but they are not specific intent to kill. That's all there is.

This was an angry assault, an ugly assault. But you heard nothing expressing a specific intent to kill. I ask that you do not let your passions be inflamed by dried blood or hyperbole.

*** 

But the critical question you have to ask yourself is, is it specific, fully formed and conscious intent to kill? An assault without intent to kill is nothing more; it's an assault, and a death without a specific intent to kill but with malice is third-degree murder.

All I ask of you is that you take a hard look at the facts in this case; a hard look at the facts, and see if you see that intent to kill expressed in these facts. I submit to you that you have to find it beyond a reasonable doubt.  If you find that it's not there, I ask that you consider the lesser degrees of homicide and you come back with the appropriate sentence in the end.

(N.T. 12/11/01 at 902-03.)

Trial Counsel clearly had a strategy and argued that the injuries were not consistent with a specific intent to kill, but rather a third-degree murder verdict.  In light of this strategy, Petitioner is left to argue that Trial Counsel's strategy was unreasonable and that Counsel should have attempted to prove that the victim died of an aneurysm.  Under Strickland, arguments about Trial Counsel's choice between two different strategies must be met with caution: "Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge.  It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.'" Harrington, 562 U.S. at 105.

As the Supreme Court has warned:

> Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence, whether pretrial, at trial, or both.  There are, however, 'countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way.'  [Strickland, 466 U.S.] at 689, 104 S. Ct. 2052.  Rare are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach. *Ibid.* It can be assumed that in some cases counsel would be deemed ineffective for failing to consult or rely on experts, but even that formulation is sufficiently general that state courts would have wide latitude in applying it.

Id. at 106-07.

As in Harrington, I am faced with Petitioner's challenge of Counsel's decision regarding consultation with different experts.   In Harrington, the petitioner argued that counsel was ineffective for failing to hire an expert because the issue was "'the single most critical issue in the case' given the differing theories of the prosecution and defense." Id. at 108.  Despite the fact that counsel in Harrington did not consult *any expert at all*, the Supreme Court rejected the petitioner's argument, explaining as follows: "To support a defense argument that the prosecution has not proved its case it sometimes is better to try to cast pervasive suspicion of doubt than to strive to

30

prove a certainty that exonerates.  All that happened here is that counsel pursued a course that conformed to the first option."  Id. at 109.

As Trial Counsel explained, Dr. Shane - the expert that he hired - "couldn't find anything with certainty."  (N.T. 6/23/2009 at 225.)  Even with years to prepare and many additional experts, that remains true.

At trial, Dr. Ross testified to his conclusion that "[t]he cause of death is multiple traumatic injuries" and "[t]he manner of death is a homicide."  (N.T. 12/07/01 at 438.)  He further pointed to the distinct bruising on the victim's body as consistent with "manual strangulation."  (Id. at 440-43, 455-59.)  As was previously discussed, Trial Counsel pointed to the absence of specific evidence of skull fracture and petechial hemorrhaging in his cross-examination of Dr. Ross.  (N.T. 12/11/01 at 471-72.)  As with the experts who testified during these appellate proceedings, Trial Counsel also inquired about the origin of the blood present in the back base of the victim's skull, attempting to impeach Dr. Ross's conclusion that the blood was connected to the physical trauma the victim endured.  His questioning attempted to point to aspects of Dr. Ross's conclusion that were not definitive:

> A:  The origin, ultimately, is from trauma.  In terms of mechanism, it's either from a direct shearing mechanism to the lower brain stem, causing hemorrhaging to that area and the choroid plexus, or the ventricular lining gets sheared off.  Or it's a direct extension from blood coming from subarachnoid space, kind of connecting through the areas.  There is [sic.] two pipes that connect into that area.  And the blood can go through the areas as well, what we call pooled in there.  It can be either/or.
>
> Q:  It's either blood flowing in or from direct trauma?
>
> A:  It's often trauma.  But it's blood flowing in from the trauma to the outside.
>
> Q:  Or it's direct trauma inside?
>
> A:  Yes.

Q:  At this point, you can't tell us which one?

A:  It's either/or.

(Id. at 476-77.)

Instead of fighting this lack of certainty by trying to prove an alternate theory, Trial Counsel attempted to use this lack of certainty to buttress his attack on Dr. Ross, who he argued was overstating the victim's injuries.  Consistent with this, Dr. Shane testified that he thought "the patient had multiple traumatic injuries.  I think there is compositive [sic.] injuries; old and recent injures.  And I think the patient did bleed into the subarachnoid space, and that did result in the cerebral edema, and that resulted in death."  (Id. at 841.)  Dr. Shane further explained that it was unusual that, with such head trauma, there was no bleeding subdural or epidural and no contusion to the victim's brain.  (Id. at 842-43.)  Accordingly, Trial Counsel used Dr. Shane to support his argument that the Commonwealth was trying to make the trauma look worse than it was and that their overstatement was evidence that they did not have enough to demonstrate specific intent to kill.  Used in tandem, Dr. Shane's conclusion that cause of death was uncertain was used in an effort to argue that the Commonwealth was not certain about cause of death either.

This strategy threaded through Trial Counsel's attack on all the medical evidence in the case.  He also used Dr. Shane's testimony to challenge Dr. Ross's conclusions on the issue of strangulation:

Q:  Are there petechial hemorrhages in this case?

A:  No.

Q:  What's the significance of that?

A:  The significance is that, without question, I think there is a strangulation injury in this case.  I don't think it was a forceful strangulation injury.

32

> Reason: In a strangulation injury, the first thing that gets occluded are the jugular veins.  First of all, they are much more superficial and are easy to access, and the veins themselves have thin walls and are easy to collapse, occlude.  And if you occlude those jugular veins, you increase the pressure into the brain and you always get petechial hemorrhage.  I have never seen a significant strangulation injury, in terms of brain damage, that did not have petechial hemorrhage; it's kind of the first thing that occurs.

(Id. at 853-54.)

Collectively, this approach attempted to minimize the objective physical injury to the victim and challenge Dr. Ross's testimony as supposition.  Counsel did not attempt to demonstrate that the victim died from an aneurysm.  Instead, he chose to "cast pervasive suspicion of doubt" rather than "strive to prove a certainty that exonerates."  Harrington, 562 U.S. at 109.

During the PCRA proceedings, and in the hearing before this Court, Petitioner's current counsel took the alternate course of presenting testimony about the likelihood that the bleeding in Ms. Taylor's brain was caused by an aneurysm, not trauma.  With the benefit of all of the medical evidence presented during the trial and in the post-trial proceedings, two things become clear: (a) Petitioner's new argument is the type of hindsight that is barred by Strickland; and (b) even if I were to review it all de novo, I would not find it any more persuasive than the course chosen originally by Trial Counsel.

During the post-trial hearings in this case, the Petitioner's counsel challenged Dr. Ross's testimony on cause of death by suggesting the victim died of an aneurysm.  Dr. Ross explained that he had ruled out an aneurysm.  (N.T. 6/26/2009 at 659-60.)  He provided an extensive list of actions that he took in excluding aneurysm.  (Id. at 660-66.)  Specifically, noting that his postmortem report stated that the Circle of Willis was intact.  (Id. at 673.)  Though that report did not state that he had dissected the Circle of Willis, he explained that it was his standard practice to dissect the Circle of Willis and that he would not have been able to reach this conclusion without

dissecting the Circle of Willis. (Id. at 673-74.) Further questioning on this point only provided additional bases for Dr. Ross's opinion that the hemorrhage was more consistent with a shearing injury than a ruptured aneurysm:

> Q: Do you agree with Dr. Wetli's conclusion that the swelling on both sides came from the aneurysm?
>
> A: No.
>
> Q: Why not?
>
> A: First of all, it's both sides. If there was an aneurysm, it would have ruptured. The blood clot would have been confined to the posterior cranial fossa and she would have died rather quickly without any hemorrhage, significant hemorrhage, or swelling occurring to those areas of the brain.
>
> Q: So the fact that there is swelling on both sides of the brain, what does that tell you?
>
> A: The fact that there is swelling throughout the brain, you have to connect the dots with that. You have hemorrhage all throughout the brain. You have swelling throughout the brain. You have over 11 different areas of bruises all regions of the scalp all due to blunt force trauma. That tells you that you have a traumatic brain injury. The swelling to this brain is classic for diffuse axonal injury essentially since it's diffusely throughout the brain.
>
> Q: Can you explain that?
>
> A: There are three grades of DAI, and it is a shearing injury, shearing forces, and that is a term that neuropathologists use.
>
> Q: Is that term recognized in the literature?
>
> A: Sure. Extensive. It's in the neuropathology books. It's in the literature which talk about it and use it all of the time, especially as it relates to the biomechanics of impact trauma. Shearing force is what we refer to as abnormal force that goes through the brain particularly at an angle. And you have axons that are in the brain connected with neurons going through the brain. And what this force does, it goes through there and it shears or actually tears the axons. And the - we know there's axons torn as the brain swells, and typically shearing concussions, case of concussions, are diffuse axonal injury. So, if somebody falls and hits their head and they had diffuse axonal injury or concussion, they have DAI.

The way in which we examine for that starts with the clinical understanding that if a person suffers a traumatic brain injury and then they are unconscious for less than six hours, that is referred to as mild diffuse axonal injury.  If they get a concussion and they are asleep for 6 to 24 hours, that's moderate DAI.  If they don't wake up, that's severe DAI from a clinical perspective.

. . .

And having said all of that, the swelling in the brain itself should alert any pathologist that you are dealing with diffuse axonal injury.  When you look at the constellation of findings, the bruises on the scalp, you look at the swelling to the scalp, you look at the subarachnoid hemorrhage all over the brain as well as the base of the brain, that tells you that you are dealing with diffuse axonal injury.

In addition, the hemorrhage to the base of the brain is classic for a tear of one of the vessels in the Circle of Willis.  It's clearly documented in the medical records.  I'm not sure if Dr. Scotti or Dr. Wetli are aware, but it's in the neuropathological texts where blunt trauma to the face and head can lead to tears in the blood vessels and they can be very difficult to find, to find the tears.

(Id. at 678-81.)

As Trial Counsel anticipated, this type of cross-examination turned the focus to a possible "certainty that exonerates" - the binary question of whether or not the victim died of aneurysm - and away from his strategy of casting doubt on Dr. Ross's overall process.  Trial Counsel had avoided this because he "couldn't find anything with certainty."  (N.T. 6/23/2009 at 225.)  The experts presented in post-trial hearings similarly provided some evidence of the possibility of aneurysm, but the testimony was limited.  Dr. Wetli testified that "the only injury to [the victim's] brain was swelling of the brain and a massive basilar subarachnoid hemorrhage, which is bleeding beneath the inner membrane of the brain at the space."  (N.T. 6/26/2009, 607.)  Dr. Wetli explained his conclusion as follows:

Q:  Talking about the basilar region of the brain, are you stating there was aneurysm in this area?

A:  I say mostly [sic.] likely aneurysm in this area, yes.

Q:  And you can't say that to a reasonable degree of medical certainty?  It's just a possibility?

A:  No, it's more than a possibility.  It's a diagnostic probability, but I can't say because we have no photograph or description of the Circle of Willis.

Q:  So you are hypothesizing then?

A: No, I'm giving -

Q:  That's a possibility?

A:   It's more than that, and speculation.   The most common case of basal subarachnoid hemorrhage and a ruptured aneurysm, and it has to be demonstrated to prove it.

Q:  But in this case there was no evidence of an aneurysm found at the hospital or by Dr. Ross?

A:  It wasn't looked for.  How could it be found?

Q:  My question is, there is no evidence of aneurysm that was either picked up by the hospital or by Dr. Ross?

A:  Absolutely not.  No.

Q:  My question is, did Dr. Ross or did the hospital detect an aneurysm?

A:  No.

(Id. at 643-44.)

Dr. Wetli disagreed that the cause of death was blunt force impact because "[w]hen trauma is associated with subarachnoid hemorrhage, it tends to be focal and patchy," rather than "isolated to the base of the brain."  (Id. at 623-24.)  Dr. Wetli further opined that the victim's injuries were not consistent with the scenario posited by the Commonwealth that the victim's head was repeatedly slammed into the floor or a chest of drawers.  (Id. at 609-10.)

Dr. Wetli attempted to undermine the fine points of Dr. Ross's testimony by focusing on more technical medical terms, instead of the simpler points about skull fracture and bruising used by Dr. Shane.  He opined that Dr. Ross's use of the word "shearing injury" as a cause of the subarachnoid hemorrhage was "inappropriate" because there was no evidence of a subdural

hematoma or diffuse axonal injury.  (Id. at 624-26.)  He explained that Dr. Ross did not report finding "shearing or tearing of the bridging veins resulting in the subdural hematoma, which is the large blood clot between the dura ma[t]ter[,] the outer membrane and the brain itself."  (Id. at 625.) Further, Dr. Wetli stated that Dr. Ross did not report finding "diffuse axonal injury," which usually results from "tiny tears in certain areas of the white matter of the brain . . . associated with disruption of the neurofibers in the brain," typically observed following car crashes.  (Id. at 625.)

During the PCRA hearings, the testimony of the defense's expert in emergency medicine, Dr. Angelo Scotti was similar.  (N.T. 6/26/2009 at 557-67.)  He opined that the cause of death was "a subarachnoid hemorrhage and a resultant cerebral edema."  (Id. at 568.)  Dr. Scotti explained that the absence of intracerebral, subdural, and epidural bleeding led him to posit that the victim's subarachnoid hemorrhage resulted from an aneurysm rather than significant trauma.  (Id. at 577-78.)  But he also admitted that nothing in the records showed the presence of an aneurysm, including the CT scans and autopsy report.  (Id. at 580, 592-93.)

Ultimately, Petitioner has presented new experts which reached the same conclusion as Dr. Shane - there was no conclusive evidence of an aneurysm.  Under both strategies, the defense was to argue that there was a fight and trauma, but that the Commonwealth had not proven that Petitioner intended to kill Ms. Taylor.  The new approach would have entailed a battle of experts, but would not have changed anything.  As the PCRA Court observed, even if the victim had an aneurysm, "the results would be the same" because "[t]he actions of [Petitioner] caused her death." (Commonwealth's Exhibit M at 117-18, ECF No. 131-14.)  As the Pennsylvania Supreme Court further observed, "Dr. Shane's opinion [regarding the shearing injury] was, in fact, not dissimilar to the opinions expressed by Drs. Scotti and Wetli, both of whom testified that the trauma evident

on the victim's body did not appear severe enough to have caused the fatal subarachnoid hemorrhage." Davido II, 106 A.3d at 630-31.

Ultimately, all of the experts agree that the manner of death was homicide, the only issue was Petitioner's specific intent to kill.  Petitioner's new experts merely create a collateral issue of whether or not the victim suffered an aneurysm.  But just like Dr. Shane, they conclude that they could not "find anything with certainty."  (N.T. 6/23/2009 at 225.)  My determination that this was not deficient performance is further amplified by my conclusion that Petitioner was not prejudiced by the decision not to present this evidence.

Petitioner's challenge is the very essence of hindsight.  Trial Counsel's approach did not persuade the jury to issue a verdict of something less than a life sentence.  Having heard the same arguments presented in a different way, I conclude that they are no more persuasive.  I find that the state court's rejection of the argument was not unreasonable because I conclude that, even under a *de novo* standard, Petitioner cannot meet either prong of Strickland.  Accordingly, Petitioner is not entitled to relief on this claim.

### D.    Claim I.D.:  Petitioner's Challenge to Counsel's Stewardship Relating to the Rebuttal and Impeachment of Dr. Ross as to Rape[13]

Petitioner next argues that Trial Counsel's rebuttal and impeachment of Dr. Ross's testimony as to rape was deficient, because counsel should have identified a second expert to testify about the rape, instead of Dr. Shane.  (Petitioner's Mem. of Law, at 36-37, ECF No. 123.)  Petitioner further asserts that the state court's rejection of his claim is not entitled to deference.  I disagree and further conclude that Petitioner's claim fails, even under *de novo* review.

---

[13]    Included as Claim V in the original habeas petition and as Claim I.D. in Petitioner's Memorandum of Law.

Petitioner first notes that the Pennsylvania Supreme Court did not address this issue directly. (Petitioner's Mem. of Law at 38, ECF No. 123.) Accordingly, he urges that I must "look through" that decision to the last related state court decision that does provide relevant rationale and assume that the Pennsylvania Supreme Court adopted that reasoning.[14] (Id.) According to Petitioner, the PCRA opinion was the last related state court decision to address this issue. (Id.) I disagree. Both the PCRA Court and the Pennsylvania Supreme Court addressed the issue raised here.[15] Ultimately, however, I conclude that Petitioner has failed to state a claim that is entitled to relief under Strickland, even under a *de novo* standard of review.

The following facts are relevant to this claim. During trial, Dr. Ross testified that the physical evidence was consistent with sexual assault and rape:

Q: You did an internal examination because of the possibility of sexual assault?

A: Agreed.

Q: Tell us what you found and the significance of what you found.

A: I was able to observe at autopsy—of course, I already had the SAFE nurse's report about the motile sperm. I also had the photographs for review. I was able to observe bruising to the outside of her vaginal area. There is two distinct bruises, fresh bruises, on the photographs. When I saw them, they were already purple. I could also observe, as you enter the base of the vagina at the 6 o'clock position—

---

[14] When a state court decision does not specify the reasoning, the federal habeas court must "'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed." Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018).

[15] Petitioner argues that the PCRA Court misunderstood his claim – believing that he was arguing that counsel should have attempted to show that there were no sexual assault injuries. But the PCRA Court's conclusion was quite clear: "The final argument within this issue is the failure to rebut or impeach the Commonwealth's witnesses regarding the rape. Dr. Shane did testify, and his testimony was that the injuries to the vagina were the result of consensual sex." (Commonwealth Exhibit M at 139 (PCRA Court Opinion at 4)).

if you look at the top as 12 o'clock—at the base as 6 o'clock, I could see where the skin was lacerated or denuded, consistent with laceration.

I noted that the SAFE nurse observed a bruised, reddened area at the 9 o'clock position inside the vagina, as well as a reddened area on the cervix.  But all of those areas, in context with the motile sperm, allows me to conclude it is compatible, in my opinion to a reasonable degree of medical certainty, that it represents forced penetration or rape
. . .
And that all is compatible to the fact that she was found upstairs, lying on the bed, nude, when previously she had been clothed.  Also, the SAFE nurse had the Wood's Lamp around the external genitalia and they did not see any flow pattern.

This is consistent with, in my opinion to a reasonable degree of medical certainty, a case of sexual assault and rape.

(N.T. 12/6/01 at 459-60.)   When shown photographs during trial, Dr. Ross testified that the photographs depicted laceration of the skin inside the vagina and opined that "I've done over 5,000 autopsies and reviewed external genitalia in all of the women, and [these injuries are] uncommon i[n] cases where there is not rape."  (Id. at 461.)

At trial, Petitioner testified that he engaged in consensual sex with Ms. Taylor during the early morning hours of May 14, 2000.  (N.T. 12/11/01 at 740.)  Trial Counsel also called Dr. Shane as a rebuttal expert witness, who testified that he did not agree with Dr. Ross's conclusion.  Instead, Dr. Shane opined that he had observed similar injuries in the past resulting from consensual sex. (Id. at 851-58.)

Petitioner raised this claim during the PCRA proceedings, where Trial Counsel acknowledged that "two doctors are better than one," but testified that he would have hired another doctor if there had been an expert willing to testify.  (N.T. 6/23/2009 at 241.)  Ultimately, Trial Counsel testified that he did not think that he needed another expert because he was "satisfied with the opinion of Dr. Shane and ultimately was satisfied with the testimony of Dr. Shane on these issues."  (N.T. 6/23/2009 at 220-22.)

40

Petitioner presents new experts, but their testimony presents the same theory that was presented by Dr. Shane at trial. (See Dr. Wetli's Report ("the bruising and abrasion of the genital area indicates forceful sexual activity but does not imply whether the sexual encounter was consensual or not"); Dr. Scotti's Report (same)). Petitioner's current argument is a repetition of his claim that Trial Counsel's use of Dr. Shane was, as a general matter, deficient. As explained supra, the PCRA Court credited Trial Counsel's testimony that he used Dr. Shane only on specific issues that they knew Dr. Shane was credible. (N.T. 6/23/2009 at 138-39.) This finding was affirmed by the Pennsylvania Supreme Court. Davido II, 106 A.3d at 630 n.9.

Petitioner argues that Hinton v. Alabama, 571 U.S. 263, 273 (2014), requires a different result. In Hinton, Trial Counsel was found to be ineffective for failing to request funding to replace an expert due to a mistaken understanding of state law. But here, Trial Counsel did not replace his expert because he was "satisfied with the opinion of Dr. Shane and ultimately was satisfied with the testimony of Dr. Shane on these issues." (N.T. 6/23/2009 at 241.) The state court found this statement credible and I have rejected Petitioner's argument that the determination was unreasonable.

On the specific issue of bringing in a second doctor to testify about the rape, Trial Counsel testified that he investigated the possibility, apparently on the theory that "two doctors are better than one," but ultimately did not call a second doctor. Petitioner urges me to assume that Trial Counsel just "let the matter drop" for no reason at all. (Petitioner's Mem. of Law at 28, 37, ECF No. 123.) Given that I must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance;" Strickland, 466 U.S. at 689, and given that Trial Counsel has credibly explained the reasons for his decision, Petitioner has not demonstrated that Trial Counsel's performance was deficient.

Finally, Petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. Having reviewed Dr. Shane's testimony and the reports from Drs. Wetli and Scotti, I conclude that Petitioner has not demonstrated the necessary Strickland prejudice. Ultimately, Petitioner presents the same information through different doctors, who are no more persuasive than the one who testified at trial. The Commonwealth's argument that the victim was raped was based on medical testimony as well as statements made by Petitioner to certain witnesses. I cannot conclude that the testimony of two different medical experts, presenting essentially the same medical opinion as the original expert, would have had any impact on the verdict.

Having failed to satisfy either prong of Strickland, Petitioner is not entitled to relief as to the ineffective assistance of counsel claim relating to rape.

### E.    Claim II:  Petitioner's Challenge to Counsel's Ineffectiveness for Failing to Present a Heat of Passion Defense[16]

Petitioner next argues that Trial Counsel was ineffective for failing to "adequately investigate and present a heat of passion defense," which could have resulted in a voluntary manslaughter verdict. (Petitioner's Mem. of Law at 39, ECF No. 123.) In making this argument Petitioner acknowledges, as he must, that Trial Counsel did present the jury with evidence and arguments in an effort obtain a voluntary manslaughter verdict. As the Pennsylvania Supreme Court explained, counsel focused most of his efforts in arguing for a third-degree murder verdict, but he took care "not [to] foreclose the jury's consideration of an alternative, lesser verdict." Davido II, 106 A.3d at 634. Petitioner argues that this approach was deficient, because there was

---

[16]    Included as Claim VI in the original habeas petition and as Claim II in Petitioner's Memorandum of Law.

more evidence that was available and should have been presented in pursuit of a voluntary manslaughter verdict.

To establish a violation of <u>Strickland</u>, Petitioner must show that counsel's decision making was deficient and that those deficiencies prejudiced Petitioner.  As I review Counsel's decision-making, I recognize that "the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge." <u>Harrington</u>, 562 U.S. at 105.  I further recognize that when examining the state court's application of <u>Strickland</u>'s general standards, "the range of reasonable applications is substantial."  <u>Id.</u>  "The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard."  <u>Id.</u>  In light of these standards, I find no error in the Pennsylvania Supreme Court's determination that Petitioner had failed to establish that Trial Counsel's representation "fell below an objective standard of reasonableness as defined by prevailing professional norms."  <u>Saranchak v. Sec'y, Pa. Dep't of Corrections</u>, 802 F.3d 579, 588 (3d Cir. 2015) (internal quotation marks omitted).

As Pennsylvania Supreme Court explained, counsel presented "facts which could have supported a jury finding that [Petitioner's] culpability rose no higher than voluntary manslaughter and that the trial court charged the jury on the elements of voluntary manslaughter."  <u>Davido II</u>, 106 A.3d at 632.  Simultaneously, counsel argued in favor of a third-degree murder verdict - the approach requested by Petitioner who insisted that Ms. Taylor's death was "accidental and unintentional."  <u>Davido II</u>, 106 A.3d at 634.  The state court found no constitutional error in counsel's strategic decision to tread carefully and present the jury with two theories as an alternative to a first-degree murder verdict.  Further, the state court observed that there was

substantial risk in pursuing the additional evidence that Petitioner now proposes, and he was not prejudiced by counsel's decision to tread cautiously.

"A heat of passion defense . . . is a partial defense, focused on the element of intent. A defendant accused of murder may establish that he or she is guilty, not of murder, but rather of voluntary manslaughter, by proving that, at the time of the killing, he or she was acting under a sudden and intense passion resulting from serious provocation by the victim." Commonwealth v. Hutchinson, 25 A.3d 277, 314 (Pa. 2011). "To reduce an intentional blow, stroke, or wounding resulting in death to voluntary manslaughter, there must be sufficient cause of provocation and a state or rage or passion without time to cool, placing the prisoner beyond the control of his reason, and suddenly impelling him to the deed." Commonwealth v. Miller, 987 A.2d 638, 651 (Pa. 2009) (quoting Commonwealth v. Collins, 269 A.2d 882, 885-86 (Pa. 1970)). "If any of these be wanting—if there be provocation without passion, or passion without a sufficient cause of provocation, or there be time to cool, and reason has resumed its sway, the killing will be murder." Id.

A heat of passion defense was difficult in this case for three primary reasons. First, Petitioner was primarily focused on pursuing a defense that would result in an outright acquittal and he was steadfast in his insistence that he would not admit that he intended any physical harm to Ms. Taylor. Second, there was substantial evidence that indicated that Petitioner had been fighting with his brother for as much as a week regarding his relationship with Ms. Taylor. Third, Petitioner had a history of violence against women, arising under substantially similar circumstances, that counsel was trying to keep from the jury.

In support of his claim, Petitioner tries to avoid AEDPA and Strickland deference by arguing that Trial Counsel's strategic decisions were premised on a misunderstanding of state law.

He argues that Trial Counsel failed to understand that a heat of passion defense only required a concession of general criminal liability. But as the Pennsylvania Supreme Court explained, Trial Counsel correctly understood that "third-degree murder and voluntary manslaughter are internally inconsistent with and mutually exclusive of each other, with respect to malice and intent." Davido II, 106 A.3d at 634.

Petitioner made it clear to Trial Counsel that he would not testify that he intended to kill or hurt Ms. Taylor. In his memorandum of law, Petitioner relies on a letter that he wrote to Trial Counsel to support the proposition that he was "amenable to a heat of passion defense." (Petitioner's Mem. of Law at 40, ECF No. 123.) The letter supports no such proposition. In the letter, Petitioner states that Ms. Taylor "never had a broken nose" and that he "never hit [her] in the head." (Petitioner's Supp. App., ECF No. 124 at 6.) He states further, "I never intended for anyone's life to end…. You said yourself you did not see intent." (Id. at 7). Petitioner then detailed his theory that Ms. Taylor died because she was taking other medication and caused the fatal injury. (Id. at 8). Though Petitioner notes the voluntary manslaughter defense, it is plain that he does not understand the intent element of the crime, since he speaks of the defense and then immediately details that he did not beat her to death and that her injuries were not significant enough to cause her death. (Id. at 8-9). As he stated, "she was not beaten to death and [the] assault was not life threatening." (Id. at 9).

Then, and it seems now, Petitioner has remained steadfast in his desire to "secure an outright acquittal on the theory that the victim's death was not the result of his actions at all, but was caused by some undetermined, coincidental fatal brain abnormality." Davido II, 106 A.3d at 635, fn. 12. As has already been discussed, that was an unpersuasive theory to pursue, but counsel attempted to seek acquittal by arguing that the Commonwealth failed to prove its case. Trial

counsel used a similar strategy in advocating for lesser included offenses - both third-degree murder and voluntary manslaughter.  As Trial Counsel explained, the defense team, "had to determine what [they] could prove based on what Mr. Davido was willing to support and what we felt the facts would support . . . . In other words, this was either a third-degree case where there was a malice factor, but not a specific intent to kill, or this was some sort of heat of passion defense, which would take us to voluntary manslaughter, which requires a specific intent to kill, but militates there is no malice."  (N.T. 6/23/2009 at 194.)

Petitioner consistently refused to acknowledge that he intended to hurt Ms. Taylor.  At trial, Petitioner attempted to suggest that he had not even hit Ms. Taylor during the altercation.  (N.T. 12/10/01 at 584-93, 644-45; N.T. 12/11/01 at 610-11, 622-25, 752.)  He described a fight with Ms. Taylor and with his brother, but he described a mostly verbal dispute, as opposed to a physical confrontation.  Id. at 741-44.  According to Petitioner's testimony, he was in another room when the victim suffered her fatal injury and he tried desperately to revive her, but she was "in a trance."  Id. at 744-45.  During cross examination, Petitioner claimed that Ms. Taylor "bruised easily."  Id. at 790.  Though Petitioner's testimony was inconsistent on several points, one thing was clear throughout, Petitioner insisted that he did not intend to hurt or kill Ms. Taylor.

This testimony was consistent with Petitioner's several statements to police.  Though the statements were riddled with inconsistency, Petitioner was consistent in his denials that he intended Ms. Taylor any harm.  Initially, Petitioner denied strangling the victim, but he later admitted that he choked her, but only with his hands.  He admitted slapping the victim, but denied hitting her with a closed fist.  He attempted to explain the bruising on the victim's body by claiming she had fallen down the stairs and landed on her face.  According to Petitioner, he had not pushed her down the stairs, but he had merely grabbed her and "she flew over [his] head like a dream"

and fell down the stairs face first.  <u>Davido II</u>, 630 A.3d at 617-18.  *See also* N.T. 12/10/01 at 584-93, 644-645.  In preparation for trial, counsel would have known that a decision to fully commit to a heat of passion defense was going to collide with these statements and with Petitioner's likely testimony that Ms. Taylor's death was a tragic accident.  The "tragic accident" theory could be stretched to include an argument for acquittal or third degree murder, because under both theories, Petitioner did not intend any significant harm.  Rather, he was angry, he lashed out, but Ms. Taylor's death was the shocking result.

A heat of passion defense was more difficult.  To present a heat of passion defense, counsel had to harness testimony that showed Petitioner passionately responded and was "beyond control of his reason" when he inflicted blows that killed Ms. Taylor.  Petitioner's testimony did not admit to the infliction of any real blows at all, so it did not match a heat of passion theory of the case.

In reaching this conclusion about Counsel's decision-making, I am mindful of the balance that counsel is required to strike when there is a dispute with his client about strategic decisions. Trial Counsel bears the responsibility for matters of trial management: "decisions such as 'what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence.'"  <u>McCoy v. Louisiana</u>, 138 S. Ct. 1500, 1508 (2018).  But other decisions are reserved for the defendant.  Notably, the "[a]utonomy to decide that the objective of the defense is to assert innocence" is the defendant's choice alone.  <u>Id.</u>  Here, where Petitioner was arguing for a defense that was contrary to the medical evidence, Trial Counsel's ability to present certain defenses was limited.  When evaluating counsel's decisions, I must guard against hindsight evaluations that fail to account for the real limitations placed by Petitioner's own insistence about his intent on the day of the murder, and his constitutional right to overrule Trial Counsel's own strategic judgment on these points.

Understanding that the law was restrictive, Trial Counsel successfully advocated for the jury to consider that Petitioner merely had a passionate response to an affair. As the Pennsylvania Supreme Court explained, Trial Counsel went as far as he could with the evidence that he had by arguing to the jury that "the 'triggering event [and] provocation' for the 'angry dispute' that 'ends with Angie Taylor in the hospital' was that 'Angie makes some comment to Ted about engaging in a sexual act with his brother, Spanky Davido; specifically an oral sexual act with Spanky Davido.'" Davido II, 106 A.3d at 632 (quoting N.T. 12/5/01 at 33)). This argument was possible because Trial Counsel managed to extract sufficient testimony from Petitioner about how the argument started and how upset he was - even if Trial Counsel could not extract testimony about Petitioner's intent or sufficient detail about the fight itself. I do not see any evidence that he misunderstood the requirements of Pennsylvania law when he made that choice. Instead, the record before me demonstrates that Trial Counsel pursued the reasonable approach of providing the jury the choice of multiple lesser included offenses.

Beyond the question of intent and the allegations that Trial Counsel misunderstood the law, Petitioner also argues that the evidence presented in support of the heat of passion defense was deficient. He first claims that Trial Counsel should have presented additional evidence from Stephanie Tsamutalis to provide evidence about the "provocation" that gave rise to Petitioner's heat of passion defense. Second, he argues that Trial Counsel should have presented mental health experts to support his heat of passion defense.

Petitioner also argues that Trial Counsel should have asked Ms. Tsamutalis to provide "detailed information about the cause of the fight," which could have provided more evidence regarding the nature of the "sudden and intense passion" experience by Petitioner and the details of the "serious provocation by the victim." (Petitioner's Mem. of Law at 41, ECF No. 123). The

48

Pennsylvania Supreme Court reviewed this argument and determined that Trial Counsel's decision was not deficient because of the risks associated with further questioning of Ms. Tsamutalis.  I agree.

Petitioner does not challenge counsel's preparation, as he admits that Trial Counsel reviewed Ms. Tsamutalis's statement and interviewed her.  Rather, Petitioner challenges Trial Counsel's failure to question her more expansively at trial.  I find this argument unpersuasive for several reasons.

Before I can assess what counsel did not do, I must review what happened at trial.  Ms. Tsamutalis testified for the Commonwealth and was cross-examined by Trial Counsel.  She explained that Petitioner had been fighting with Ms. Taylor and had banged on Ms. Tsamutalis's bedroom door to wake up his brother, Spanky.  She stated that Petitioner was banging on the door saying that Angie had said that she "had did something with his brother."  (N.T. 12/6/01 at 334.)

During cross-examination, Trial Counsel reinforced that Petitioner and Ms. Taylor were fighting when they knocked on her bedroom door, and that the scuffle between Petitioner and Spanky lasted only a "couple of minutes."  (Id. at 340-41.)  Upon stressing the short time period, he asked Ms. Tsamutalis to confirm that they had left the house to allow Petitioner time to cool off and that they had asked Ms. Taylor to come with them, but she refused.  Trial Counsel's efforts extracted beneficial facts from Ms. Tsamutalis for purposes of a heat of passion defense.  The testimony established both a triggering event (i.e., Ms. Tsamutalis's testimony that "Angie had said that she had did something with his brother") and Petitioner's sudden and intense passion (i.e., Ms. Tsamutalis's testimony that she thought that the best way to get "it all to stop" was to leave the house).  (Id. at 334, 341-42.)

Petitioner argues that Trial Counsel's handling of this witness was deficient because he "failed to ask her any questions about [Ms. Taylor]'s statement to her (which she reported to police) that [Ms. Taylor] had indeed told Petitioner that she had performed oral sex on Spanky, but that it was not true." (Petitioner's Mem. of Law at 42, ECF No. 123). Considering what the jury did hear, I do not believe that this additional detail was crucial. The testimony provided the necessary context about the fight. More importantly, Trial Counsel focused his attention on Ms. Tsamutalis's opinion that the best way to handle the situation was to leave Petitioner alone to cool off. Instead of focusing on less important details, Trial Counsel focused on the best testimony available:

> Q: And you wanted it all to stop?
>
> A: Yes.
>
> Q: And you thought the best way to do that was to get people out of the house?
>
> A: Yes.
>
> Q: And Angie chose not to come out? You asked her, and she chose not to come out?
>
> A: I asked her to come and she didn't want to.

(Id. at 341-42.)

Petitioner argues that the limits on Tsamutalis's testimony prejudiced him because the jury was not presented evidence of provocation or Petitioner's "impassioned state" at the time of the murder. But as is plain from this exchange, Trial Counsel extracted testimony to demonstrate that Petitioner was enraged, and Ms. Tsamutalis believed that the best thing to do was to give him time to cool off. Importantly, her testimony provided the jury with evidence that Ms. Tsamutalis encouraged Ms. Taylor to leave that day, but she chose to stay.

Regardless, the Pennsylvania Supreme Court found Trial Counsel's testimony credible, wherein he explained that he did not call Ms. Tsamutalis because he had concerns about the potential opening of the door to Petitioner's prior bad acts with other women. Davido II, 106 A.3d at 632-33. I agree with the Pennsylvania Supreme Court's decision that this was a reasonable strategy, especially considering the testimony counsel had already obtained.

Petitioner urges me to disregard the state court's finding and reject counsel's explanation as "post-hoc rationalization." Specifically, Petitioner focuses on Trial Counsel's testimony that he did not have a specific recollection about Ms. Tsamutalis's testimony. (N.T. 6/23/2009 at 200.) But the Supreme Court has been clear that appellate courts should not "insist counsel confirm every aspect of the strategic basis for his or her actions." Harrington, 562 U.S. at 109. Rather, "[t]here is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'" Id.

Trial Counsel was aware of Ms. Tsamutalis's statement to police and he interviewed her in advance of trial. So, it is apparent that Trial Counsel did spend time considering her testimony. Though Counsel initially responded that he did not remember the specifics of his decisions regarding Ms. Tsamutalis, when asked if he could "think of a strategic or tactical reason" not to ask the question, he stated: "We had significant concerns about asking any questions that had the potential to open the door to prior bad behavior with other women because we had a bad history we wanted to keep out." (Id.)

Counsel's statement is confirmed by his arguments during the trial. Trial Counsel fought to exclude evidence of allegations that "repeatedly in the past that Davido would make allegations of infidelity, followed with physical abuse." (Id. at 242.) Ms. Tsamutalis's statement to police was discussed in this context and it was clear that a detailed discussion of Ms. Taylor's statements

to Ms. Tsamutalis about the origin of the fight and the truth of her admission would potentially open the door to the bad acts evidence that counsel wished to exclude.  (Id. at 242-45.)  Considering Trial Counsel's contemporaneous statements, opening the door to evidence of his prior bad acts was at the forefront of his mind during trial, and this concern was specifically discussed in the context of his ability to cross-examine Ms. Tsamutalis.  I, therefore, reject Petitioner's argument that this was a *post-hoc* rationalization.  Ultimately, there was no reason to pursue this point further with Ms. Tsamutalis, since she had already provided the evidence needed by the defense.

Petitioner argues that counsel's concern about opening the door to this bad acts evidence was inconsistent with Pennsylvania law.  The Pennsylvania Supreme Court, however, disagreed. The state court concluded that Trial Counsel's concerns about opening the door to other bad acts was well-founded and a very significant problem with any attempt to pursue a heat of passion defense.  As the Court explained, "other witnesses could confirm that [Petitioner] had a history of accusing his former girlfriends of having sex with his brother Spanky, and that [Petitioner] had committed aggravated assault against a former girlfriend in an incident arising out of such an accusation."  Davido II, 106 A.3d at 633.  As the state court explained, "pursuit of [a voluntary manslaughter] theory . . . would have opened the door to unsavory evidence regarding [Petitioner's] past violence against women."  Id. at 633.  A state court's decision on its own state law cannot be so easily cast aside.

These legal concerns were also discussed during the trial.  The prosecutor made it clear during a sidebar if the defense theory of the case began to focus on presenting testimony that Petitioner was provoked into the killing, then the Commonwealth would want to present evidence that Petitioner had a history of making up allegations of infidelity and then assaulting his girlfriends in response.  As the prosecutor explained, a heat of passion defense is premised on

provocation, but if Petitioner created the situation through his own false allegations, then he is not insulated by the defense.  (N.T. 6/23/2009 at 245.)

Additional testimony by Ms. Tsamutalis created another problem for Petitioner.  Despite Petitioner's current assertions, there was a real issue with the "cooling off period" as it applied to his heat of passion defense.  At trial, Michelle Gray, who had been a close friend of Petitioner's family for years, testified that Petitioner was already fighting with his brother on Friday, days before the murder.  (N.T. 12/6/01 at 361.)  Ms. Tsamutalis had told police that "[Petitioner] had been accusing Spanky of those things for approximately a week" before the murder.  (N.T. 6/24/2009 at 275.)  Ms. Tsamutalis's trial testimony did not delve into this delay.  As a result, Trial Counsel was able to present a scenario that sounded like an "impassioned state," as opposed to a fight that spanned a week.

Trial Counsel wisely avoided testimony that would have demonstrated that Petitioner was repeating old patterns - his paranoid obsession that his girlfriend was having an affair leading to a week of fighting that ultimately culminated in violence.  Focusing detailed attention on the timing and what was said the morning of the murder, would have focused on two things - the fact that this was not new information the morning of the murder and the fact that Ms. Taylor had said that none of it was true - as had been the case the last time Petitioner had confronted a girlfriend about infidelity.

I agree with the state court that Trial Counsel's careful approach to Ms. Tsamutalis's testimony was reasonable.

Finally, Petitioner argues that counsel should have presented mental health experts who could have testified about the reasonableness of an enraged reaction to the news of the victim's infidelity.  I have already detailed Pennsylvania law in this area in relation to Petitioner's consistent

minimization of his intent. This is a particular problem when dealing with a mental health experts, where the admissibility of the testimony depended heavily on the legal theory presented. Given that Petitioner refused to admit he was acting in a rage, it is hard to understand how this would have been a productive defense, if it would have been permitted at all.

Petitioner has not identified any expert who could present testimony that would fit the requirements of a heat of passion defense. During the PCRA hearings, Petitioner relied on the testimony of Dr. Robert Fox and Dr. Blumberg to support his heat of passion defense. In that testimony, Dr. Fox acknowledged that Petitioner told him that he did not intend to kill Ms. Taylor. (N.T. 6/24/2009 at 392). During those hearings, Petitioner also presented the testimony of Dr. Blumberg, who had worked with Trial Counsel in advance of the trial. Dr. Blumberg similarly confirmed that Petitioner stated that Ms. Taylor's death was "accidental." Id. at 328. Similarly, Dr. Lawrence Donner, a neuropsychologist, consulted by Petitioner's Trial Counsel in advance of the trial, would have provided report would have further supported the Commonwealth's theory that the provocation in this case arose out of Petitioner's own paranoid behaviors. As the Pennsylvania Supreme Court pointed out, Dr. Donner's "diagnostic testing revealed that [Petitioner] is manipulative and controlling of women." Davido II, 106 A.3d at 633.

As the Pennsylvania Supreme Court explained, Trial Counsel's decision not to call these experts was sound because (a) Petitioner never indicated to him that he was acting under an uncontrollable rage at the time of Ms. Taylor's death, and (b) his testimony would have potentially opened the door for Petitioner's prior bad acts with other women. Id. at 633-34. Petitioner argues that I should discount all of these conclusions because Petitioner had nothing to lose by trying.

But Petitioner had quite a lot to lose by pursuing this approach. A decision to make provocation the central issue in the case would have necessarily forced the prosecutor to delve

deeply into the question of provocation and Petitioner's own history of paranoid fabrications about infidelity that had resulted in other violent attacks on women.

Furthermore, the testimony of these experts would have had very little benefit for Petitioner. Petitioner argues that this expert testimony was necessary to demonstrate his "impassioned state at the time of the offense." (Petitioner's Mem. of Law at 50, ECF No. 123.) But there was very little doubt that Petitioner was in a rage at the time of the murder. Ms. Tsamutalis testified that she left the house because she was afraid. Petitioner's sister left the house and called the police for the same reason. The jury heard testimony that Petitioner believed Ms. Taylor had performed oral sex on his brother. It is hard to understand why a juror would need an expert to explain that this would cause a heated response.

Aware of the Commonwealth's position, the risks of the evidence of prior bad acts, and Petitioner's unwillingness to admit that he assaulted Ms. Taylor in a rage, Trial Counsel made the professional judgment to primarily focus his attention on a third-degree murder defense, wherein he would argue that Petitioner did not have the requisite "malicious" state of mind. Trial Counsel strategically used the evidence presented by the Commonwealth to support a voluntary manslaughter argument. Through this evidence he was able to make an argument on the issue and obtain a jury instruction but prevent the introduction of additional evidence of prior bad acts. This was not a deficient strategy. Further, the risks of pursuing this alternate legal theory were substantial. As a result, Petitioner was not prejudiced by counsel's choice. In light of the high deference that is owed to Trial Counsel and the Pennsylvania Supreme Court, Petitioner is not entitled to relief as to this claim.

F.      **Claim III:  Petitioner's Challenge to Ms. McGarrity's Trial Testimony as "False, Unreliable and Misleading" and Counsel's Ineffectiveness Relating Thereto[17]**

Petitioner next challenges the testimony of Maureen McGarrity, the Sexual Assault Forensic Examiner ("SAFE") nurse at Lancaster General Hospital.  As with his challenge to Dr. Ross's testimony discussed in section III.A, supra, Petitioner has indicated that this claim is not one legal claim, but two claims based on distinct, but related, legal theories.  He argues that: (a) Ms. McGarrity's testimony was so false, unreliable and misleading that the admission of the testimony violated the due process clause; and (b) Trial Counsel's impeachment of Ms. McGarrity was constitutionally deficient.  (Petitioner's Mem. of Law at 55-57, ECF No. 123.)  I will address these separate claims separately.

(1)      **Exhaustion and Procedural Default**

As discussed above, exhaustion requires that Petitioner give the state court an opportunity to review his allegations of error before seeking relief in federal court.  Baldwin, 541 U.S. at 29. To fairly present a claim, a "petitioner must present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted." McCandless, 172 F.3d at 261.  In Evans v. Court of Common Pleas, Del. Cnty., Pa., 595 F.2d 1227 (3d Cir. 1992), the Third Circuit held that a petitioner could alert a state court of the presence of a federal claim, as opposed to a claim raised under state law, without "citing chapter and verse of the constitution," through:

> (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right

---

[17]   Included as Claim VII in the original habeas petition and as Claim III in Petitioner's Memorandum of Law.

protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

Evans, 959 F.2d at 1232; see also Johnson v. Mechling, 541 F.Supp.2d 651, 659-61 (M.D. Pa. 2008) (providing a detailed review of Third Circuit and Supreme Court cases interpreting the "fair presentation" requirement).

The claim presented to the Pennsylvania Supreme Court was captioned similarly to the claim presented here: "The Commonwealth Presented False, Inaccurate and Misleading Testimony from Maureen McGarrity; All Prior Counsel Were Ineffective for Failing to Raise and Litigate this Issue." (Commonwealth's Exhibit N at 63, ECF No. 131-15.)  This heading was almost identical to the heading used in challenging counsel's ineffectiveness relating to the "false, inaccurate and misleading testimony" of Dr. Ross.  (Id. at 25.)  As I noted earlier, in briefing that claim to the state court, Petitioner specifically indicated that he intended to set forth a challenge to counsel's stewardship, not a stand-alone challenge under the due process clause.  Since Petitioner's caption is essentially identical in this claim, the state court reasonably presumed that Petitioner was presenting the same legal theory in this claim as he was in the prior claim.

Furthermore, in briefing this claim about Ms. McGarrity in state court, Petitioner relied exclusively on the three-part ineffectiveness analysis used in Pennsylvania to litigate a constitutional challenge to counsel's stewardship - as opposed to the analysis used for a stand-alone due process claim.  These terms are "so particular as to call to mind a specific right protected by the Constitution." Werts v. Vaughn, 228 F.3d 178, 203 (3d Cir. 2000) (setting forth the Strickland standard and the equivalent Pennsylvania standard).  But the particular federal

constitutional right called to mind was the 6th Amendment right to counsel, not a stand-alone due process violation.[18]

Tellingly, Petitioner's Memorandum of Law to this Court relies on two subheadings: (a) "Due Process violation" and (b) "Sixth Amendment violation." (Petitioner's Mem. of Law at 55-57, ECF No. 123.) Those headings are not present in Petitioner's brief to the Pennsylvania Supreme Court. (See Commonwealth's Exhibit N at 63-70, ECF No. 131-15.) Indeed, Petitioner's brief to the Pennsylvania Supreme Court does not cite to Napue, nor does it discuss it in any way. (Id.) Having presented this issue as an ineffectiveness claim during the PCRA proceedings, Petitioner cannot pursue a stand-alone due process claim before this court because a due process challenge was not fairly presented to the state court.[19]

In any event, if I were to review this due process challenge, I would find it meritless. To establish a Napue violation, Petitioner must "show that (1) [the witness] committed perjury; (2) the government knew or should have known of his perjury; (3) the testimony went uncorrected; and (4) there is any reasonable likelihood that the false testimony could have affected the verdict." Lambert, 387 F.3d at 242-43. Petitioner has not made a sufficient showing as to any prong of Napue, nor has he attempted such a showing. This claim is most easily disposed on the fourth prong. Petitioner has alleged that Ms. McGarrity's use of the word laceration was improper because she should have used the word "abrasion" or "denuded," as Dr. Ross did, and that this

---

[18]  Petitioner's argument as it related to Dr. Ross, where he specifically disavowed raising a stand-alone due process claim, set forth a legal analysis that looked more like a stand-alone due process claim then the one was seen with this claim.

[19]  A procedurally defaulted claim may be reviewed in federal court if the petitioner can demonstrate cause and prejudice or a miscarriage of justice. Petitioner has made no such showing, nor have I identified any argument to support the excusal of the procedural default.

somehow negatively influenced the jury. The jury was aware of Dr. Ross's testimony and they were told that they should understand the term "laceration" to mean something like "denuded." (N.T. 12/7/2001 at 443.) There was no confusion on this point. There is no reasonable likelihood that Ms. McGarrity's use of the term "laceration" affected the verdict.

### (2)        Discussion of the Merits of the Ineffectiveness Claim

Petitioner did fairly present a claim that Trial Counsel was ineffective for failing to adequately cross-examine Ms. McGarrity. He argues here that the state court's rejection of the claim was in error. (Petitioner's Mem. of Law, at 55-57, ECF No. 123.)[20]  In support of this argument, Petitioner points to Trial Counsel's lack of tactical or strategic basis in failing to address an alleged inconsistency between Ms. McGarrity's testimony and other findings. (Id. at 55.) The Commonwealth replies that Trial Counsel did not render ineffective assistance because he called Dr. Shane as a rebuttal witness at trial. (Commonwealth's Mem. of Law, at 89-98, ECF No. 134.)

Ms. McGarrity was the SAFE nurse at Lancaster General Hospital who collected the rape kit from Ms. Taylor on May 14, 2000. (N.T. 12/6/01 at 391-94.) She was not qualified as an expert; she was a fact witness. During trial, Ms. McGarrity described how she documented Ms. Taylor's injuries and took photographs. (Id. at 394-97.) She also described that she completed a vaginal speculum examination, whereby she observed lacerations in the vaginal area and multiple contusions and abrasions to her labia. (Id. at 397-405.). She also collated seminal fluid that was found inside of Ms. Taylor's body, which contained motile sperm. (Id.) Trial Counsel cross-examined Ms. Taylor, whereby he highlighted that (a) Ms. Taylor did not conduct testing on the

---

[20]  In his challenge to Dr. Ross's allegedly false or misleading testimony, Petitioner did fairly present a claim that counsel was ineffective for failing to argue that the admission of the testimony violated the due process clause. That is not what happened with this challenge to Ms. McGarrity's testimony. The claim presented in state court did not relate in any way to the due process clause of the constitution.

fluid at the time the sample was collected, (b) she was unable to determine whether there were fractures, and (c) it was unusual for her to complete the rape kit in the trauma bay.  (Id. at 405-08.)

Petitioner testified at trial that he had engaged in consensual sex with Ms. Taylor on the morning of the murder.  (N.T. 12/11/01 at 740.)  And Trial Counsel called Dr. Shane as a rebuttal witness at trial, who was accepted as an expert in forensic pathology, with a specialization in neurological pathology and gynecological pathology.  (Id. at 823-35.)  Dr. Shane opined that the injuries were not consistent with rape, and stated that he had observed similar injuries following consensual sexual encounters.  (Id. at 851-58.)

Petitioner argues that this was not enough.  Ms. McGarrity described certain vaginal injuries as "lacerations."  Petitioner claims that this term was prejudicially different than "abrasions" or "contusions" or "denuded" (the term used by Dr. Ross), and Trial Counsel should have done more to impeach the testimony.  The state court disagreed, as do I.

When Trial Counsel testified about this point during the PCRA hearing, he indicated that he did not specifically recall Ms. McGarrity's testimony.  (N.T. 6/23/2009 at 218.)  But upon further questioning, he was able to clarify that he did not believe that there was any real difference between injuries described as "lacerations," as opposed to the term "denuded" skin that was used by Dr. Ross.  (Id. at 252.)[21]  To dispute this point, Petitioner provides a number of citations to a forensic pathology textbook about the definitions of these medical terms.  It is apparent that Trial Counsel chose not to focus on the particularities of these terms.  This made sense in light of his overarching strategy regarding the vaginal injuries.  As the PCRA court concluded, Trial Counsel decided in his professional judgment that placing emphasis on the sexual injuries would not be

---

[21]  The jury was aware that the SAFE nurse and Dr. Ross had used different terms for the same injuries.  Indeed, on direct examination, Dr. Ross clarified that the injuries described by the SAFE nurse as "lacerations" was "highly consistent" to his own term – "denuded".

beneficial, and relying on Dr. Shane's rebuttal was sufficient.  Davido II, 106 A.3d at 635.  The Pennsylvania Supreme Court affirmed, finding that "[t]he record supports that counsel's strategy of rebutting the testimony with Dr. Shane and [Petitioner] was a reasonable one designed to effectuate [Petitioner's] interests."  Id.

Keeping in mind that Dr. Ross did not use the word "laceration," and that Dr. Shane was going to testify that all of these injuries (whatever they were) were consistent with consensual sex, it is very hard to understand how Petitioner would have benefitted from extensive cross examination of the exact nature of the injury.  As Trial Counsel stated in his opening statement, "the physical findings will probably not be in significant dispute, but the doctors are going to give you two different opinions on what the physical findings mean.  And it's important that you listen to both of the doctors and give them full consideration and thought."  (N.T. 12/5/01 at 40.)

Trial Counsel fought to restrict the photos of Ms. Taylor that were shown to the jury.  As a result of Counsel's efforts, the Commonwealth did restrict the photos that it used, specifically excluding any photos of a sexual nature.  Counsel could have cross-examined Ms. McGarrity extensively about her use of the word "laceration."  If he had done so, her testimony about lacerations (previously two sentences long) would have been extensive.  The exact nature of the injury would have been on graphic display before the jury and might have opened the door to the admission of a photograph that actually depicted the injury – a photograph that Trial Counsel had fought to exclude.  Though Trial Counsel did not recall his specific reasons for not challenging this testimony, those reasons are apparent.  In a Strickland analysis, I am obligated to presume that "counsel's conduct falls within the wide range of reasonable professional assistance."  466 U.S. at 689.  "There is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'"  Harrington, 562 U.S. at 109.  Here the

reasons for counsel's decisions are apparent from the record.  Considering the strong presumption of counsel's competence, Petitioner has not made a sufficient showing to meet his burden on this prong of Strickland even under a *de novo* analysis.

Furthermore, to prevail, Petitioner must show that Trial Counsel's alternate approach was an error *and* that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  He fails on this second prong as well.  The Commonwealth's own expert advised the jury that the term laceration here should be taken to mean the same thing as "denuded." Though Petitioner suggests that the use of the term laceration would have misled the jury into believing that the injury was bleeding tear, that was simply not the case.  Dr. Ross specifically explained that the injury "wasn't as severe as a laceration, but there certainly was a contusion in that area."  (N.T. 12/6/01 at 444.)  The real issue before the jury was disputed between the two testifying doctors, neither of which quibbled over the characterization of the injury.  Whatever Ms. McGarrity chose to call the injury, Dr. Shane testified that it was consistent with consensual sex.  On the other hand, the decision that Petitioner advocates today, would have directed the jury's attention to the exact nature of this injury, which would have risked making the term used seem more significant, not less significant.  Petitioner was not prejudiced by Trial Counsel's decision not to focus on this term, instead of the real issue of whether the injury was consistent with rape.

Petitioner has failed to establish either prong of Strickland.  I, therefore, conclude that the state court's rejection of this claim was reasonable.

G.     **Claim IV:  Petitioner's Challenge to Counsel's Ineffectiveness for Failing to Object to Unlawfully-Obtained Evidence[22]**

Petitioner next argues that Trial Counsel failed to object to the alleged warrantless entry into his home, which amounted to ineffective assistance of counsel.  (Petitioner's Mem. of Law at 63-64, ECF No. 123.)  Respondents reply that Petitioner's original counsel, Mr. Kenneff, who became unable to represent Petitioner during the trial due to an illness, filed pretrial motions on Petitioner's behalf seeking to suppress the evidence seized during an execution of a search warrant at his residence.  Moreover, Petitioner's replacement trial counsel reviewed the pretrial motions and was satisfied that no further meritorious motions existed that needed to be filed. (Commonwealth's Mem. of Law at 99-100, ECF No. 134.)

(1)     **Relevant Facts**

The relevant facts for this claim are as follows.  On May 14, 2000, an anonymous 9-1-1 call was received at the Lancaster County Communication Center, reporting that "a guy was beating up a girl" at 26 Hager Street.  The caller was later determined to be Rosanna Davido.  (N.T. 12/5/01 at 42-52.)   Officers Ziegler and Schwmiz of the Lancaster City Borough Police Department were dispatched to the residence based on the understanding that there was a "domestic situation where there was an argument and that it was believed that a man was hitting a woman."  (Id. at 80.)  The dispatcher informed these officers that the caller, who placed the 9-1-1 call from a payphone, advised that someone was screaming inside the residence, and the officers arrived at the residence within three minutes of the call.  (Id. at 80-81.)  The officers testified that the house was very quiet when they arrived.  Upon inspection, the officers observed that the front

---

[22]   Included as Claim VIII in the original habeas petition and as Claim IV in Petitioner's Memorandum of Law.

and back doors of the residence were locked and no one answered the door upon knocking.  The officers entered the home through an unlocked window and found the body of Ms. Taylor.  The officers called for an ambulance upon finding Ms. Taylor unresponsive.  (Id. at 81-95.)  The officers did not immediately search the home, but instead obtained a search warrant for the residence later that day.  (Id. at 100-01, 154-58.)

During the PCRA hearing, Trial Counsel testified about the pretrial motions.  He explained that prior trial counsel, Jack Kenneff, had litigated all pretrial motions.  Though Trial Counsel had reviewed the motions when he first took over the case, he "didn't see anything that [he] thought had merit that hadn't already been litigated."  (N.T. 6/23/2009 at 78.)

The PCRA Court held that the warrantless entry was supported by probable cause and exigent circumstances in light of the 9-1-1 call regarding a domestic assault, the lack of response to the knock-and-announce efforts, and the officers' "protective sweep" of the property.  Davido II, 106 A.3d at 622.  The Pennsylvania Supreme Court affirmed, finding that the officers' warrantless entry was objectively reasonable under the totality of the circumstances.  Id. at 624. The Pennsylvania Supreme Court acknowledged that the signs of danger may be masked in domestic dispute, and that domestic violence victims often remain silent or lie to police about abusive relationships to protect the abuser, for fear of retaliation.  Id. The Pennsylvania Supreme Court concluded that there is not a "per se" exigent need for a warrantless entry in all domestic abuse cases.  However, the Court noted that the police have a duty to respond seriously to reported domestic conflicts and be "accorded some latitude in making on-the-spot judgments as to what actions to take and what actions are reasonably necessary to protect themselves and potential victims of abuse."  Id. at 623-24.

(2)     <u>**Analysis**</u>

In order to satisfy the standard set forth in 28 U.S.C. § 2254, I must determine whether the state court's findings were contrary to or an unreasonable application of clearly established federal law. As the Supreme Court has explained, <u>Strickland</u> is a demanding standard to meet. Where a Petitioner seeks to establish that Trial Counsel was ineffective for failing to litigate a suppression motion, the Petitioner must show that Trial Counsel's performance was deficient and establish further that "a meritorious Fourth Amendment issue" was present, and that due to the "gross incompetence of [his] attorneys" Petitioner was "denied a fair trial." <u>Kimmelman v. Morrison</u>, 477 U.S. 365 (1986). The Pennsylvania Supreme Court rejected Petitioner's claim, concluding that there was no meritorious Fourth Amendment issue. I agree.

In ruling that no warrant was required, the Pennsylvania Supreme Court articulated the following facts: (a) there was a specific anonymous call that a man was beating a woman at a specific residence, (b) there was a second separate report that screaming was heard emanating from the residence, (c) the knock-and-announce efforts were unsuccessful, and (d) no sound could be heard except for the ringing of an unanswered telephone within the residence. <u>Davido II</u>, 106 A.3d at 624. Though Petitioner argues that this "was an unreasonable application of the Supreme Court's Fourth Amendment jurisprudence," his arguments are based primarily on cases that were decided by lower appellate courts, as opposed to the Supreme Court itself.

Petitioner argues that the Pennsylvania Supreme Court's decision was an unreasonable application of United States Supreme Court precedent for two primary reasons. First, Petitioner argues that the decision utilized an improper *per se* exigency exception for domestic violence

situations.  Second, he argues that the Court improperly considered the officer's subjective state of mind.[23]

Since this is an ineffectiveness claim, Petitioner must demonstrate that counsel's decision not to pursue suppression was deficient.  It is notable that not one, but two different defense counsel – Mr. Gratton and Mr. Kenneff – decided not to pursue suppression on this ground.  Attorney Kenneff did seek to suppress other evidence and obtained a hearing to review those arguments.  Attorney Gratton testified that he reviewed the pretrial suppression motions filed by Attorney Kenneff and determined that no further motions needed to be filed.  Recognizing that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," Strickland, 466 U.S. at 690, Petitioner faces a serious challenge in pursuing this claim.  A review of the 4th Amendment case law reveals why each prior counsel made the choice he did and why the Pennsylvania Supreme Court properly rejected this claim.

The Fourth Amendment protects the people from "unreasonable searches and seizures." U.S. Const. amend. IV.  Warrantless searches of the home "are presumptively unreasonable unless the occupants consent, or probable cause *and* exigent circumstances exist to justify the intrusion." United States v. Coles, 437 F.3d 361, 365 (3d Cir. 2006).  "A court must determine whether exigent circumstances existed by an objective standard; the subjective intent of the officer is irrelevant."

---

[23]  For the first time in his current memorandum of law, Petitioner argues that the Pennsylvania Supreme Court opinion is problematic because "swatting" (i.e., fraudulent calls to police) is a concerning problem.  I cannot consider this argument, because it was never presented to the state court.

Additionally, the argument that Trial Counsel should have made this argument lacks logic. Petitioner is challenging the decisions made by Trial Counsel in 2002 – six years before the FBI even coined the term "swatting."  I am tasked with considering Trial Counsel's choices.  I cannot apply a 2008 consideration to a decision made in 2002.

Brigham City, Utah v. Stuart, 547 U.S. 398, 404 (2006).  Exigent circumstances exist when officers reasonably believe that "a person within the house is in need of immediate aid."  Michigan v. Fisher, 558 U.S. 45, 47 (2009)

"No question has been raised, or reasonably could be, about the authority of the police to enter a dwelling to protect a resident from domestic violence; so long as they have good reason to believe such a threat exists, it would be silly to suggest that the police would commit a tort by entering . . . to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur."  Georgia v. Randolph, 547 U.S. 103, 118 (2006).  The Third Circuit has explained that "courts have generally accorded great latitude to an officer's belief that a warrantless entry was justified by exigent circumstances when the officer had substantial reason to believe that one of the parties to a domestic dispute was in danger."  Smart v. Borough of Bellmawr, 528 F. App'x 163, 166 (3d Cir. 2013) (finding that the warrantless entry was unconstitutional where the officer could only establish that the 9-1-1 call reported an altercation between two males and a female in a hotel lobby, there was no mention of anything occurring in the hotel room, and no indication that the altercation constituted possible domestic violence).

Petitioner argues that the Pennsylvania Supreme Court's opinion provided an improper *per se* exigency exception for domestic violence situations.  Petitioner concedes, as he must, that the Pennsylvania Supreme Court specifically stated that it <u>was</u> <u>not</u> applying a *per se* rule.  He argues instead that this was "in effect" the state court's rule.  As I explained below, I disagree that was the ruling by the state court.  But in any event, Petitioner must demonstrate that the state court's decision was an unreasonable application of United States Supreme Court precedent, not the circuit precedent that Petitioner relies on.  See Kane v. Espitia, 546 U.S. 9 (2005) (per curiam) (concluding that a split of authority among federal appellate courts is clear evidence that the Supreme Court

has not "clearly established" such a right).  Since there is currently a circuit split about the propriety of a *per se* rule, Petitioner's claim necessarily fails under the AEDPA standard of review.

Petitioner's reliance on United States v. Davis, 290 F.3d 1239, 1244 (10th Cir. 2002) in support of his position that there is not a special rule for domestic calls is misplaced.  While that may be the rule in the Tenth Circuit, at least three circuits have concluded that "a 911 call reporting a domestic emergency, without more, may be enough to support a warrantless search of a home." United States v. Brooks, 367 F.3d 1128, 1136 (9th Cir. 2004) (discussing the cases in the Seventh and Eighth Circuits).  Indeed, the Pennsylvania Supreme Court relied in part on the Ninth Circuit's reasoning in Brooks, noting "the combustible nature of domestic disputes."  Davido II, 106 A.3d at 623.  Even if Pennsylvania had applied a per se rule, I do not believe that would have been an unreasonable application of United States Supreme Court precedent.

Either way, the Pennsylvania Supreme Court did not conclude that there was a *per se* exigency, but applied a totality of the circumstances test that is consistent with the rule set forth in Davis.  In Davis, the defendant was not threatening or aggressive, and the officers were able to check on the victim's condition without entering the home.  Id.  In contrast, the 9-1-1 call here specifically informed the police that a man was actively beating a woman at the residence, a separate report indicated that screams were heard from the home, and the police could not check on the victim's condition without entering the home.  While courts in this Circuit have declined to find that a call reporting domestic violence *per se* supports a finding of exigent circumstances, such a call is one important consideration in viewing the totality of the circumstances.  United States v. Wadley, No. CR.07-166, 2007 WL 4593508, at *7 (W.D. Pa. Dec. 28, 2007) ("In sum, considering the totality of the circumstances, in particular the two 911 emergency telephone calls reciting a domestic violence dispute and a hostage situation, respectively, coupled with the police

officers hearing commotion as well as yelling and screaming upon approaching the home and Ms. Blue's characterization of Defendant as 'acting crazy', all taken together, establish both the probable cause and exigent circumstances necessary for a warrantless entry and search of the residence."). Courts in our circuit have considered this factor in many cases. Indeed, the exigent circumstance exception in the domestic violence context is a fact-specific analysis. See, e.g., McNeil v. City of Easton, 694 F. Supp. 2d 375, 388 (E.D. Pa. 2010) (finding that the warrantless entry was reasonable where the officers received a specific 9-1-1 call regarding domestic dispute in progress, and loud noises were heard from the home upon arrival); United States v. Holyfield, No. 2:04-CR-035, 2005 WL 2106624, (W.D. Pa. Aug. 26, 2005) (finding that a warrantless entry was reasonable where the officers responded to a domestic violence call, heard arguing inside the home, and observed a man attempting to leave the apartment through a rear window). The Pennsylvania Supreme Court's consideration of these facts was not unreasonable.

Similarly, Petitioner's argument that the Pennsylvania Supreme Court improperly considered the officer's "gut feelings" is not a sufficient basis to conclude that the state court's decision was unreasonable. He cites to Florida v. J.L., 529 U.S. 266 (2000) in support of his argument that gut feelings and uneventful observations do not amount to a reasonable basis for warrantless entry. But in J.L., the United States Supreme Court held that an anonymous tip, without more, was insufficient to form a reasonable basis for a warrantless search. Id. at 270-71. The United States Supreme Court has subsequently distinguished J.L. finding that an anonymous 9-1-1 call was sufficiently reliable where the caller provides specific detail and information, evidencing that the caller was an eyewitness to a situation. Navarette v. California, 572 U.S. 393, 398-99 (2014). Here, the Pennsylvania Supreme Court was not focused on the officer's subjective intent, but rather focused on the overall circumstances, consistent with Supreme Court precedent.

On this record, both Attorney Gratton and Attorney Kenneff made a decision not to seek the suppression of this evidence.  The Pennsylvania Supreme Court determined that Petitioner could not establish ineffective assistance of counsel, since there was no meritorious 4th Amendment claim here.

For the foregoing reasons, I find that Petitioner has failed to establish that the Pennsylvania Supreme Court unreasonably applied established federal law.  Accordingly, Petitioner is not entitled to relief on this claim.

> **H.** **Claim V:  Petitioner's Challenge to Counsel's Ineffectiveness Relating to the Inmate Witnesses[24]**

Petitioner next argues that Trial Counsel failed to adequately impeach or cross-examine the Commonwealth's inmate witnesses.   (Petitioner's Mem. of Law at 67, ECF No. 123.) Specifically, Petitioner argues that Trial Counsel failed to investigate and develop evidence to impeach these witnesses, because he failed to obtain their mental health records.  (Id. 67-68.)  The Commonwealth replies that Petitioner's claim is meritless because Trial Counsel cross-examined the witnesses during the trial, and because the medical records relating to the witnesses' mental health were not relevant.  (Commonwealth's Mem. of Law at 112-13, ECF No. 134.)  Because Petitioner failed to establish either prong of the Strickland test, I find no error in the state court's rejection of this claim.

> **(1)** **Relevant Facts**

During the trial, the Commonwealth called Matthew Kauffman as a witness, who testified that he and Petitioner were fellow inmates in May 2000, following Petitioner's arrest.  The jury

---

[24]   Included as Claim IX in the original habeas petition and as Claim V in Petitioner's Memorandum of Law.

was advised in the course of Mr. Kauffman's direct examination testimony that at the time of the

trial, Mr. Kauffman was on parole for simple assault.  (N.T. 12/7/01 at 502-03.)  Mr. Kauffman

testified that Petitioner told him about the May 14, 2000 incident:

> Well, as soon as I, like, confronted [Petitioner], he, like explained what had
> happened; that he had came [sic.] home and they were fighting and one thing led to
> the next and he started hitting her.  He threw her down the steps and drug her back
> up and was, like, banging her head in the side of the dresser. And he was kicking
> her and, like, stomped on her back . . . Then he was talking to her and she would
> not, like, respond.  So he, like, began to have sex then with her to like try to make
> her talk to him.

(Id. at 505-06.)

When the prosecutor questioned Mr. Kauffman further about any details that Petitioner

provided, Mr. Kauffman stated that Petitioner told him that "her eyes were twitching and she had

hesitant breathing."  (Id. at 506.)

On cross-examination, Trial Counsel pursued several avenues of impeachment.  He

established that Mr. Kauffman had read an extensive newspaper article about the murder, which

included an allegation that Petitioner had engaged in sex with Ms. Taylor while she was

unconscious.  (Id. at 509-13.)  Trial Counsel established that Mr. Kauffman did not come forward

with information about the murder until after he read the article.  (Id.)  Trial Counsel further

impeached Mr. Kauffman with inconsistencies from his prior testimony.  (Id.)

The Commonwealth also called Anthony Brown, who also testified that he met Petitioner

during his incarceration.  (N.T. 12/10/01 at 564-68.)  The Commonwealth reviewed Mr. Brown's

prior convictions for driving under the influence, cashing bad checks, burglary, receiving stolen

property, and fleeing police.  (Id. at 599-61.)  Specifically, Mr. Brown testified that:

Q:  Did he tell you specifically what happened in that house?

A:  He told me they were arguing; that he hit her; that she fell down the steps; that
she struck her head on something; that he kept trying to talk to her.  That he --

something about someone was coming or something.  I don't know.  Somebody knocked on the door somewhere or something, but he took her back and dragged her back to the bedroom.

Q:  You can say what he said.

A:  At which point he told me he wanted to make her feel better so he fucked her.

Q: Those are his words?

A: Yeah.

(Id. at 565.)

On cross-examination, Trial Counsel questioned Mr. Brown about his criminal history, and elicited the fact that Mr. Brown had read newspaper articles regarding Ms. Taylor's murder.  (Id. at 570-75.)  Importantly, Trial Counsel established that Petitioner never told Mr. Brown that he intended to kill Ms. Taylor, as part of Trial Counsel's primary strategy to reduce first-degree murder to third-degree murder.  (Id. at 575; N.T. 12/11/01 at 899-900.)

In his closing argument, Trial Counsel attacked the two witnesses' testimony as follows:

Let's talk about the informants because the Commonwealth will tell you they certainly expressed specific intent. I say they don't. But think, as a first matter, why should you believe them?

Anthony Brown. I bet not one of you thought that an inmate could get himself transferred from one prison to another because he didn't like it. I've been around for a while and I didn't know you could do it, but he did. He got himself transferred from Lebanon County to Lancaster County. He's involved with burglaries and false reports and you are going to hear about that.

I will tell you, generally speaking, the law suggests you not look favorably upon people who commit crimes. Not only does it go to the principles of such a witness, but this person - I know many of my clients wish they could get from that cold cell on the first floor to the warm cell on the second floor. Anthony Brown is a manipulator.

Matt Kauffman. He gets to read all about it in the paper before he comes into testify, and he can't be bothered to talk to the police until afterwards.

> And even if you believe these two people, what are they telling you? He
> beat her up, not that he intended to kill her. He beat her up. Beating up without
> intent to kill is not first degree murder. Ugly and malicious, hardness of heart,
> weakness of disposition and cruelty maybe, but not a specific intent to kill. It's just
> not there.

(N.T. 12/11/2001 at 899-900).

During the PCRA hearing, Trial Counsel acknowledged that impeaching these witnesses

was a high priority.  (N.T. 6/23/2009 at 66.)  Counsel did not attempt to interview Mr. Kauffman

and made minimal attempts to interview Mr. Brown.  (Id. at 66-67.)  Trial Counsel also did not

gather any mental health records pertaining to these witnesses. (Id. at 75, 78.)   Counsel

acknowledged that the medical records would have been something to investigate for

impeachment, if they contained relevant mental health history.  (Id. at 75.)  Moreover, Trial

Counsel did not interview any individuals about Mr. Kaufmann's reputation for truthfulness.  (Id.

at 127-29.)

### (2)   Analysis

I focus first on the first prong of Strickland – the assessment of counsel's performance.

The PCRA Court held that both witnesses were cross-examined rigorously at trial, and Petitioner

had failed to show that the witnesses' alleged mental health disabilities negatively affected their

abilities to accurately perceive or recall events.  Davido II, 106 A.3d at 635-36.

Trial Counsel studiously used their criminal records for impeachment and cross-examined

both Mr. Kauffman and Mr. Brown by highlighting that they both had read the newspaper articles

about the murder before coming forward with any information.  (N.T. 12/7/01 at 510-14; N.T.

12/10/01 at 570-75.)  He then effectively used the testimony to his client's benefit, arguing in

closing both that the witnesses were untrustworthy and that – even if they were to be believed –

their testimony did not provide evidence of specific intent.

Petitioner argues that this was not enough because Counsel should have obtained and used the witnesses' mental health records to impeach them further.  As the Pennsylvania Supreme Court observed Petitioner failed to show that either of the witnesses' credibility was impacted by an alleged mental disturbance that negatively impacted his abilities to accurately observe, recall, or communicate the facts to which he testified.  Id. at 637.  In the absence of such evidence, the state court observed that the mental health evidence would not have been admissible to impeach these witnesses.  Id.

Even if this evidence would have been admissible, I conclude that Trial Counsel's decision not to pursue this line of inquiry was not deficient.  In the course of a trial, Counsel makes choices about where to focus his efforts and wide latitude must be granted to Trial Counsel in making these decisions.  Harrington, 562 U.S. at 106.  Where, as here, counsel made a clear choice to pursue one avenue and abandon an alternate approach, this decision is presumptively reasonable.  This "is instead a case, like Strickland itself, in which defense counsel's 'decision not to seek more' … 'than was already in hand' fell 'well within the range of professionally reasonable judgments.'" Bobby v. Van Hook, 558 U.S. 4, 11-12 (2009).  Given the minimal impact of Petitioner's proposed impeachment (assuming it would have been admissible at all), I cannot conclude that counsel's performance was deficient.

Petitioner must also demonstrate that he was prejudiced by counsel's decision not to pursue this course.  The Pennsylvania Supreme Court also found that Petitioner had not demonstrated that he was prejudiced by counsel's omissions.[25]  As the Court explained, counsel did "vigorously"

---

[25]  In the state court, this claim was raised under two legal theories, Strickland and Brady.  In the present pleadings, Petitioner has forgone the Brady claim and focused exclusively on the Strickland claim.  When ruling on these two related claims, the state court concluded that the Petitioner had not established prejudice under Strickland or materiality under Brady.  It is well-

cross-examine both witnesses, and Petitioner has failed to show that the inmate witnesses' mental illnesses negatively impacted their abilities to accurately observe, recall, or communicate the facts to which they testified.  Davido II, 106 A.3d at 635.  I agree.

Indeed, Petitioner essentially concedes the prejudice argument when he admits that this additional evidence "considered in isolation" "would not likely have affected the outcome." (Petitioner's Mem. of Law at 72, ECF No. 123.)  Instead, Petitioner argues the Pennsylvania Supreme Court was obligated to "consider the collective effect of all of counsel's omissions." Id. To the extent that Petitioner is just raising this argument to buttress his cumulative error argument, I reject it for the reasons discussed below.  See, infra, Section M.  To the extent that Petitioner is discussing this specific challenge to counsel's stewardship, I find the argument insufficient. Counsel rigorously cross-examined these witnesses and used the impeachment effectively in his closing argument.  Additional challenge through mental health records, to the extent admissible at all, would not have pushed the needle on the analysis and could have detracted from the focused attack that was pursued.

In light of the high deference that is owed both to Trial Counsel and the Pennsylvania Supreme Court, I find that Petitioner is not entitled to relief as to this claim.

**I.    Claim VI:  Petitioner's Challenge to the Trial Court's Denial of His Request to Proceed _Pro Se_ During the Guilt Phase[26]**

Petitioner next argues that the trial court violated his Sixth Amendment right to proceed _pro se_ during the guilt phase of the trial.  (Petitioner's Mem. of Law at 72-74, ECF No. 123.)

---

established that these are the same legal standard.  Marshall v. Hendricks, 307 F.3d 36, 53 (3d Cir. 2002).

[26]    Included as Claim X in the original habeas petition and as Claim VI in Petitioner's Memorandum of Law.

Specifically, Petitioner argues that he made a timely and unequivocal request to proceed *pro se*, which the trial court denied without any colloquy. (Id. at 73-76.) The Commonwealth replies that the Pennsylvania Supreme Court correctly found that Petitioner did not make an unequivocal request to proceed *pro se* because (a) his letter requested to proceed *pro se* with his attorney as his "assistant," and (b) he was provided with another opportunity to represent himself immediately before *voir dire* and he said that he wanted Trial Counsel to represent him. (Commonwealth's Mem. of Law at 122-25, ECF No. 134.)

### (1)   Relevant Facts

On October 15, 2001, Petitioner sent the trial court a letter that stated:

> Sir, i write you in Hope that you may apoint to me new counsel. Since the tragic illness of Mr. Kenneff, i was given James Gratton of the public defender's office.
>
> There are irreconsiable differences that would deprive me of a defence most importantly a fair trial. The reason's are Mr. Gratton stated in letter's to me that he will not supena doctor's directly involved in this case. Mr. Gratton also stated to me that he will not use the pathologist retain by Mr. Kenneff as a witness. Gratton also stated that he will not use his resources to find other opinions of the medical report's. also Mr. Gratton does not review any issue i bring to his attention in which it is impossible for me to assist in my defence.
>
> Mr. Gratton also stated he will not call witnesses on my behalf. Finally Mr. Gratton stated he has 4 other Death penalty cases and is to busy for me to write him or work with him. Which again your Honor deprives me of a decent type of defence. **i pray that you would just apoint new counsel that i may have a fair trial and be treated like any normal person.**
>
> also your honor i must bring to your attention that i and Merrill Spahn was reviewing transcripts of the preliminary hearing in which Scott oberhettzes had a conflict of interest with one of the doctor's as we were reading testimony of Dr. Ross. We did not find statement's given by Dr. Ross in which we both Spahn and i remembered. Mr. Spahn said to me that we would have to prove that the transcripts were changed in which Mr. Gratton also neglect's in which Mr. Kenneff also was aware. also your honor Detective Erb have not given toxology results of the hospital L-G-H. Most importantly your honor the pathologist in the defence has reason to medical certainty that Angelina Taylor had preexisting condition's head brain injury in which Kenneff filed motion to request past medical history of Angelina. I ask your honor that the body of Angelina Taylor be exhumed that a

different pathologist should give a New uptopsy and new toxology that's be done to with in fact there have not ever reported bump's or lump's to the head scalp of Angelina. If some are is being punch or shamed. Struck in the head to cause brain injury then there in fact should have ben bump's to the head and sculp. none were reported from emergency medical nor Dr. Ross.

Please your honor i ask that you please intervene in this case and please exhume this body that we may look over again cause of death. it was told to me by Mr. Spahn and Gratton that Dr. Ross work's for police and would go by witnesses statement's and advis of police. **Please appoint new councel nd intervene in this tradgedy. Mr. Gratton and i cannot work indefinitely together. all i ask if you will be just and fair. i was told by an attorney that i must bring these vital issues to your attention.** also most of all Sir your honor. i want to bring to your attention that Detective Erb has tampered and has changed physical evidence and written statement's and is withholding medical records of Angelina. from Ohio. also that he has got an x inmate Kauffman to give a statement that i allegedly gave Kauffman information. if you would read the report Mr. Erb write's the statement in his own words and i believe he has made inmate's try to get information from me to testify against me. This i must bring to your attention.

Also that Angelina was taking medication and toxology levels from LGH would support that and that i ask if we could have an independent investigator retrieve true medical records of Angelina from Ohio. Please your honor consider my appeal to you please. i have letter's from Gratton on his statement's to me. Also toxology report's that have not bene given. Also an expert stating Angelina had a preexisting condition and she was taking medication and there is medical records in Cleveland to support this. That is why i ask to exhume the body the fact no bump's or lump's on the head nor scalp of Angelina and toxology report's medication for brain injury prior to her hospital stay.

**Your honor this is a nightmare and i plea that the truth be told that is i ask of you. in that if you do not appoint new counsel then ill have no other alternative but to excersise my 6th Amendment to represent my self and have Mr. Spahn as my assistant.**

And have i give a list of supena's I wish to call as witnesses. **if you decide not to appoint new counsel on the fact of irreconsiable difference's, i am asking simply that i be given a fair trial and a decent defence**. i pray that you act on these vital issues i bring to your attention. Thank you at last i would ask for postponement till all other paperwork and witnesses are interviewed.

(Petitioner's Supp. App. at SA13-SA16, ECF No. 124 (emphasis added)(errors in original).)

On November 14, 2001, the trial court held an evidentiary hearing, wherein the trial judge

addressed Petitioner's October 15, 2001 letter at length and permitted Petitioner to place his

complaints about Trial Counsel on the record.  (Commonwealth's Exhibit A at 83-97, ECF No. 131-1.)  Specifically, the following exchange occurred between the trial judge and Petitioner:

> THE COURT:  We have two matters.  The first one is Mr. Davido, there is a letter requesting appointment of new counsel.
>
> MR. DAVIDO:  Yes Sir.
>
> THE COURT:  That request is denied.  The attorneys that are appointed for you will be able to represent you extremely well in my opinion.  Any request of yours to proceed *pro se* is also denied.
>
> MR. DAVIDO:  Am I allowed to retain private counsel?
>
> THE COURT:  To try this case on November 28th, you may retain them, but there will be no continuances granted.
>
> MR. DAVIDO:  I am allowed to have private counsel?
>
> THE COURT:  That's correct.  You can hire private counsel, and they need to be ready to proceed on this case on November 28th.  We're going forward on November 28th.

(Id. at 83.)   The trial court specifically found that Trial Counsel was pursuing the case in Petitioner's interests.  (Id. at 94.)

On direct appeal, the Pennsylvania Supreme Court applied a totality of the circumstances approach in finding that Petitioner failed to make an unequivocal request to proceed *pro se*. Davido I, 868 A.2d at 438-39.

### (2)    Analysis

In order to satisfy the standard set forth in 28 U.S.C. § 2254, I must determine whether the state court's findings were contrary to or an unreasonable application of clearly-established federal law.  I find that they were not.  The Pennsylvania Supreme Court properly conducted a fact-specific "totality of the circumstances" analysis, as required by federal law, and Petitioner has failed to

show that the Pennsylvania Supreme Court applied the rule to the facts of the case in objectively unreasonable manner.  Davido I, 868 A.2d at 438-39.

The Sixth Amendment guarantees the right to self-representation where the defendant makes a valid waiver.  Faretta v. California, 422 U.S. 806, 834 (1975).  "It is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts. But where the defendant will not voluntarily accept representation by counsel, the potential advantage of a lawyer's training and experience can be realized, if at all, only imperfectly."  Id.  "The right to defend is personal.  The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction.  It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage.  And, although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.'"  Id. (quoting Illinois v. Allen, 397 U.S. 337, 350-51 (1970) (Brennan, J., concurring)).

A waiver of the right to counsel must be made prior to trial, must be unequivocal, and must be a knowing, voluntary, and intelligent waiver.  Id. at 807, 835 (finding that the defendant explicitly asked to represent himself at trial).  Moreover, a waiver is not "voluntary" where the defendant is not exercising free will, but instead feels "compelled" to proceed *pro se*.  Pazden v. Maurer, 424 F.3d 303, 316 (3d Cir. 2005) (finding that the defendant's waiver of counsel was not voluntary where he was compelled to proceed *pro se* because his attorney had not been given enough time to familiarize herself with the case).

The Pennsylvania Supreme Court noted the applicable standards and rejected Petitioner's claim.  As the Court explained, Petitioner never invoked his Sixth Amendment right of self-representation because (a) Petitioner's October 15, 2001 letter focused on his request for new

counsel; (b) Petitioner's October 15, 2001 letter said that he would exercise his Sixth Amendment right if new counsel was not appointed; (c) Petitioner was permitted to express his grievances during the November 14, 2001 hearing, wherein he did not return to the issue of *pro se* representation, and instead focused on his request for new counsel; and (d) Petitioner clearly indicated that he did not want to represent himself when asked on the first day of trial. Id. at 439-40. In the absence of unequivocal waiver, Petitioner's claim must fail.

Petitioner does not address the state court's opinion, instead arguing that his waiver was not equivocal because he also asked for a new lawyer. (Petitioner's Mem. of Law at 74, ECF No. 123.) But the Pennsylvania Supreme Court's decision that the request was equivocal was not based on the fact that Petitioner asked for multiple types of relief, but rather, the Court focused on the totality of the circumstances surrounding the request. As the Supreme Court explained:

> The substance of the October 15th letter focused on Appellant's desire for the appointment of new counsel or permission to retain private counsel because of the difficulty he was having with present counsel. Appellant's request to proceed *pro se* was posed as his only alternative if he was not afforded new counsel. Thus, it was employed as a bargaining device, rather than as a clear demand for self representation. Furthermore, at the hearing on the request, the trial court gave [Petitioner] the opportunity to air his grievances, and Appellant's focus was on retaining new counsel; his need for a continuance; and his dissatisfaction with his current counsel. [Petitioner] never returned to the issue of *pro se* representation. Lastly, when directly asked by the trial court whether he wanted to proceed *pro se* on the first day of trial, [Petitioner] clearly indicated that he did not want to represent himself. Based on the totality of the circumstances surrounding Appellant's request to represent himself at trial, we conclude the request was equivocal.

Davido I, 868 A.2d at 439, 440.

There is nothing unreasonable about the Pennsylvania Supreme Court's reading of this letter. Petitioner begins the letter asking the trial court to "appoint [him] new counsel." Throughout he focuses on counsel's representation and repeatedly requests the appointment of

new counsel.  The prospect of proceeding *pro se* is raised merely as a bargaining device to obtain the remedy truly sought – new counsel.

The Pennsylvania Supreme Court reasonably concluded that Petitioner did not make such an express request where (a) his letter stated that he "would have to" exercise his right of self-representation if new counsel was not appointed, (b) he focused on his request for new counsel during the preliminary hearing, and (c) he expressly stated that he wanted Trial Counsel to represent him on the first day of trial.  There was only one point during state proceedings where Petitioner unequivocally stated that he wished to proceed *pro se* – prior to the penalty phase.  At that point, as is discussed below, the trial court conducted a colloquy and Petitioner was allowed to proceed without counsel.  Prior to trial, however, Petitioner made no such unequivocal statement.[27]

There is an additional problem with Petitioner's claim.  As Justice Saylor noted in his concurring opinion, even if Petitioner's initial request to proceed *pro se* was unequivocal, he ultimately withdrew the request:

> THE COURT: ... And I thought that, after you started seeing what was going on in the case, you would probably agree that you would be far better off having attorneys to represent you rather than you representing yourself. So at this time, do you still wish to represent yourself, or do you want Mr. Gratton and Mr. Spahn [the public defenders] to represent you at this time?

---

[27]  The Petitioner's citations are inapposite because they all involve situations where the defendant expressly requested to proceed *pro se*.  See, e.g., Buhl v. Cooksey, 233 F.3d 783, 787 (3d Cir. 2000) (the defendant filed a motion to proceed *pro se* prior to trial); Alongi v. Ricci, 367 F. App'x 341, 343 (3d Cir. 2010) (finding that the defendant unequivocally requested to proceed *pro se* where his Trial Counsel informed the court before the jury that his client had requested that Trial Counsel be discharged and the defendant be permitted to represent himself); Moore v. Haviland, 531 F.3d 393, 402 (6th Cir. 2008) (finding that the defendant unequivocally requested to represent himself where he expressly asked the judge whether he could "go *pro se*").

[Appellant]: Your Honor, you were correct in allowing me to keep Mr. Gratton, and I wish him to represent me.

N.T. 11/28/01 at 2.

This provides an additional basis for my decision to reject Petitioner's claim.

Accordingly, Petitioner cannot demonstrate that the state court's rejection of his claim was an unreasonable application of United States Supreme Court precedent.  The claim is denied.

J. **Claim VII:  Petitioner's Challenge to the Trial Court's Grant of His Request to Proceed *Pro Se* During the Penalty Phase[28]**

Petitioner also argues that the trial court violated his Sixth Amendment right by permitting him to proceed *pro se* during the penalty phase of the trial.  (Petitioner's Mem. of Law at 83-88, ECF No. 123.)  This claim was reviewed in part during direct appeal and reviewed in part during collateral review proceedings.  Before I can review the claim before me, I must ensure that the substance of this claim was exhausted in state court.  I find that part of this claim was not presented to the state court and is now procedurally defaulted.  I conclude further that all four parts of this claim are meritless.

(1) **Exhaustion, Procedural Default and Standard of Review**

"A district court ordinarily cannot grant a petition for a writ of habeas corpus arising from a petitioner's custody under a state court judgment unless the petitioner first has exhausted his available remedies in state court."  Houck v. Stickman, 625 F.3d 88, 93 (3d Cir. 2010)(citing 28 U.S.C. § 2254(b)).  Mere similarity of the federal and state issues is insufficient to prove exhaustion.  Duncan v. Henry, 513 U.S. 364, 366 (1995).  The habeas petitioner bears the burden

---

[28]   Included as Claim XI in the original habeas petition and as Claim VII in Petitioner's Memorandum of Law.

of proving exhaustion of all state remedies.  Boyd, 579 F.3d at 367 (quoting Lambert, 134 F.3d at 513).

On direct review, Petitioner argued the trial court erred when it allowed him to represent himself during the penalty phase of the trial.  In support of this claim, Petitioner presented three theories: (a) his request to proceed *pro se* was equivocal and the colloquy was insufficient, (b) a defendant is not permitted to waive counsel during the penalty phase, and (c) a defendant is not allowed to waive the presentation of a defense during the penalty phase.

On collateral appeal, Petitioner continued his attack on the trial court's decision to allow him to proceed *pro se*.  During those proceedings, Petitioner argued that (a) Trial Counsel was ineffective for failing to investigate and argue that Petitioner was incompetent to represent himself during the penalty phase and (b) counsel was ineffective for failing to challenge the sufficiency of the colloquy, particularly due to the incompetence of Petitioner.

In the memorandum of law, Petitioner argues that (1) he never made an unequivocal request to proceed *pro se* during the penalty phase, and to the extent a waiver was unequivocal, it was only a waiver of the right to present mitigating evidence, and not his right to counsel; (2) the trial court's colloquy was constitutionally inadequate; (3) counsel was ineffective for failing to hire mental health experts to review Petitioner's competency; and (4) the trial court placed an unconstitutional restriction on penalty counsel.  (Petitioner's Mem. of Law at 83-88, ECF No. 123.)[29]  The parties agree that the first three subparts of this claim on were exhausted during direct and collateral appeal.  The exhaustion issue arises only in reference to the fourth subpart to this claim.

---

[29]  Neither Petitioner's argument that a defendant is not allowed to proceed *pro se* at the penalty phase of his trial nor his argument that a defendant is not allowed to waive the presentation of a defense during the penalty phase have been presented here.

In his memorandum of law to this Court, Petitioner argues that the trial court erred when it appointed stand-by counsel and then restricted stand-by counsel's role in the case. A review of Petitioner's briefs to the Pennsylvania Supreme Court on direct and collateral appeal, reveal that this is the first time that such an argument has appeared in an appellate brief. The argument presented here and the Supreme Court case relied upon to support it were never presented to any state appellate court at any time. The argument is therefore defaulted and unreviewable here.[30]

Petitioner argues that on collateral appeal, the Pennsylvania Supreme Court failed to adjudicate his claim that Trial Counsel was "ineffective for failing to investigate and timely litigate facts that would have called into question the trial court's ruling that the waiver was voluntary, knowing and intelligent." (Petitioner's Mem. of Law at 88, ECF No. 123.) He asserts that since this subpart of the claim went unadjudicated, the subpart should now be reviewed *de novo*. I disagree.

On collateral appeal, the Pennsylvania Supreme Court determined that Petitioner "present[ed] no meaningful argument to support his claim that if counsel's request for a competency evaluation [had] been made prior to the colloquy, the request would have been granted by the court, or that the court erred in denying the request when it was lodged after the colloquy." Davido II, 106 A.3d at 639. The Court concluded further that Petitioner had not presented sufficient evidence of incompetency, particularly given that he was competent to stand trial and that Petitioner's own expert testified on PCRA that he "could not with certainty opine that [Petitioner] was at any time not competent to decide to proceed without counsel and to forgo the

---

[30] Since Petitioner has not acknowledged this procedural default, he has not argued that it should be excused. I have independently reviewed the record and I have not identified evidence of cause and prejudice or a miscarriage of justice, as would excuse the default here.

presentation of mitigating evidence during the penalty phase proceedings."  Id.  I will address the objective reasonableness of the state court's determination below even though it seems clear that the Court recognized and addressed the issue.

Exhaustion, default and the proper standard of review now clear, I turn to Petitioner's claim.

### (2)     Relevant Facts

I will briefly recount the facts that are relevant to this claim.  On December 12, 2001, the jury found Petitioner guilty of first-degree murder and rape.  (N.T. 12/12/01 at 993-94.)  Following the jury verdict, and prior to the commencement of the penalty phase, Petitioner's Trial Counsel and Penalty Phase Counsel advised the trial court that Petitioner wanted to continue *pro se* and he did not wish to present any evidence during the sentencing hearing.

The trial court engaged in extensive colloquy of Petitioner that addressed his desire to proceed *pro se*, his right to appointed counsel, the risks of proceeding without counsel, and the types of evidence that would be forgone if no defense was presented during the penalty phase.

The trial court explained the purpose of the penalty phase of the trial and the types of evidence the prosecution planned to offer in support of their position:

> THE COURT:  The jury has found you guilty of murder in the first-degree, Mr. Davido, which means the jury now has only two things to consider: One, whether you will face the penalty of death, or whether you will face the penalty of life imprisonment.  Do you understand that?
>
> THE DEFENDANT:  Yes sir.
>
> THE COURT:  The Commonwealth in this case is going to claim and allege and put into evidence the following items which they consider to be aggravating circumstances: The first one being that the defendant, you, committed a killing while in the perpetration of a felony.  Specifically, what they are saying is that you killed her while perpetrating the felony of rape.  Do you understand that?
>
> THE DEFENDANT:  I understand.

THE COURT:  That's the aggravating circumstance they will have to prove, and in essence, by the jury finding you guilty of rape, they have found you guilty of that, but the jury still must consider this particular aggravating circumstance.  They have to come back and find it again.  Do you understand that?

THE DEFENDANT:  Yes sir.

THE COURT:  And secondly, the prosecution is going to argue that you have a significant history of felony convictions involving the use or threat of violence to a person.  Do you understand they are going to argue here? That means that you have more than one conviction of a felony - - two, or I think it's only two - - that they are claiming involving the use or threat of violence to a person.  Do you understand what the two aggravating circumstances that they are going to present are?

THE DEFENDANT:  Yes sir.

THE COURT:  They still have to prove aggravating circumstances to the jury beyond a reasonable doubt.  Do you understand?

THE DEFENDANT:  Yes sir.

THE COURT:  Now, Mr. Spahn stands there prepared at this time to defend against these aggravating circumstances.  By this I mean he is willing to put on whatever evidence is necessary and make any arguments he thinks are relevant and important to the jury to try and convince them that these circumstances are not present, or that the Commonwealth was unable to prove them beyond a reasonable doubt.  Do you understand that?

THE DEFENDANT:  Yes sir.

THE COURT:  Mr. Spahn is here to do that.  Do you wish him to do that in this case?

THE DEFENDANT:  To defend me, no.

THE COURT:  You don't wish him to defend you against the aggravating circumstances?

THE DEFENDANT:  Correct.

(Id. at 996-98).

Additionally, Penalty Phase counsel, Mr. Spahn outlined the arguments that he would raise against the aggravating circumstances.  (Id. at 1006-13.)

The trial court also detailed Petitioner's right to present mitigating evidence in his own defense:

> THE COURT:  Now, of course, you know that you have the right to submit mitigating circumstances to the jury.  Do you understand that?
>
> THE DEFENDANT:  I understand.
>
> THE COURT:  And mitigating circumstance is anything that could concern your character and record, anything that could be considered something for the jury not to impose the death penalty.  Do you understand what we mean by mitigating circumstance?
>
> THE DEFENDANT:  Yes sir.
>
> THE COURT:  And I believe Mr. Spahn would have a number of mitigating circumstances that he would be willing to present to the jury.  Is that correct, Mr. Spahn?
>
> MR. SPAHN:  Absolutely, Your Honor.

(Id. at 996-99.)

The trial court called upon Penalty Phase Counsel to detail the type of evidence that he planned to offer as mitigation.  Mr. Spahn explained that he had intended to present evidence that: (a) Petitioner had no significant history of prior convictions, (b) Petitioner was under extreme mental and emotional disturbance, (c) Petitioner's age, and (d) the "catchall" circumstance.  (Id. at 999-1004.)  Mr. Spahn advised that he planned to present evidence as to the "catchall" mitigating circumstance showing nineteen various factors, including Petitioner's difficult upbringing, Petitioner's efforts to financially support his family, and Petitioner's action in saving the life of another inmate.  (Id.)

The trial court spent time to explain the impact of aggravating and mitigating circumstances on the jury.  As the court explained:

> THE COURT:  Mr. Davido, you have heard what Mr. Spahn would propose to do for you in the defense of you during this part of the trial.  Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:   And the mitigating circumstances, unlike the aggravating circumstances, only have to be proven by a preponderance of the evidence, which is a much less standard than beyond a reasonable doubt.  They just have to believe it's more likely than not this occurred.  Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  And you understand, Mr. Davido, that if just one of those jurors found any of these aggravating circumstances, then that would be a consideration for the jury and they would have to take that and discuss it and balance it with the mitigating circumstances.  If any of the jurors found, any one of them found, any mitigating circumstances, the jury would have to consider them, and they would have to balance then against the aggravating circumstances that may exist.  Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  And the aggravating circumstances are different.  The prosecution has to prove to all 12 of the jurors beyond a reasonable doubt that they exist.  Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:   And I would tell you, Mr. Davido, I am hearing substantial mitigating circumstances in this particular case that, if presented to the jury -- I don't know what the jury is going to do, but there are substantial mitigating circumstances here, including one that you saved a person's life. That could well be considered by the jury, which might be sufficient to balance against any aggravating circumstances that may be proved so that you can have a sentence of life imprisonment.  Do you understand that?

THE DEFENDANT:  Yes, sir.

(Id. at 1004-06.)

The trial court also explained that the failure to take certain actions could result in waiver

of his rights, explaining:

THE COURT:  If these mitigating circumstances are not presented, they may be lost permanently.  You may never get the right to raise them again.  Do you understand that?

THE DEFENDANT:  I understand.

[***]

THE COURT:  And if something happens, and I'm not saying it's going to happen here, if evidence that should not have come in got in and there was no objection to that, you would lose your tight to raise that on appeal.  Do you understand that?

THE DEFENDANT:  I understand.

THE COURT:  Again, there are possible defenses to this in the nature of mitigating circumstances which your attorneys might be aware of, and they said that's basically what they want to do.  And if these aren't raised at these hearings they could be lost permanently.  Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  I have to say this again.  There are many rights that you have that, if not timely asserted, that means brought up, you could lose them permanently.  Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  I have to say this again.  There are many rights that you have that, if not timely asserted, that means brought up, you could lose them permanently.  Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  And if errors occur and are not timely objected to or otherwise timely raised by you they might be lost permanently.  Do you understand that?

THE DEFENDANT:  I understand sir.

[***]

THE COURT:  Do you also understand that you would not be able to raise the defense of ineffective assistance of counsel in any proceeding on which you waive your right to counsel or represent yourself, and that would be for this, the death penalty phase.

THE DEFENDANT:  Right.

(Id. at 1009-13.)

The trial court recognized that this was a complex waiver of not one but two rights, the right to counsel and the right to present any defense in the penalty phase of the trial.  On several different occasions, the court confirmed it understood correctly that Petitioner was asserting both waivers and the court confirmed that Petitioner could waive one of these rights, but not the other.

In the course of the questioning, it became clear that Petitioner had discussed waiving his right to present any defense at the penalty phase with his attorney prior to trial.  As Petitioner explained that he had been discussing this issue with Penalty Phase Counsel "since the beginning" and that he had advised counsel that he did not want a defense "if the death penalty phase came into place."  Id. at 1014.  The trial court also questioned Penalty Phase Counsel on this point:

THE COURT:  Mr. Spahn, was this a constant thing throughout the proceedings, that Mr. Davido indicated to you that he didn't want a defense?

MR. SPAHN:  That's correct, Your Honor.  The first time I met Mr. Davido, in May of 2000, it was explained to him that it was a potential capital case, and it was explained that he would have two counsel; counsel for the guilt phase and counsel for the penalty phase.

I have remained constant counsel in this case. I have been counsel for the penalty phase from day one.  Due to certain circumstances, there were various other lawyers that assumed the guilt phase responsibilities to Mr. Gratton, who did try the case for Mr. Davido.

I can tell the Court that from the day I first met Mr. Davido, he expressed a strong desire to defend himself from day one.  He indicated that if the jury came back with a first-degree murder, he preferred the death penalty as opposed to life imprisonment.  I have spent countless hours in prison with him.  We talked about the subject, and my position was always, we'll deal with it if and when we get there. Unfortunately, we are here.

I can tell the Court there is no threats, no force being applied to Mr. Davido. This is a decision which he has spoken about for nearly two years; at this point, a decision which I never supported and, in fact, tried to express otherwise to him.

But I have no doubt that he is making a knowing decision in this regard, albeit against my advice, and he has never wavered in his position.

(Id. at 1014-16.)

90

When Petitioner explained that he was unhappy that Penalty Phase Counsel did not have more of a role in the guilt phase, the trial court took the time to explain Penalty Phase Counsel's role in the case to ensure that there was no mistaken belief that he should have been concentrating on Petitioner's guilt phase defense.  However, Petitioner clearly indicated that there was no "anger or any type of resentment."  (Id. at 1016-17.)

Ultimately, Petitioner held firm to his position that he would proceed *pro se* and that he did not wish to present any defense in the Penalty Phase.  The trial judge concluded the colloquy as follows:

> THE COURT:  Mr. Davido, I personally do not think it is a good idea for this to occur.  I can't decide that, but I've been through all of this with you and I think you are making it pretty clear to me what you want, and that is you want no defense whatsoever in this case I'm telling you I think that is a bad decision to make, and I think that you should have a defense, and I think Mr. Spahn is prepared for this. And my opinion is that you should allow Mr. Spahn to go forward and present evidence.  That's what I think.  Do you want him to do that or no?

> THE DEFENDANT:  I appreciate it, sir, I do.  I appreciate your concern.  I appreciate your advice.  I really do.  I appreciate the manner of advice, you know. You guys are very experienced and I don't know about these things, but I do appreciate you taking the time and asking me, and I do appreciate you guys' advice, but I don't want Mr. Spahn to talk for me.

(Id. at 1017-18.)

### (3)   **Analysis**

Petitioner challenges the trial court's decision and Penalty Phase Counsel's stewardship in relation to both his decision to proceed *pro se* and his decision not to present a defense.  As is explained above, this challenge was partially presented to the Pennsylvania Supreme Court on direct review and was presented in a different manner to the Pennsylvania Supreme Court on collateral review.   Petitioner's argument breaks into three subparts: (1) he never made an unequivocal request to proceed *pro se* during the penalty phase, and to the extent a waiver was

91

unequivocal, it was only a waiver of the right to present mitigating evidence, and not his right to counsel; (2) counsel was ineffective for failing to hire mental health experts to review Petitioner's competency; and (3) the adequacy of the  trial court's colloquy considering Petitioner's mental health impairments.  (Petitioner's Mem. of Law at 83-88, ECF No. 123.)[31]  I will address each point in turn.

> ### (a)    Petitioner's assertion of his right to proceed pro se and his decision not to present a defense

Petitioner argues that he did not unequivocally request to proceed *pro se* during the Penalty Phase, and the trial court's decision to allow his to proceed as such was error.  The Pennsylvania Supreme Court rejected this claim on direct appeal.   Since I conclude that both Petitioner's assertion of his right to proceed *pro se* and his decision not to present a defense were plainly and repeatedly stated, I reject Petitioner's argument.

The Sixth Amendment guarantees the right to self-representation where the defendant makes a valid waiver.  Faretta v. California, 422 U.S. 806, 834 (1975).  This right is recognized

---

[31]   As is explained above, Petitioner's subclaim that the trial court placed an unconstitutional restriction on Penalty Counsel is procedurally defaulted and unreviewable here.  However, I note that if I were to review this subclaim, I would find it meritless as well.

Petitioner argues that the trial court improperly barred stand-by counsel from making arguments.  This, he says, is improper under the Sixth Amendment because under *McCaskle v. Wiggins*, 465 U.S. 168, 179-81 (1984) "standby counsel may address court outside presence of jury as long as the defendant is free to address the court and any disagreements are resolved in the defendant's favor."  (Pet'r's Mem. of Law at 82-83).

Stand-by counsel is indeed permitted to make arguments to the court.  However, stand-by counsel is *not* permitted to assert arguments that are contrary to the defendant's wishes.  Here, stand-by counsel urged the trial court to consider certain mitigation evidence and instruct the jury on such evidence.  But Petitioner had been entirely clear that he did not want mitigation presented.  Where stand-by counsel's arguments were contrary to the *pro se* defendant's choices about his own defense plan, the trial court was obligated to follow the views of the defendant and to disregard the urging of stand-by counsel.  This dispute is discussed in more detail in Section L, below.

despite the Court's awareness that "in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts." Id.  Ultimately, the defendant's "choice must be honored out of 'that respect for the individual which is the lifeblood of the law.'" Id. (quoting Illinois v. Allen, 397 U.S. 337, 350-51 (1970) (Brennan, J., concurring)).

Petitioner met with Penalty Phase Counsel for the first time in May of 2000, almost two years prior to the trial.  The two worked closely together, but from the day of their first meeting, Petitioner stated that he wanted to fight the charges, but "if the jury came back with a first degree murder [verdict], he preferred the death penalty as opposed to life imprisonment."  (N.T. 12/12/2001 at 1015.).  For the almost two years of representation, Penalty Phase Counsel attempted to persuade Petitioner to pursue a different course, but according to counsel, Petitioner "never wavered in his position." Id. at 1016.  For purposes of the waiver analysis here, it is important to consider that Petitioner had the benefit of almost two years of advice from counsel who was attempting to persuade Petitioner to pursue a different course.  The trial court sought to do the same, ensuring that there was a full record of the nature of Petitioner's waiver and Petitioner's understanding of the rights that he was forgoing.

Petitioner argues that there was no unequivocal assertion of his desire to forgo counsel. But that is untrue.  It is clear from the colloquy that from Petitioner's view that his decision not to present any evidence and his decision to take those steps *pro se*, as opposed to counseled, were intertwined.  Petitioner repeatedly asserted these two waivers simultaneously stating that he wished to litigate (or more precisely not litigate) the penalty phase of his trial on his own and without the benefit of counsel.  This does not mean that he did not want *both* rights waived or that the dual nature of his waiver was not apparent.

Either way, the thorough questioning by the trial court elicited a specific waiver of the right to counsel.  As Petitioner stated:  "I appreciate the manner of advice, you know.  You guys are very experienced and I don't know about these things, but I do appreciate you taking the time and asking me, and I do appreciate you guys' advice, **but I don't want Mr. Spahn to talk for me**."  Id. at 1018 (emphasis added).[32]

> **(b)**  ***Counsels' ineffectiveness for failing to investigate Petitioner's incompetency in relation to penalty phase proceedings.***

Petitioner also argues counsel was ineffective for failing to utilize an expert to determine if Petitioner was competent to waive his right to counsel at the penalty phase.  This allegation was rejected by the Pennsylvania Supreme Court on collateral appeal.  Because I find that Petitioner failed to meet either prong of the Strickland analysis, I also reject the claim.

In reviewing this Strickland claim I must assess the choices made by counsel and any prejudice that could have resulted from those choices, if I were to find fault with them.  As a reviewing court, I must be cautious about second-guessing counsel's decision considering that "the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client."  Harrington, 562 U.S. at 105.  In order to assess counsel's decisionmaking and the alleged prejudice, I must first review the relevant considerations for a finding of incompetency and the specific facts in this case.

---

[32] Petitioner appears to take issue with the fact that it was counsel, as opposed to Petitioner himself, who first asserted that Petitioner wished to proceed *pro se*.  Considering counsel's statement that he had been discussing this exact concern with Petitioner for almost two years, it is clear that counsel fully understood the nature of Petitioner's waiver.  Ultimately, though, there is no constitutional requirement that Petitioner is the individual who raises the issue to the court in the first instance.  The requirement is that the assertion of the right is unequivocal.  It was plainly so here.

"[T]he standard for competence to stand trial is whether the defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the proceedings against him." Godinez v. Moran, 509 U.S 389, 396 (1993) (quoting Dusky v. United States, 362 U.S. 402 (1960) (per curiam)). See Jermyn v. Horn, 266 F.3d 257, 283 (3d Cir. 2001) (discussing the relevant Supreme Court case law in detail). Courts look to "evidence of a defendant's irrational behavior, his demeanor at trial, [as well as] any prior medical opinion on competence to stand trial . . . ." Drope v. Missouri, 420 U.S. 162, 180 (1975). This is more than just expert reports. The Third Circuit has explained that a trial court can and should rely on its "own observations and interactions with [the defendant]." Taylor v. Horn, 504 F.3d 416, 433 (3d Cir. 2007). Additionally, it is proper to consider "reports of counsel's observations and interactions with him." Id. In Taylor, Circuit court considered that "[t]he record shows that throughout the proceedings Taylor was able to engage with counsel and respond to the trial court's inquiries, and that Trial Counsel never expressed concern over Taylor's competency." Id. at 433-34.

A defendant may be competent to stand trial even if he is severely mentally ill. The reviewing Court must focus on whether the defendant was capable of "understanding the proceedings and assisting in his defense." Jermyn v. Horn, 266 F.3d 257, 292-93 (3d Cir. 2001). Because of the special relationship between counsel and client, defense counsel's decision not to request a hearing before trial and the absence of any indication there were problems with communication, also suggests competency. Id. at 297-98. Reports drafted years after the fact do not carry the same weight as opinions given at the time of the proceedings. United States v. Askari, 222 F. App'x 115, 120-121 (3d Cir. 2007) (unpublished).

Petitioner's counsel was aware of these competency standards.  Indeed, counsel asked the defense expert Dr. Blumberg to evaluate Petitioner in advance of trial to determine if he was competent to proceed.  But Petitioner argues that this was not enough.  He presses that since Penalty Phase Counsel knew that Petitioner was going to try to proceed *pro se* at the penalty phase, he should have sought an evaluation on the discrete issue of competency to proceed in the penalty phase.  In other words, Penalty Phase Counsel should have been prepared to argue that – despite Dr. Blumberg's competence finding about the trial – Petitioner was nonetheless incompetent for purposes of the penalty phase.

On this point, Petitioner keys his argument to counsel's allegedly faulty decision not to obtain an expert report to support this argument.  The state court rejected this claim based on its conclusion that there was simply no basis to find Petitioner incompetent – expert report or not.  I agree.  This hypothetical expert report would have been but one small piece in a larger record, which is replete with evidence of Petitioner's competency.

A competent defendant must have "sufficient present ability to consult with his lawyer." Godinez v. Morgan, 509 U.S. 389, 396 (1993).  On this point, the statements of Penalty Phase Counsel to the trial court become extremely important.  Mr. Spahn explained to the trial court that he had been working closely with Petitioner for almost two years.  Though it was plain that lawyer and client disagreed about the best approach to the penalty phase proceedings, it is equally clear that Mr. Spahn was satisfied with Petitioner's ability to consult with him and understand the proceedings.  As Mr. Spahn explained:  "This is a decision which he has spoken about for nearly two years; at this point, a decision which I never supported and, in fact, tried to express otherwise to him.  But I have no doubt that he is making a knowing decision in this regard, albeit against my advice, and he has never wavered in his position."  (N.T. 12/12/2001 at 1016.)

It is hard to understand how Petitioner can overcome the weight of counsel's statements on this point.  I recognize that later in the proceedings, Penalty Phase Counsel does ask for a continuance for a competency evaluation.  As counsel explains:  "I am remiss if I don't ask the Court at this time for a continuance to have Mr. Davido evaluated.  Mr. Davido has been convicted of first degree murder less than two hours ago.  It is our position that he's not of a psychological state to absorb that and make a knowing, voluntary and intelligent decision with respect to this proceeding."  (N.T. 12/12/2001 at 1022.)  The timing of this request is significant.  Petitioner argues that it was error.  I disagree.

Considering that Penalty Phase Counsel knew there was an expert report finding competency to stand trial, and considering that his own discussions with Petitioner were thorough and apparently sound, it is hard to see how counsel could have expected that he could obtain an opinion that the Petitioner was competent as to one phase of the trial, but incompetent as to another. Instead, the decision to seek the evaluation based on his assertion that Petitioner was "not in a psychological state" to "absorb" the verdict, makes strategic sense.  This request puts Petitioner in a better position to achieve the result rather than a worse.

But, ultimately, the trial court denied the request because both Penalty Phase Counsel and the trial court had sufficient information in the record.  The trial court is obligated to consider the Petitioner's ability to respond to its inquiries as it assesses Petitioner's competency.  Taylor, 504 F.3d at 433; Jermyn, 266 F.3d at 294-95.  In the course of an extensive colloquy, the trial court had the opportunity to observe Petitioner while he actively explained his understanding of the proceedings.

Additionally, Penalty Phase Counsel had a productive attorney-client relationship with Petitioner for almost two years.  Petitioner stated during the entirety of that relationship that he

wished to forgo counsel and not present a defense were there to be a penalty phase.  As a result, it was difficult to argue that Petitioner became incompetent due to the psychological impact of the verdict.  Indeed, Petitioner had been found to be competent prior to trial.  The only distinguishing factor between his competence as to the penalty phase was the fact of his decision to waive a defense.  Mere disagreement with counsel's strategic decisions is not itself incompetency.  Indeed, imbedded in our discussions of the right to proceed *pro se* is the understanding that the "unskilled efforts" of a *pro se* defendant are likely to impair his defense.  <u>Faretta</u>, 422 U.S. at 834.  It is clear that counsel's interactions with Petitioner gave him no reason to believe that Petitioner did not have "sufficient present ability to consult with [him]."  <u>Godinez</u>, 509 U.S. at 396.

Furthermore, Petitioner has not demonstrated that he was prejudiced by counsel's decision.  Even if counsel could have obtained an expert report finding Petitioner incompetent for the penalty phase (as opposed to the guilt phase), the overall record in this case indicates to the contrary.  A reviewing court faced with a competency claim must also examine a petitioner's ability to "respond to the trial court's inquiries."  <u>Taylor</u>, 504  F.3d at 433; <u>Jermyn</u>, 266 F.3d at 294-95.  The exhaustive colloquy demonstrated Petitioner's rational and factual understanding of the nature of the proceedings.  <u>Godinez</u>, 509 U.S. at 396.  Additionally, prior medical opinions on competence are persuasive on the question of competence.  <u>Drope</u>, 420 U.S. at 180.

In light of the foregoing, I cannot conclude that counsel was ineffective for failing to seek a competency evaluation in advance of the trial.

### (c)    *The adequacy of the trial court's colloquy and Counsels' ineffectiveness in light of Petitioner's mental health issues.*

Petitioner's next argument, that the trial court did not provide a constitutionally adequate colloquy, is likewise belied by the record.  The colloquy that occurred on December 12, 2001

sufficiently demonstrated that Petitioner understood what he was giving up by proceeding *pro se*, and the dangers and disadvantages of doing so. Specifically, the trial judge ensured that Petitioner understood the critical roles of mitigation evidence and argument, which included the following questions and responses:

> THE COURT: The jury has found you guilty of murder in the first-degree, Mr. Davido, which means the jury now has only two things to consider: One, whether you will face the penalty of death, or whether you will face the penalty of life imprisonment. Do you understand that?
>
> THE DEFENDANT: Yes sir.
>
> THE COURT: The Commonwealth in this case is going to claim and allege and put into evidence the following items which they consider to be aggravating circumstances: The first one being that the defendant, you, committed a killing while in the perpetration of a felony. Specifically, what they are saying is that you killed her while perpetrating the felony of rape. Do you understand that?
>
> THE DEFENDANT: I understand.
>
> THE COURT: That's the aggravating circumstance they will have to prove, and in essence, by the jury finding you guilty of rape, they have found you guilty of that, but the jury still must consider this particular aggravating circumstance. They have to come back and find it again. Do you understand that?
>
> THE DEFENDANT: Yes sir.
>
> THE COURT: And secondly, the prosecution is going to argue that you have a significant history of felony convictions involving the use or threat of violence to a person. Do you understand they are going to argue here? That means that you have more than one conviction of a felony - - two, or I think it's only two - - that they are claiming involving the use or threat of violence to a person. Do you understand what the two aggravating circumstances that they are going to present are?
>
> THE DEFENDANT: Yes sir.
>
> THE COURT: They still have to prove aggravating circumstances to the jury beyond a reasonable doubt. Do you understand?
>
> THE DEFENDANT: Yes sir.
>
> THE COURT: Now, Mr. Spahn stands there prepared at this time to defend against these aggravating circumstances. By this I mean he is willing to put on whatever

evidence is necessary and make any arguments he thinks are relevant and important to the jury to try and convince them that these circumstances are not present, or that the Commonwealth was unable to prove them beyond a reasonable doubt. Do you understand that?

THE DEFENDANT: Yes sir.

THE COURT: Mr. Spahn is here to do that. Do you wish him to do that in this case?

THE DEFENDANT: To defend me, no.

THE COURT: You don't wish him to defend you against the aggravating circumstances?

THE DEFENDANT: Correct.

THE COURT: Now, of course, you know that you have the right to submit mitigating circumstances to the jury. Do you understand that?

THE DEFENDANT: I understand.

THE COURT: And mitigating circumstance is anything that could concern your character and record, anything that could be considered something for the jury not to impose the death penalty. Do you understand what we mean by mitigating circumstance?

THE DEFENDANT: Yes sir.

THE COURT: And I believe Mr. Spahn would have a number of mitigating circumstances that he would be willing to present to the jury. Is that correct, Mr. Spahn?

MR. SPAHN: Absolutely, Your Honor.

* * *

THE COURT: Mr. Davido, you have heard what Mr. Spahn would propose to do for you in the defense of you during this part of the trial. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: And the mitigating circumstances, unlike the aggravating circumstances, only have to be proven by a preponderance of the evidence, which is a much less standard than beyond a reasonable doubt. They just have to believe it's more likely than not this occurred. Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  And you understand, Mr. Davido, that if just one of those jurors found any of these aggravating circumstances, then that would be a consideration for the jury and they would have to take that and discuss it and balance it with the mitigating circumstances.  If any of the jurors found, any one of them found, any mitigating circumstances, the jury would have to consider them, and they would have to balance then against the aggravating circumstances that may exist.  Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  And the aggravating circumstances are different.  The prosecution has to prove to all 12 of the jurors beyond a reasonable doubt that they exist.  Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  And I would tell you, Mr. Davido, I am hearing substantial mitigating circumstances in this particular case that, if presented to the jury -- I don't know what the jury is going to do, but there are substantial mitigating circumstances here, including one that you saved a person's life. That could well be considered by the jury, which might be sufficient to balance against any aggravating circumstances that may be proved so that you can have a sentence of life imprisonment.  Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  If these mitigating circumstances are not presented, they may be lost permanently.  You may never get the right to raise them again.  Do you understand that?

THE DEFENDANT:  I understand.

(Id. at 173-76.)

Petitioner's argument that he did not know, prior to the penalty phase, what mitigation evidence existed is belied by the record because Mr. Spahn described the evidence he would have introduced at length during the colloquy, including that (a) Petitioner had no significant history of prior convictions, (b) Petitioner was under extreme mental and emotional disturbance, (c) Petitioner's age, and (d) the "catchall" circumstance." (Id. at 174-75.)  Petitioner's argument is

101

further belied by the fact that Mr. Spahn explained that he had spent the two years prior to the trial explaining the nature and purpose of the penalty phase.   As both Petitioner and Mr. Spahn explained, this advice and explanation at times caused tension between them.  Id. at 1016-17.

Petitioner's argument that the trial court did not determine whether he understood the purpose of the penalty phase is also not supported by precedent or the record.  Indeed, Petitioner's responses to several other questions asked during the colloquy clearly demonstrate that Petitioner was aware of the disadvantages that he would suffer by waiving his right to counsel and electing to proceed *pro se.* The colloquy included the following questions and responses:

> THE DEFENDANT:  I am really trying to understand this all.  I can't find the words to tell you.  I really can't.  I can't explain the way I feel because I don't know.  I have all of these mixed emotions inside of me that I just I don't know what to say, or the certain word or not to say a certain word.  I don't know what I should say, but they came with first-degree and rape of my fiancée and I don't wish to defend myself or Merrill Spahn to defend me in the penalty phase.

> THE COURT:  Mr. Spahn, was this a constant thing throughout the proceedings, that Mr. Davido indicated to you that he didn't want a defense?

> MR. SPAHN:  That's correct, Your Honor.  The first time I met Mr. Davido, in May of 2000, it was explained to him that it was a potential capital case, and it was explained that he would have two counsel; counsel for the guilt phase and counsel for the penalty phase.

> I have remained constant counsel in this case. I have been counsel for the penalty phase from day one. Due to certain circumstances, there were various other lawyers that assumed the guilt phase responsibilities to Mr. Gratton, who did try the case for Mr. Davido.

> I can tell the Court that from the day I first met Mr. Davido, he expressed a strong desire to defend himself from day one.  He indicated that if the jury came back with a first-degree murder, he preferred the death penalty as opposed to life imprisonment.  I have spent countless hours in prison with him.  We talked about the subject, and my position was always, we'll deal with it if and when we get there.  Unfortunately, we are here.

> I can tell the Court there is no threats, no force being applied to Mr. Davido.  This is a decision which he has spoken about for nearly two years; at this point, a decision which I never supported and, in fact, tried to express otherwise to him.

But I have no doubt that he is making a knowing decision in this regard, albeit against my advice, and he has never waivered in his position.

(Id. at 177-78.)

Despite all of these warnings, Petitioner unequivocally affirmed that he wished to waive his right to counsel and proceed *pro se*:

> THE COURT:  Mr. Davido, I personally do not think it is a good idea for this to occur.  I can't decide that, but I've been through all of this with you and I think you are making it pretty clear to me what you want, and that is you want no defense whatsoever in this case I'm telling you I think that is a bad decision to make, and I think that you should have a defense, and I think Mr. Spahn is prepared for this. And my opinion is that you should allow Mr. Spahn to go forward and present evidence.  That's what I think.  Do you want him to do that or no?
>
> THE DEFENDANT:  I appreciate it, sir, I do.  I appreciate your concern.  I appreciate your advice.  I really do.  I appreciate the manner of advice, you know. You guys are very experienced and I don't know about these things, but I do appreciate you taking the time and asking me, and I do appreciate you guys' advice, but I don't want Mr. Spahn to talk for me.

(Id. at 178-79.)

The trial court's colloquy was expansive.  The Pennsylvania Supreme Court properly applied the federal law, described above, finding that the colloquy was "sufficiently penetrating" to satisfy the court that Petitioner's waiver of counsel was done knowingly, voluntarily, and intelligently.  Commonwealth v. Peppers, 302 F.3d 120, 130-31 (3d Cir. 2002).  Indeed, "the purpose of inquiring as to the defendant's knowledge is only to ascertain the extent to which the defendant understands the procedure that is to be followed during the course of the trial, not to assess his legal knowledge or training to determine his ability to represent himself well."  Id. at

137.  The state court's conclusion was not an objectively unreasonable application of United States Supreme Court precedent.  I, therefore, reject the claim.[33]

    **K.**    **Claim VIII:  Petitioner's Challenge to Counsel's Ineffectiveness Relating to the Investigation and Presentation of Mitigating Evidence[34]**

Petitioner argues that Trial Counsel failed to investigate and present readily available mitigating evidence, which amounted to ineffective assistance of counsel.  (Petitioner's Mem. of Law at 93-94, ECF No. 123.)  However, Petitioner acknowledges that such a claim is unable to be pursued upon the Court's finding that his waivers of counsel and the right to present mitigating evidence were valid.  (Id.)  Because I find that the waivers were valid as discussed infra, Petitioner is not entitled to relief as to this claim.

---

[33] Petitioner's argument that the trial court violated the Sixth Amendment by instructing Mr. Spahn to take no action unless affirmatively asked by Petitioner is also without merit.  (Pet'r's Mem. of Law at 87–88, ECF No. 123.)  The Third Circuit Court of Appeals has expressly found that standby counsel "must be available if and when the accused requests help, must be ready to step in if the accused wishes to terminate his own representation, may explain and enforce the basic rules of courtroom protocol to the accused, and serves to overcome routine obstacles that may hinder effective *pro se* representation."  United States v. Jones, 452 F.3d 223, 230 (3d Cir. 2006) (quoting United States v. Bertoli, 994 F.2d 1002, 1019 (3d Cir. 1993) (internal quotation marks omitted)).  Thus, the trial court's statement to Petitioner that Trial Counsel was there to help once help was requested complies with federal law as interpreted by the Third Circuit.

Petitioner's argument that counsel rendered ineffective assistance by failing to "protect him" from making invalid waiver of his Sixth Amendment right to counsel is belied by the record.  Mr. Spahn specifically testified that Petitioner had consistently advised him that Petitioner did not want to be represented in the penalty phase and represented to the court that his waiver was "voluntary."  (N.T. 12/12/01 at 1015-17.)

[34] Included as Claim XII in the original habeas petition and as Claim VIII in Petitioner's Memorandum of Law.

**L.      Claim IX:  Petitioner's Challenge Relating to the Trial Court's Failure to Instruct the Jury Pursuant to *Simmons v. South Carolina*[35]**

Petitioner argues that the trial court erred when it failed to instruct the jury pursuant to the requirements of Simmons v. South Carolina.  (Petitioner's Mem. of Law at 89-95, ECF No. 123.).  The Pennsylvania Supreme Court reviewed this claim on direct appeal and concluded that it was waived and meritless.   Davido I, 868 A.2d at 445.   The Commonwealth argues that claim is procedurally defaulted, since the state court denied the claim on independent and adequate procedural grounds.  (Commonwealth's Mem. of Law at 161-63, ECF No. 134.)  Petitioner replies that the Commonwealth failed to address his argument that his claim is not defaulted because he did not actually waive his right to a Simmons instruction.  (Petitioner's Reply at 28-29, ECF No. 141.)

I find that Petitioner's failure to request Simmons instruction in the proper manner at the time of trial results in a procedural default of the claim.  Further, I conclude in the alternative that Petitioner's Simmons claim is meritless.

**(1)      Procedural Default**

The United States Supreme Court has made clear that, "[j]ust as in those cases in which a state prisoner fails to exhaust state remedies, a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal clams has deprived the state courts of an opportunity to address those claims in the first instance." Coleman, 501 U.S. at 732.  It is also the case that "[a] federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate

---

[35]   Included as Claim XIII in the original habeas petition and as Claim IX in Petitioner's Memorandum of Law.

to support the judgment." Walker v. Martin, 562 U.S. 307, 315 (2011) (quoting Beard v. Kindler, 558 U.S. 53, 55 (2009)(internal quotation marks omitted)).

Petitioner filed a direct appeal to the Pennsylvania Supreme Court, wherein he argued that the trial court erred in failing to instruct the jury that life in prison meant life without the possibility of parole in violation of Simmons v. South Carolina, 512 U.S. 154 (1994).  On direct appeal, the Pennsylvania Supreme Court held that Petitioner had waived the claim, rendering it unreviewable:

> The Commonwealth points out that during this stage of the trial, [Petitioner] was proceeding *pro se* and never requested a Simmons instruction.  Rather, his counsel requested the instruction and the trial court concluded that counsel was exceeding the bounds of his representation at this point in the proceedings.
>
> The Commonwealth is correct that this issue is waived.  Although, as noted previously, [Petitioner] is entitled to the benefit of relaxed waiver, we have been clear that relaxed waiver is not appropriate with respect to a Simmons claim, "given the unique nature of such a claim."  See Commonwealth v. Dougherty, 860 A.2d 31, 2004 WL 2358279, *4 (Pa. Oct. 20, 2004); Freeman, 827 A.2d at 400 n.9.  Accordingly, this claim is not subject to our review."

Davido I, 868 A.2d at 445.

Here, the Pennsylvania Supreme Court held that Petitioner failed to request a Simmons instruction during trial, which constituted a waiver.  This was consistent with state rules of procedure.  Pursuant to Pennsylvania Rule of Appellate Procedure 302(a), "[a] defendant must make a timely and specific objection at trial or face waiver of her issue on appeal."  Commonwealth v. Olsen, 82 A.3d 1041, 1050 (Pa. 2013) (quoting Commonwealth v. Schoff, 911 A.2d 147, 158 (Pa. Super. Ct. 2006)).  "A specific and timely objection must be made to preserve a challenge to a particular jury instruction.  Failure to do so results in waiver."  Id. (quoting Commonwealth v. Moury, 992 A.2d 162, 178 (Pa. Super. Ct. 2010)).

The Commonwealth argues that this was a state court decision resting on an independent and adequate state rule, which forecloses our review here.  Petitioner responds that the trial court's

ruling that this claim was waived does not preclude federal review for three reasons: (a) the Pennsylvania Supreme Court's decision was incorrect, because the claim was not waived since it was raised by Mr. Spahn, after Petitioner had insisted on proceeding *pro se*; (2) the state court's reliance on its procedural rules was exorbitant; and (3) Pennsylvania's relaxed waiver rule[36] renders the claim inadequate. These arguments are unpersuasive because Petitioner intentionally decided not to present a defense at the penalty phase.

### (a)     *"Standby Counsel's" Statements Did Not Constitute a Request*

First, Petitioner argues that the state court was wrong to find his claim waived because "standby" counsel, requested a <u>Simmons</u> instruction. In chambers, Petitioner's former Penalty Phase Counsel stated the following:

> MR SPAHN: I would ask that my points of charg[e be] made a court exhibit and have it marked for future reference. One issue of concern, if I were counsel, I would argue Ms. Eakin has opened the door for future dangerousness, and the jury should be instructed that means life. And aside from that, I have a litany of arguments if the court disagrees with the future dangerousness that the jury should be instructed as su[ch.]

> THE COURT: How can you make an objection to something she hasn't done? Plus you are not involved.

> MR. SPAHN: I would argue during the guilt phase she has. There are a litany of reasons that the jury sho[uld] be instructed that life means life in Pennsylvania.

---

[36] As the Pennsylvania Supreme Court has explained, "[r]elaxed waiver, as an operating principle, was created to prevent [the state Supreme Court] from being instrumental in an unconstitutional execution. Due to the unique severity and finality of the death penalty, this court has relaxed its waiver rules as to any claim raised on direct appeal for which the record permits review. The relaxation of waiver principles on direct appeal has been justified, in part, on grounds of judicial economy because it reduces the number and necessity of post-conviction relief petitions." <u>Commonwealth v. Albrecht</u>, 720 A.2d 693 (Pa. 1998). However, "the relaxed waiver rule is no longer applicable to PCRA appeals and therefore any claims that have been waived by Appellant are beyond the power of this Court to review under the terms of the PCRA." <u>Commonwealth v. Brown</u>, 872 A.2d 1139, 1144 (Pa. 2005).

THE COURT: Again, I'm not going to do that. I regrettably say that you are out of the case. I will adm[it] as a court exhibit, your requested point of charge bec[ause] I think that they support that we stated on the record what the possible defense and possible factors of mitig[ation] that you were going to make. So we'll do that.

MR. SPAHN: I think it's automatic, but I make exceptions on the record to all of the rulings the Court has made here for preservation.

THE COURT: I did not want it to get to this, but we have no choice.

(N.T. 12/12/01 at 1028-29.) Petitioner argues that this instruction constitutes a proper request for a <u>Simmons</u> instruction under state rules and the state court's waiver ruling was erroneous. I disagree.

Petitioner urges me to assume that Mr. Spahn was acting as Petitioner's standby counsel after Petitioner was allowed to proceed *pro se.* But that is not an accurate reflection of Petitioner's waiver of counsel or his decision to forgo any defense in the penalty phase. During the colloquy, Petitioner made several things entirely clear: he did not want Mr. Spahn involved in the case; he wished to proceed *pro se;* and he did not wish to present *any* defense in the penalty phase. Since the trial court determined that these decisions were knowing, intentional and voluntary, the court was obligated to follow Petitioner's requests.

Recognizing this obligation, and further recognizing the difficult position it was in, the trial court did everything it could to create a complete record and ensure that all automatically required constitutional protections were in place. As the court explained, it was not going to allow Petitioner to "plea[d] to death," but it recognized that Petitioner's insistence that he would not present any defense had to be respected. (<u>Id.</u> at 1025.) Though Petitioner now argues that Mr. Spahn was acting as standby counsel, that was clearly not what occurred. Four separate times during the discussion in chambers, the court clearly stated that counsel was no longer involved in the case: "he made it clear to me that he does not wish to have this contested, so I mean, regrettably,

Mr. Spahn, this is not the way I wanted it to be, but you are not in the case anymore."  (Id. at 1024; see also id. at 1026 ("you are not in the case anymore"); id. at 1028 ("you are not involved . . . you are out of the case").)  Tellingly, former Penalty Phase Counsel did not challenge these statements in any way.  Nor could he, as Petitioner had made his position very clear.

The trial court's ruling that Mr. Spahn was "out of the case" was based not only on Petitioner's clearly stated intent to proceed without Mr. Spahn, but also on Petitioner's clear statement that he did not want to present a defense in the case.  This second point is important. Mr. Spahn had worked to create a defense for Petitioner.  The extensive record that he had created to present to the jury was laid out during the colloquy.  Despite this, Petitioner clearly stated (repeatedly) that he did not wish to present *any defense* during the penalty phase of the trial.

Petitioner urges me to conclude that he "only wanted to waive mitigating evidence and argument." (Petitioner's Mem. of Law at 92, ECF No. 123.)  But that is not a fair characterization of the record.  The court explained aggravating circumstances to Petitioner, ensured his understanding, and then confirmed that Petitioner did not want him to defend him against the aggravating circumstances that the Commonwealth would present.  (N.T. 12/12/01 at 996-98.) The trial judge separately addressed the waiver of presentation of mitigating evidence, including a thorough recitation of the type of evidence Penalty Phase Counsel had been planning to present. (Id. at 998-1006.)  The trial court then proceeded to discuss Penalty Phase Counsel's arguments that related to aggravating circumstances.  (Id. at 1006-08.)  This is a complete waiver, and not, as Petitioner urges, a partial waiver.

Petitioner also suggests that the trial court was somehow obligated to make sure that Petitioner was expressly waiving his right to have his lawyers make objections on his behalf.  I question if such an express waiver is indeed required.  But, either way, the trial court ensured that

Petitioner understood that lawyers understood the rules of evidence and procedure better than he did, and further ensured that if there was no objection Petitioner would lose his right to raise that on appeal.  (N.T. 12/12/01 at 1010-11.)  This clearly advised Petitioner that he – as opposed to his lawyer – would be responsible for making the objections.

Ultimately, Petitioner's explained that his decision was not a spur of the moment choice, but rather one that he had made early in the preparation of his defense.  While that is not a requirement, it provides a backdrop upon which to judge the nature of the waiver, lending further credence to the argument that it was a complete waiver, not the partial one that Petitioner now suggests.  As Petitioner explained, it had "always been [his view] that if there was a penalty phase then there would be no defense."  (Id. at 1014.)  Mr. Spahn affirmed this, explaining that Petitioner had "indicated that if the jury came back with a first degree murder, he preferred the death penalty as opposed to life imprisonment."  (Id. at 1015.)  Despite "countless hours" with Petitioner, Penalty Phase counsel could not persuade Petitioner to take a different approach.  Petitioner was firm in his position that no defense be offered.

At the conclusion of these discussions, the trial court did the only thing it could.  It advised the Petitioner that both Trial Counsel and Former Penalty Phase Counsel would "remain seated right behind [him], and if [Petitioner had] any questions, [he could] feel free to turn around and talk to them."  (Id. at 1030.)  Petitioner chose not to engage the help of these lawyers who stood by to provide aid.  Penalty Phase Counsel's attempts to make objections on Petitioner's behalf went beyond the scope of his role.

In light of this, I reject Petitioner's argument that Mr. Spahn was acting as Petitioner's lawyer when he presented the Court with his Simmons argument.  Petitioner had chosen to forgo counsel and forgo a defense.  That choice was not a half-measure.  Former Penalty Phase Counsel's

efforts were laudable, but the trial court ruling that they were not properly made on Petitioner's behalf was not only right, but also very likely the only constitutionally appropriate position that the court could have taken.

### (b)      *Substantial Compliance*

In a footnote, Petitioner argues that his claim was not defaulted because he "substantially complied" with the applicable rule, making a passing reference to Lee v. Kemna, 534 U.S. 362 (2002).  Since it is clear that Petitioner waived the right to have Former Penalty Phase Counsel to make objections on his behalf, and it is clear that Petitioner further indicated that he did not want any defense to be presented during the penalty phase, it is clear that Petitioner did not request a Simmons instruction.  As a result, Petitioner did not "substantially comply" with Pennsylvania's rules of procedure.

By relying on a fleeting reference to Lee, Petitioner greatly minimizes his burden to meet the requirements of this procedural default exception.  The "substantial compliance" language that Petitioner uses is a part of the Lee standard, but only a piece.  In Lee, the United States Supreme Court explained that there are "exceptional cases" where a state court's "exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question." Lee, 534 U.S. at 376.  Though a rule may "ordinarily serve[] a legitimate governmental interest," in "*rare circumstances* . . . [an] unyielding application of the general rule would disserve any perceivable interest."  Id. at 380 (emphasis added).  Essentially, the Court determined that there were times where a state procedural rule generally protected a legitimate state interest, but in Lee's case, the rule became inadequate because its application "serve[d] 'no perceivable state interest.'"  Id. at 378.  In those instances, the rule was "exorbitantly applied" and therefore the state procedural rule should not bar federal review.  That was most assuredly not the case here.

111

Petitioner had waived his right to present a defense and his right to have counsel act on his behalf. Because the trial court complied with the Petitioner's decisions (as it was obligated to do), no one properly presented a request for a <u>Simmons</u> instruction.

It is my obligation to enforce the procedural default doctrine in a manner that "ensures that the States' interest in correcting their own mistakes is respected in all federal habeas cases;" without it, prisoners could wrongly "avoid the exhaustion requirement by defaulting their federal claims in state court." <u>Coleman</u>, 501 U.S. at 732. In cases where state appellate courts "have not had a chance to mend their own fences and avoid federal intrusion," the writ "extracts an extra charge by undercutting the State's ability to enforce its procedural rules." <u>Engle v. Isaac</u>, 456 U.S. 107, 129 (1982). In asking this Court to forgive Petitioner's error of judgment now, he is asking me to take the action that he prohibited the trial court and state Supreme Court from taking. That would be directly contrary to the purpose of the procedural default doctrine.

Petitioner did not substantially comply with the state court's rule. His non-compliance with the state rule prevented the trial court from acting. The <u>Lee</u> exception does not apply here.[37]

### (c)     *The Impact of "Relaxed Waiver"*

Having concluded that the <u>Simmons</u> claim was indeed waived, I turn to Petitioner's second argument that the state court's waiver ruling was not an independent and adequate state rule that bars review in this Court, because the rule was inadequate.[38] Petitioner argues that even if the

---

[37] The fact that the trial court gave some instructions on the Petitioner's behalf is not evidence of exorbitant application, but evidence of an effort to protect the defendant's interest as much as the court was permitted under the circumstances. Unlike the instructions used, a <u>Simmons</u> instruction requires affirmative request. Petitioner did not request the instruction and counsel had been removed from the case.

[38] The <u>Lee</u> rule discussed in the foregoing section assumes that the rule is ordinarily adequate, but only became inadequate as applied here.

claim was waived, under Pennsylvania's relaxed waiver rule, the claim should still have been reviewed.  The Commonwealth disagrees, noting that Pennsylvania has been clear in ruling that relaxed waiver does not apply to <u>Simmons</u> claims.

"To qualify as an 'adequate' procedural ground, a state rule must be 'firmly established and regularly followed.'"  <u>Walker v. Martin</u>, 562 U.S. 307, 316 (2011) (quoting <u>Beard v. Kindler</u>, 558 U.S. 53, 60-61(2009)).  That rule is clearly met here: a year prior to Petitioner's trial, the Pennsylvania Supreme Court explained that "relaxed waiver has no applicability" in the context of a <u>Simmons</u> instruction.  <u>Commonwealth v. Spotz</u>, 759 A.2d 1280, 1291, n.14 (Pa. 2000).  Thus, I reject Petitioner's argument that he could not have known that the waiver rule would apply in his case.

The waiver rule, as applied here, was independent and adequate. As a result, the claim is procedurally defaulted and unreviewable.

### (2)    <u>Merits</u>

Even if I were to review the merits of Petitioner's claim, I conclude that it fails as a matter of law.  "In Pennsylvania, a <u>Simmons</u> instruction informing the jury that life imprisonment means life without the possibility of parole is mandated only when: (1) the prosecutor makes the defendant's future dangerousness an issue; and (2) the defendant specifically requests that a 'life means life' instruction be provided." <u>Commonwealth v. Brown</u>, 196 A.3d 130, 184-85 (Pa. 2018). As I have already discussed at length, Petitioner cannot demonstrate that he requested the instruction.  That showing alone is fatal to his claim.  Additionally, Petitioner makes two arguments in support of his claim that the Commonwealth raised an issue of his future dangerousness.  For the foregoing reasons, I find that both are unpersuasive.

First, Petitioner attempts to establish that future dangerousness was raised during the Commonwealths case-in-chief. (Petitioner's Mem. of Law at 94-96, ECF No. 123.) In support of this claim, Petitioner points to portions of the trial transcript during the guilt phase where the Commonwealth argued and proved that Petitioner "viciously, violently and nonchalantly beat this girl into a coma, strangled her and had sex with her, from which she never woke up." (Id. at 89 (quoting N.T. 12/5/01 at 25-26).) Additionally, Petitioner points to the evidence admitted at trial regarding the force of the beating, the nature of the resulting brain injury and the rape of the victim. Id. at 89-90 (citing N.T. 12/6/01 at 401-05, 451, 459-61).

There are several issues with Petitioner's argument. First, there has never been a Supreme Court case that has held that the trial court was required to consider the evidence or arguments of the prosecutor submitted during the guilt phase (as opposed to penalty phase) to determine if the prosecutor was arguing "future dangerousness" of the defendant. The clear Supreme Court rule is: "[W]hen future dangerousness is an issue **in a capital sentencing determination**, the defendant has a due process right to require that his sentencing jury be informed of his ineligibility for parole." Simmons v. South Carolina, 512 U.S. 154, 172 (1994) (Souter, J., concurring) (emphasis added)). This was reinforced in Kelly v. South Carolina, which concerned arguments raised during the penalty phase of trial, and not the guilt phase. Kelly v. South Carolina, 534 U.S. 246, 248 (2002) ("The trial then proceeded to a separate sentencing phase calling for the jury to determine whether any aggravating factor had been shown and, if so, to choose between recommendations of death or life imprisonment."). In the absence of a holding of the United States Supreme Court on this point, I cannot conclude that it was unreasonable for the Pennsylvania Supreme Court to fail to consider the evidence and arguments from the guilt phase when reaching their alternative holding that Petitioner did not establish the future dangerousness prong of Simmons.

The second problem with Petitioner's argument is that United States Supreme Court precedent does not obligate the state court to consider the evidence submitted by the prosecutor, instead of just focusing on the arguments presented.  As noted by the Third Circuit, the United States Supreme Court has "declined to decide whether a defendant is entitled to a parole ineligibility instruction 'when the State's evidence shows future dangerousness but the prosecutor does not argue it.'" Bronshtein v. Horn, 404 F.3d 700, 716 (3d Cir. 2005) (quoting Kelly v. South Carolina, 534 U.S. 246, 254 (2002)).  Thus, the prosecutor must *argue* that Petitioner poses a future threat.  See Lynch v. Arizona, 136 S. Ct. 1818, 1819 (2016) ("During the penalty phase, the State argued that the jurors should consider the defendant's future dangerousness when determining the proper punishment."); Robinson v. Beard, 762 F.3d 316, 327 (3d Cir. 2014) ("Unlike the prosecutor in Kelly, who presented evidence that Kelly had engaged in violent behavior even while incarcerated, the prosecutor at Robinson's trial did not suggest to the jury that Robinson posed 'a risk of violent behavior, whether locked up or free.'" (internal citation omitted)).

Finally, future dangerousness is not put into issue where "the statements in question were limited to the considerations involved in determining whether the death sentence was the appropriate punishment for murde[r]." Commonwealth v. Chmiel, 889 A.2d 501, 537 (Pa. 2005) ("Here, unlike in Kelly, the prosecutor's closing argument focused exclusively on the facts surrounding the murder . . . and did not speculate about characteristics inherent in Appellant that implied future dangerousness.  The part of the argument where the prosecutor referred to the 'bliss of the knife' speaks in the past tense, focusing on the motive for the murder, and did not draw conclusions about Appellant's inherent characteristics . . . . Thus, in contrast to Kelly, the prosecutor did not discuss any propensity for violence. Viewed in the context of the entire

argument, these comments were nothing more than oratorical flair; the prosecutor summarized the evidence of Appellant's criminal acts and argued, from that evidence, that the jury should impose a death sentence.")  Here, Petitioner points to several points made by the prosecutor in argument, but in each, the arguments were not presented to advocate that the Petitioner was a future danger, but rather were presented as evidence of intentional conduct, in an effort to argue that the jury should find Petitioner guilty of first-degree murder.

For example, Petitioner extracts a quote from the Prosecutor's opening statement to assert that she was arguing "future dangerousness," but a full look at the section of her statement reveals that she was discussing degree of guilt.  She urged the jury to "concentrate on each and every piece of the evidence, because as we tie together the little things, the details, it's in the details of this case that get you to finding of the appropriate degree of guilt; the willful, deliberate, premeditated nature of this case."  (N.T. 12/5/01 at 24.)  One of those details was the brutal nature of the attack. I cannot find that the state court's determination that this was not an argument about future dangerousness was unreasonable, since this statement bears little resemblance to the arguments presented by the prosecutors in the relevant Supreme Court cases.  In Simmons, the prosecutor argued that a sentence of death was "an act of self-defense."  The prosecutor's argument in Kelly was more nuanced, but the specter of future threat was still apparent in the repeated references to violence, set forth within argument that invited the jury to consider Kelly a continuing threat.  That was simply not the case here.  When my focus turns to the prosecutor's arguments actually made during the penalty phase, the disconnect is even more stark.

The Commonwealth's closing arguments during the penalty phase were limited to establishing the two aggravating factors (significant criminal history and rape).  (N.T. 12/12/01 at 1036-37.)  As in Chmiel, the only reference to the evidence was made in referenced the facts

116

surrounding the murder and rape of Ms. Taylor but did not draw conclusions about Petitioner's characteristics. Petitioner focuses on portions of the record where the Commonwealth introduced evidence of his past convictions during the penalty phase (Petitioner's Mem. of Law at 90, ECF No. 123 (quoting N.T. 12/12/01 at 1036-37).) In Kelly, the United States Supreme Court explained that a prosecutor's arguments about prior felonies can be the type that give rise to the need for a Simmons instruction even when the prosecutor does not expressly mention future dangerousness. Kelly, 534 U.S. at 252-53. As the Court explained, "Evidence of future dangerousness under Simmons is evidence with a tendency to prove dangerousness in the future; its relevance to that point does not disappear merely because it might support other inferences or be described in other terms." Id. at 254. But that doesn't mean that the use of prior felonies automatically triggers a suggestion of future dangerousness.

The prosecutor's argument relating to the "significant history aggravator" was cabined and was not focused on Petitioner's future behavior. The prosecutor stated:

> Let me tell you what the statutory enumerated aggravating factors are: [Petitioner] has a significant history of convictions involving the use or threat of use of violence against a person, and that's why we just brought in his conviction out of Ohio. Now, you are going to have to decide whether that's a significant history, whether two incidents, two convictions for the causing physical harm to Linda Miller, is significant.

> The judge is going tell you how to weigh that, including factors that you can consider the number of convictions, the nature of the previous crimes, how they are similar to this particular murder. So and that's a choice you are going to have to make, whether they have been proven beyond a reasonable doubt. Obviously, if they are not, you can consider that as mitigating evidence because that's one of the mitigators; there is no significant history. So I would suggest to you that one way or the other you are going to have an aggravator or mitigator in the circumstances.

(N.T. 12/12/01 at 1036-37.)

In light of this focused style of presentation, I cannot conclude that future dangerousness is implicated. See, e.g., Commonwealth v. Brown, 196 A.3d 130, 187 (Pa. 2018) ("[T]he

prosecutor limited his arguments to Brown's past violent convictions and conduct, and accordingly did not place his future dangerousness at issue."); <u>Commonwealth v. Lesko</u>, 15 A.3d 345, 407 (Pa. 2011) ("[F]uture dangerousness was not placed in issue by the mere fact that the significant history aggravator was argued and proved by the Commonwealth."). Accordingly, Petitioner's argument fails because his prior convictions were introduced only to establish the significant history aggravator. (N.T. 12/12/01 at 1036-39.)

Since the Pennsylvania Supreme Court reached an alternate holding on the merits of Petitioner's <u>Simmons</u> claim, the question before me is a narrow one: whether the state court's conclusion was an objectively unreasonable application of United States Supreme Court precedent. "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004). On these facts and in this circumstance, I cannot conclude that the state appellate court's conclusion was an objectively unreasonable application of <u>Simmons</u> or the cases that followed.

### M.    Claim X:  Petitioner's Challenge Relating to Cumulative Error[39]

Petitioner argues that the Pennsylvania Supreme Court failed to apply a cumulative error analysis to claims other than the <u>Strickland</u> claims, which he argues was a violation of clearly established federal law. (Petitioner's Mem. of Law at 101-02, ECF No. 123.) The Commonwealth replies that Petitioner's claim is without merit because he did not raise the cumulative prejudice claim properly in state court. (Commonwealth's Mem. of Law at 171-72, ECF No. 134.)

---

[39]    Included as Claim XIV in the original habeas petition and as Claim X in Petitioner's Memorandum of Law.

The United States Court of Appeals for the Third Circuit has held that "[i]ndividual errors that do not entitle a petitioner to relief may do so when combined, if cumulatively the prejudice resulting from them undermine the fundamental fairness of his trial and denied him his constitutional right to due process." Fahy v. Horn, 516 F.3d 169, 205 (3d Cir. 2008). Cumulative errors will only be deemed harmful where "they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish actual prejudice." Id. (internal quotation marks omitted.) To satisfy this standard, a petition must show that the errors complained of "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." Murray v. Carrier, 477 U.S. 478, 494 (1986).

Petitioner presented the cumulative error claim before the Pennsylvania Supreme Court, and thus this claim is exhausted. (Commonwealth's Exhibit M at 110-11, ECF No. 131-14.) The Pennsylvania Supreme Court directly addressed this issue. The Pennsylvania Supreme Court reviewed each of the underlying claims, rejected each on its merits, and denied relief because "no number of failed claims may collectively warrant relief i[f] they fail to do so individually." Davido II, 106 A.3d at 647 (quoting Commonwealth v. Sepulveda, 55 A.3d 1108, 1150 (Pa. 2012)). Considering the evidence presented at Petitioner's trial, as well as his sentencing hearings, which have been recounted in great detail, I conclude that Petitioner's claims are insufficient to implicate the fundamental fairness of either his trial or his sentencing hearings. I find that Petitioner has failed to show that the Pennsylvania Supreme Court erred in either applying the incorrect federal law or applying the correct federal rule to the facts of the case in an objectively unreasonable manner.

N.      **Claim XI:   Petitioner's Challenge Relating to Evidence of Decedent's Medication**[40]

Petitioner next argues that evidence was presented at trial that Ms. Taylor was taking a prescription medication that caused drowsiness, but also advised that no evidence has been discovered to confirm that Ms. Taylor had symptoms of an aneurysm prior to the night in question. (Pet. for Writ of Habeas Corpus ¶¶ 415-17, ECF No. 33.)   The Commonwealth argues that Petitioner has failed to state a claim upon which relief could be granted.   (Commonwealth's Mem. of Law at 168-69, ECF No. 134.)   I agree with the Commonwealth and find that Petitioner has failed to state claim entitling him to any review.

## IV.   CONCLUSION

Following an evidentiary hearing and careful consideration of his Petition, and for the reasons articulated above, I find that Petitioner is not entitled to habeas relief on any of his claims for relief.   His petition, therefore, will be denied.

At the time of a final order denying a petition under 28 U.S.C. 2254, the court must determine whether to issue a certificate of appealability.   A certificate of appealability should issue "only if the applicant has made a substantial showing of the denial of a constitutional right."   28 U.S.C. §2253(c)(2).   To satisfy this burden, the petitioner must show "that a reasonable jurist would find the district court's assessment of the constitutional claims to be debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).   I conclude that Petitioner has failed to make this showing and therefore deny the certificate of appealability.

An appropriate order follows.

---

[40]   Included as Claim XV in the original habeas petition and as Claim XI in Petitioner's Memorandum of Law.